UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
In re: :
: Chapter 11
NEW YORK SKYLINE, INC., :
: Case No. 09-10181 (SMB)
Debtor. :
-------------------------------------------------------------X
EMPIRE STATE BUILDING COMPANY L.L.C. :
and EMPIRE STATE BUILDING, INC., :
:
Plaintiffs, : Adversary Proceeding
:
-against- : Case No. 09-01107 (SMB)
:
NEW YORK SKYLINE, INC. :
:
Defendant. :
-------------------------------------------------------------X
NEW YORK SKYLINE, INC., :
:
Plaintiff, : Adversary Proceeding
:
-against- : Case No. 09-01145 (SMB)
:
EMPIRE STATE BUILDING COMPANY L.L.C., :
EMPIRE STATE BUILDING, INC. and :
EMPIRE STATE BUILDING ASSOCIATES :
L.L.C., :
:
Defendants. :
-------------------------------------------------------------X

**NEW YORK SKYLINE, INC.'S MEMORANDUM OF LAW
IN OPPOSITION TO THE MOTION OF EMPIRE STATE BUILDING L.L.C.,
EMPIRE STATE BUILDING, INC. AND EMPIRE STATE BUILDING
ASSOCIATES, L.L.C. FOR SUMMARY JUDGMENT AND/OR DISMISSAL**

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT……………………………………….. 1

STATEMENT OF FACTS……………………………………………... 6

ARGUMENT……………………………………………………….... 13

    I.      STANDARDS FOR SUMMARY JUDGMENT……………. 13

    II.    ESB IS NOT ENTITLED TO SUMMARY JUDGMENT OR
           DISMISSAL RESPECTING SKYLINE'S CLAIM FOR
           RESCISSION……………………………………………... 14

           A.  Recognized Grounds to Rescind a Contract……………… 14

           B.  Skyline Was Fraudulently Induced to Enter the May 2005
                Agreement by ESB's Promises that It Would Continue to
                Promote the Combination Ticket at the Observatory Ticket
                Offices and Its Promises of Peaceful Co-Existence………. 14

           C.  ESB's Breaches Go to the Root of the Agreement………... 18

           D.  Skyline Acted Promptly in Seeking Rescission…………… 21

           E.  This Court Can Fashion the Appropriate Remedy to Return
                the Parties to the Status Quo……………….……………… 24

    III.   ESB IS NOT ENTITLED TO SUMMARY JUDGMENT
           DISMISSING SKYLINE'S CLAIMS BASED ON ESB'S
           MISINTERPRETATION AND ITS ELECTRICAL
           CONSULTANT'S MISAPPLICATION OF ARTICLE 42 OF
           THE LEASE RESPECTING THE CALCULATION OF
           ELECTRICAL CHARGES……………………………….. 26

CONCLUSION…………………………………………………………. 31

# TABLE OF AUTHORITIES

Page

<u>CASES</u>

*Adams-Mitchell Co. v. Cambridge Distrib. Co.,* 189 F.2d 913 (2d Cir. 1951) ……..    21

*Altman v. New York Board of Trade, Inc.,* 52 A.D.3d 396, 860 N.Y.S.2d 94
(1st Dep't 2008) ……………………………………………………………    21

*Aries Ventures Ltd. v. Axa Finance S.A.,* 729 F. Supp. 289 (S.D.N.Y. 1990) ……..    4

*Babylon Assocs. v. County of Suffolk,* 101 A.D.2d 207, 475 N.Y.S.2d 869
(2d Dep't 1984) ……………………………………………………………    14

*Ballow Brasted O'Brien & Rustin P.C. v. Logan,* 435 F.3d 235 (2d Cir. 2006) …….    21

*Baratta v. Kozlowski,* 94 A.D.2d 454, 464 N.Y.S.2d 803 (2d Dep't 1983) ……….    14

*Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc.,* 98 F.3d 13
(2d Cir. 1996) ………………………………………………………………    16

*Callanan v. Powers,* 199 N.Y. 268, 92 N.E. 747 (1910) …………………………    14, 18

*Canfield v. Reynolds*, 631 F.2d 169 (2d Cir. 1980) …………………………………    18

*Cauff, Lippman & Co. v. Bernstein,* 807 F. Supp. 1007 (S.D.N.Y. 1992) ………….    27

*Channel Master Corp. v. Aluminum Ltd. Sales, Inc.,* 4 N.Y.2d 403,
176 N.Y.S.2d 259, 151 N.E.2d 833 (1958) ………………………………………    3, 15

*Chase v. Columbia Nat'l Corp.,* 832 F. Supp. 654 (S.D.N.Y. 1993) ………………    15

*Committee of Unsecured Creditors of Operation Open City v.
New York State Dep't of State,* 170 B.R. 818 (S.D.N.Y. 1994) ……………………    12

*Compton Advertising, Inc. v. Madison-59th Street Corp.,* 91 Misc. 2d 768,
398 N.Y.S.2d 607 (Sup. N.Y. 1977) ……………………………………………..    28

*Cougar Audio, Inc. v. Reich,* 2000 WL 420546 (S.D.N.Y. Apr. 18, 2000) ………..    16

*D'Amico v. City of New York*, 132 F.3d 145 (2d Cir.), cert. den.,
524 U.S. 911, 118 S. Ct. 2075, 141 L. Ed. 2d 151 (1998) …………………………    13

*Deerfield Comms. Corp. v. Chesebrough-Ponds, Inc.,* 68 N.Y.2d 954,

510 N.Y.S.2d 88, 502 N.E.2d 1003 (1986) …………………………………….. 15, 17

*Fasolino Foods Co. v. Banca Nazionale Del Lavoro,* 761 F. Supp. 1010
(S.D.N.Y. 1991) …………………………………………………………….. 20

*Felix Frank Assocs., Ltd. v. Austin Drugs, Inc.*, 1997 U.S. App. LEXIS 19795
(2d Cir. Apr. 10, 1997) ……………………………………………………….. 18

*Friedman v. Meyers,* 482 F.2d 435 (2d Cir. 1973) ……………………………….. 13

*Gannett Co. v. Register Publishing Co.,* 428 F. Supp. 818 (D. Conn. 1977) ……… 22

*George Becker Management Corp. v. Acme Quilting Co., Inc.,* 46 N.Y.2d 211,
413 N.Y.S.2d 135, 385 N.E.2d 1062 (1978) ……………………………………. 29

*Henkind v. Brauser,* 1989 U.S. Dist. LEXIS 5344 (S.D.N.Y. May 17, 1989) …….. 22

*In re Domestic Fuel Corp.,* 79 B.R. 184 (Bankr. S.D.N.Y. 1987) ………………… 22

*In re S.E. Nichols, Inc.,* 120 B.R. 745 (Bankr. S.D.N.Y. 1990) …………………… 4

*Krantz v. Chateau Stores of Canada, Ltd.,* 256 A.D.2d 186, 683 N.Y.S.2d 24
(1st Dep't 1998) ……………………………………………………………. 15

*L.B. Foster Co. v. America Piles, Inc.*, 138 F.3d 81 (2d Cir. 1998) ……………… 13

*Mackinder v. Schawk, Inc.,* 2005 U.S. Dist. LEXIS, 15880
(S.D.N.Y. Aug. 2, 2005) …………………………………………………… 18

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574,
106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) ……………………………………… 13

*McDarren v. Marvel Entertainment Group, Inc.,* 1994 U.S. Dist. LEXIS 10144
(S.D.N.Y. July 22, 1994) …………………………………………………… 3, 4

*Merrill Lynch & Co., Inc. v. Allegheny Energy, Inc.,* 500 F.3d 171
(2d Cir. 2007) ……………………………………………………………. 15

*Metromedia Fiber Network Servs. v. Lextent, Inc.,* 290 B.R. 487
(Bankr. S.D.N.Y. 2003) ……………………………………………………. 12

*New Paradigm Software Corp. v. New Era of Networks, Inc.,*
107 F. Supp. 2d 325 (S.D.N.Y. 2000) ………………………………………… 19

*Prospect Owners Corp. v. Sandmeyer,* 2009 N.Y. App. LEXIS 4008
(1st Dep't May 26, 2009) …………………………………………………. 20

*Sabo v. Delman,* 3 N.Y.2d 155, 164 N.Y.S.2d 714, 143 N.E.2d 906 (1957) ………. 3, 15, 17

iii

*Spaulding v. Benenati,* 57 N.Y.2d 418, 456 N.Y.S.2d 733, 442 N.E.2d 1244 (1982) ……………………………………………………………………………….  17

*Swann* v. *Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 1, 91 S. Ct. 1267, 28 L. Ed. 2d 554 (1971) …………………………………………………………….  25

*Wall v. CSX Transportation, Inc.,* 471 F.3d 410 (2d Cir. 2006) ……………………  17

*WIT Holding Corp. v. Klein,* 282 A.D.2d 527, 724 N.Y.S.2d 66 (2d Dep't 2001) ………………………………………………………………  14, 17

## TREATISES

Restatement (Second) of Contracts, § 241(a) ……………………………………..  18

Calamari & Perillo, *The Law of Contracts,* § 11-18(a) (3d ed. 1987) ……………..  18

Williston, *On Contracts,* § 63:3, 440-41, n. 34 (4th 3d. 2002) ……………………  18

New York Skyline, Inc. ("Debtor" or "Skyline") respectfully submits this memorandum

of law in opposition to the motion of Empire State Building L.L.C., Empire State Building, Inc.,

and Empire State Building Associates, L.L.C. (collectively, "ESB"), which seeks summary

judgment or dismissal of Skyline's First, Third, Eleventh, Twelfth and Thirteenth Claims for

Relief.[1]

## PRELIMINARY STATEMENT

Discovery reveals that ESB detests Skyline and looks forward to the day when it can

replace Skyline with another tenant in the large, unusually configured space on the second floor

of the Empire State Building that Skyline has occupied since February 1993.  Skyline is a

competitor of ESB for tourist dollars.  Skyline's sales people – ESB disparagingly and

unapologetically refers to them as "hawkers" and "carnies" – are a constant target of ESB's ire.

Skyline's only grace, in ESB's view, is that it, in Anthony Malkin's words, "does pay very

meaningful rent"  and "[ESB does not] have a present program through the BRC observatory

experience for their space."   Once ESB locates another tenant for Skyline's space, ESB will seek

to drive it from the Empire State Building (the "Building").

ESB's purpose in executing the settlement agreement dated May 27, 2005 (the "May

2005 Agreement") was not to resolve bona fide disputes about Skyline's right to use the West

---

[1]   Skyline's First Claim for Relief seeks a declaratory judgment that Skyline is not in default of its lease or license obligations.  Although ESB's brief states in the caption that it seeks dismissal of Skyline's First Claim for Relief, its brief contains no argument respecting this claim.  Nor does ESB's 7056-1 Statement contain facts regarding this claim.  For this reason, ESB has failed to meet the requirement for dismissal under Rules 12(c) or 56 for dismissal or summary judgment.

Escalators, the rights of combination ticket holders to merge into the Observatory line upon exiting Skyride, Skyline's right for its customers to use ESB public bathrooms, or the "change of control" of Skyline. Each of these disputes, as Skyline recognized in May 2005, was bogus. Nonetheless, Skyline saw the May 2005 Agreement as an opportunity "to live in peace, make some money, focus on business as opposed to litigation and all these backbiting and childish issues," in exchange for its payment of additional rent, imposed as fees for security and "access," incepting at $735,000. With the proposed installation of its monitors in the new Observatory ticket area, and as long as ESB abided by its promises to promote Skyline's helicopter simulator (the "Attraction" or "Skyride"), as ESB had done in the past, Skyline's reasonably anticipated increased revenues would more than make up for the additional rent imposed by the May 2005 Agreement. In short, Skyline paid for peace.

What is now evident from discovery is that ESB used the relocation of the Observatory ticket offices as a pretext to raise bogus disputes in order to impose additional fees on a cash-strapped company, force additional controls on Skyline's "hawkers" and strengthen ESB's litigation position once Skyline's business failed. As stated in Anthony Malkin's gloating memorandum to his "negotiating team" upon the conclusion of the May 2005 Agreement:

> we have taken a potential lose/lose of having skyride win unfettered access
> through the lobby in their pre-existing, unprofessional and carnival-like style,
> and turned it into a win/win requiring them to live with serious restrictions and
> limits, protecting the lobby and enforcing etiquette and behavior on skyride,
> requiring them to pay for additional controls and benefits of their position, and
> putting us in a strong position if/when their business ultimately fails to avoid
> being blamed for it.

Stewart Opp. Ex. D. [2]   As another ESB employee put it, ESB had "created a 'silk purse' out of a 'sow's ear.'"  Stewart Opp. Ex. E.

The record reflects that ESB never had any intention to follow up on its promises to support Skyline's business, or to stop harassing it.  For example, ESB consistently has delayed approving Skyline's installation of video monitors in the Observatory ticket office, a critical component of Skyline's business.  It has not allowed Skyline to install important signage.  It has not promoted Skyline's business at the Observatory ticket office.  And it has continued to harass Skyline, causing it to incur repeated legal fees.  Stewart Opp. Exs. DD-PP.  Consequently, as Skyline's lost profits expert has concluded, Skyline's business has suffered damages totaling millions of dollars, all directly traceable to ESB's failure to abide by its promises.  Stewart Opp. Ex. T.  ESB's subversive strategy has led Skyline, a once profitable company, to this Courthouse.  Once ESB's strategy became apparent, Skyline sought to rescind the May 2005 Agreement.  If there ever was a case for applying the equitable remedy of rescission, this is it.

The facts presented here satisfy even the most stringent test for rescission.  Under New York law, "an action for fraud will lie when a promise was actually made with a preconceived and undisclosed intention of not performing it."  *McDarren v. Marvel Entertainment Group, Inc.,* 1994 U.S. Dist. LEXIS 10144, at *14 (S.D.N.Y. July 22, 1994), *citing Sabo v. Delman,* 3 N.Y.2d 155, 164 N.Y.S.2d 714, 143 N.E.2d 906 (1957); *Channel Master Corp. v. Aluminum Ltd. Sales, Inc.,* 4 N.Y.2d 403, 176 N.Y.S.2d 259, 262-63, 151 N.E.2d 833 (1958).  Moreover, "New York

---

[2]  "Stewart Opp. Ex. __" refers to the exhibits attached to the accompanying Certification of Charles A. Stewart, III, dated July 23, 2009, which accompanies Skyline's papers in opposition to ESB's motion for summary judgment and/or to dismissal.

law recognizes a cause of action for fraud in the inducement of a contract distinct from a claim that a party failed to perform the contractual obligations themselves." *McDarren, citing, Aries Ventures Ltd. v. Axa Finance S.A.,* 729 F. Supp. 289, 299 (S.D.N.Y. 1990). If the Court concludes that the May 2005 Agreement resulted from ESB's plan to induce Skyline to settle bogus legal claims in exchange for promises that ESB did not intend to fulfill in order to financially cripple Skyline, the Court has ample grounds to rescind this agreement under New York law.

When the law is applied to the facts and all reasonable inferences are drawn from the record in Skyline's favor, as the law requires, it is clear that ESB is not entitled to any of the relief it seeks via its motion, except with respect to Skyline's Thirteenth Claim for Relief, which Skyline previously advised the Court and ESB's counsel on July 16, 2009 it was no longer pursuing. In the order they appear, ESB's arguments respecting Skyline's rescission claim fail for the following reasons:

1.      Skyline is not seeking partial rescission of the May 2005 Agreement. It is seeking to rescind all aspects of the agreement. The Second Complaint is self-evident on this point (*see* Second Amended Complaint, ¶¶ 123-134), and the Court's resources need not be further diverted in this expedited proceeding by this disingenuous argument of ESB.[3]

2.      If Skyline was fraudulently induced to enter the May 2005 Agreement, the Court may rescind this agreement.

---

[3]  *In re S.E. Nichols, Inc.,* 120 B.R. 745, 747 (Bankr. S.D.N.Y. 1990) is inapposite to any issue in this case. *S.E. Nicholas* involves the debtor's right to affirm or reject an integrated contract under 11 U.S.C. 365. Nor did the debtor argue that the lease it sought to reject was obtained because of the landlord's fraud.

3.      Skyline has alleged, and discovery reflects, that ESB made fraudulent misrepresentations to Skyline that were collateral or extraneous to the May 2005 Agreement. Among these extraneous misrepresentations were ESB's statements that ESB would continue to promote Skyline at its ticket offices, and its assurances about "peace."

4.      ESB's misrepresentations were "material and willful" and went to the root of the parties' agreement.

5.      Under the circumstances, Skyline acted promptly in seeking to rescind the May 2005 Agreement.

6.      The Court is capable of fashioning relief that returns the parties to the status quo.

Likewise, ESB has not demonstrated that either of Skyline's electricity claims should be summarily dismissed. As demonstrated in Skyline's motion for summary judgment on the electrical issue, Article 42 of the Lease, the provision dealing with electricity, is ambiguous. ESB has used this ambiguous lease provision to earn substantial profits from unsuspecting tenants, like Skyline, that pay ESB additional rent for electricity in amounts that are substantially greater than the sums that ESB pays its electricity generators and suppliers for such electricity. ESB acknowledges that the parties have an ongoing dispute about the electrical billing. Moreover, if the Court determines that Skyline is correct, ESB will not be able to rely on the 15-day arbitration provision to curtail Skyline's rights to recover damages for over-payment of both electricity charges and COLA overpayments. Instead, ESB will have to conduct an appropriate survey – one measuring the estimate of Skyline's consumption – before the 15-day period of Article 42 is triggered.

# STATEMENT OF FACTS

For Skyline's Statement of Facts, the Court respectfully is referred to Skyline's Local Rule 7056-1(c) Statement, the Certification of Fredrick Schulman ("Schulman Cert."), dated July 23, 2009, the Certification of Michael Leeb ("Leeb Cert."), dated July 23, 2009, the Certification of Charles A. Stewart, III, dated July 24, 2009, the exhibits attached thereto, as well as the papers accompanying Skyline's initial motion.

## The Parties' Litigious History Prior to May, 2005

The parties' tortured history is spelled out at length in Skyline's Second Amended Complaint and will not be rehearsed here.  (In his accompanying certification, Mr. Leeb, who has been working at Skyride since it began in 1994, confirms the accuracy of the allegations of the complaint.)  Suffice it to say that, in 1996, Skyline was acknowledged in an internal ESB memorandum as having "contributed to the increased visitorship [sic] of the Observatory" and being "a significant asset to our [ESB] organization."  Stewart Opp. Ex. U.   Less than ten years later, ESB, in internal memoranda, refers to Skyline and its personnel as "unprofessional and carnival-like," "not a desirable tenant," "not a real addition to this building" and "in trouble and flailing."  By May, 1995, the parties had been involved in two litigations and numerous business disputes.   In March, 2006, when ESB hired a new general manager, Anthony Malkin made it a point to state:  "Please familiarize yourself with the history of the Skyline tenancy.  There are a number of irregularities with this Skyline.  There is also an extensive litigation history."  Stewart Opp. Ex. W.  It is against this backdrop that the May 2005 Agreement was executed.

## Skyline's Interference with the Cartoon Museum's Tenancy

In or about December 2003, ESB advised Skyline that it desired to sell tickets for a new tenant, the International Museum of Cartoon Art (the "Cartoon Museum"), through its Observatory ticket offices. Nism Ex. M, at ¶ 17.[4]  Because the ESB/Skyline license agreement prohibits ESB from selling tickets to any attraction at the Building other than Skyride, ESB sought a waiver to permit it to sell the Cartoon Museum tickets.  Negotiations between ESB and Skyline lasted almost a year.  *See* Stewart Opp. Ex. Y.  Skyline, however, refused to relinquish its exclusivity rights, notwithstanding ESB negotiation tactics.  Internal ESB memoranda reflects that ESB considered measures as extreme as sending a default notice for alleged Skyline lease violations (Stewart Opp. Ex. W), to offering concessions "that would be of value to NY Skyride in return for their waiving of exclusivity in combo ticket sales."  Stewart Opp. Ex. Z.   Thomas Sullivan, ESB's Director of Leasing, testified that ESB management, including Anthony Malkin and other members of Wein Malkin Properties, the entity that ultimately oversees all ESB operations, participated in regular communications respecting the status of the Skyline/ESB negotiations respecting the waiver issue.  Stewart Opp. Ex. B, Sullivan Dep., 78-84.  When newspaper articles announced that the Cartoon Museum would not be coming to the Empire State Building, Mort Walker, the creator of "Beetle Bailey" and one of the organizers of the museum was quoted in an Associated Press article as stating:  "They [ESB] changed the deal on us … They were going to sell our tickets when they sold tickets to the observation tower.  We

---

[4]  "Nism Ex. __" refers to the exhibits attached to the Affidavit of Francine Nism, sworn to on July 17, 2009, which accompanies ESB's motion for summary judgment and/or dismissal.

were going to split the ticket sales.  They turned around and said they couldn't do it.  They put

our rent at $650,000.  We found that too difficult, so our lease was cancelled."  Stewart Opp. Ex.

AA.  One plausible inference to be drawn from the record is that ESB was deeply displeased that

Skyline had rebuffed its efforts to facilitate the Cartoon Museum's tenancy.

### ESB's Knowledge of Skyline's Financial Condition

Discovery has revealed that ESB personnel tracked Skyline's financial condition for

years.  Thomas Sullivan, for example, testified that he regularly reviewed the public filings of

Skyline Multimedia, Skyline's parent, between 1992 and 2004.  Stewart Opp. Ex. B, Sullivan

Dep., 83:16-84:9.  On November 17, 2004, Mr. Sullivan sent Anthony Malkin an email stating:

"I do not know if you have reviewed Skyrides 10K.  It appears that the individuals who

purchased Skyrides debt last year for pennies on the dollar are now running it into the ground."

Stewart Opp. Ex. X.   On May 11, 2005, while the parties were in litigation, Robert Zorn,

Directory of the Observatory, sent Stephen Tole, ESB's General Manager, an email discussing

Skyline's "financial straits."  Stewart Opp. Ex. BB.  Thomas Keltner, the person selected by ESB

to negotiate the May 2005 Agreement and the trustee of several Malkin Family Trusts, testified

that he had reviewed a financial presentation about Skyline that showed that "Skyline was pretty

thinly capitalized and perhaps skimping a little bit on its operations of its business."  Stewart

Opp. Ex. C, Keltner Dep., 72:25-73:7.   The inference from the record is that ESB was aware, in

May 2005, that Skyline was not able to take on $735,000 in additional expense without a

concomitant increase in revenues.

## ESB's Closure of Immediate Access to Skyride

In April 2005, ESB took the extraordinary step of reversing the direction of the West Escalators so that all escalators ran from the second floor to the lobby, instead of one escalator going up to Skyride and one coming down to the lobby. This step was purportedly taken in conjunction with ESB's relocation of its ticket office from the basement to the second floor. The escalator was Skyline's employees and visitors' primary means of direct access to the Attraction, and the top of the escalator was approximately ten feet from the entrance to Skyride. Following the reconfiguration, Skyline's visitors and employees were forced to begin their journey to Skyride from a couple blocks away, passing through ESB's portion of the second floor on the other side of the Building; customers then had to wait on a long line (for up to several hours) along with all persons waiting to visit the Observatory, and pass through the equivalent of an airport security check, where, finally, they would be able to access Skyride after walking down a long corridor.

On May 2, 2005, Skyline moved by order to show cause to enjoin ESB from reversing the direction of the escalators. Justice Ramos executed this Order to Show Cause, which included TRO provisions prohibiting ESB from blocking ingress to or egress from Skyride via the West Escalators. *See* Nism Ex. N, Order to Show Cause. After Skyline obtained the TRO, in violation of the parties' prior agreement respecting the rights of combination ticket holders, ESB forced customers who had purchased combination tickets to exit the Premises after experiencing Skyride, and re-enter the main entrance line and security check in order to use their previously-

purchased combination ticket to the Observatory. *See* Stewart Opp. Ex. I, Affidavit of Michael Leeb, dated May 18, 2005, at ¶¶ 11-13.[5] This practice dissuaded customers from purchasing combination tickets – a direct violation of ESB's promise to take steps to promote the Attraction. *See* Nism Ex. F, License Modification Agreement. *See also* Stewart Opp. Ex. U. Again, for many years, both ESB and Skyline employees had promoted the Attraction, which included the right of combination ticket holders to merge from Skyline's premises into the Observatory line. Since Skyride opened for business in December 2004, combination ticket holders had always had this right. Skyline 7056-1 Statement, at ¶ 70. After the TRO was issued, ESB put up signs stating that Skyride customers had to return to the beginning of the Observatory line, and further stating that "Anyone Telling You Differently Is Not Telling You The Truth!" *See* Stewart Opp. Ex. I, Leeb 5/18/05 Aff., at ¶ 14. Also coinciding with the relocation of ESBC's ticket counters, ESBC removed signs that had been affixed to the Building's walls at various entrances to the lobby to provide directions for visitors to Skyride.

## **The Settlement**

On May 27, 2007, the parties executed the May 2005 Agreement. From Skyline's perspective, the purpose of the May 2005 settlement was far broader than merely resolving the parties' litigation about the West Escalators. *See, e.g.,* Nism Ex. W, Schulman Dep., 63:4-67:21 ("[W]hen I say the big picture as opposed to the way you described it as a small picture, we were not trying to just resolve this action or these couple of facts, we were trying to resolve what apparently we had inherited as a legacy of tension, of misunderstanding … what can we

---

[5]  Mr. Leeb's May 18, 2005 affidavit was executed but apparently never filed in the 2005 litigation because the parties entered into settlement discussions.

do to now is live in peace, make some money, focus on business as opposed to litigation and all these backbiting and childish issues.  And what can we do to work together that will benefit the building and benefit us and something that could act and work smoothly").  Indeed, Mr. Schulman testified that the May 2005 Agreement did not handle all of the parties' disputes. Stewart Opp. Ex. G, Schulman Dep., 71:13-22.  According to Mr. Schulman, Skyline realized that it was not gaining any "rights" under the May 2005 Agreement:  the access right, the bathroom right, the elevator right, the control right were not bona fide issues but ones that ESB had raised as a pretext, to gain leverage.  See *Id.*, 59:22-68:18.

As discussed above, discovery reveals that ESB had a much different agenda than Skyline in May 2005:  to weaken Skyline financially, gain greater controls over "hawkers" or "carnies," as ESB disparagingly referred to Skyline sales personnel, and cover itself from liability once Skyline's business operations failed.  *See* discussion *supra* at pp. 1-3.  Putting the best pro-ESB spin on the settlement, Thomas Sullivan testified that he thought the May 2005 Agreement was a "win/win" for ESB and that Skyline had "given up way too much for what they had gotten in exchange."  Stewart Opp. Ex. B, Sullivan Dep., 98:9-21, 101:16-23.

## ESB's Continued Harassment of Skyline

As stated in the Second Amended Complaint, since the execution of the May 2005 Agreement, ESB has continued to harass Skyline's business operations, and it has failed to live up to its promises in the May 2005 Agreement or the assurances it made that ESB would continue to promote Skyline, including at the Observatory ticket office.  *See* Second Amended Complaint, ¶¶ 69-114; *see also* Skyline 7056-1 Statement, at ¶¶ 68-86.  ESB has not halted its

aggressive legal tactics, but, if anything, has increased them.  *See* Stewart Opp. Exs. DD-PP.

For example, in a Notice to Cure served in July 2008, ESB asserted that Skyline could not

operate a gift shop, notwithstanding a provision in Skyline's lease expressly permitting it to

operate a gift shop.  For making this frivolous assertion, ESB was sanctioned by Justice

Ramos.[6]  ESB also asserted that Skyline owed it $431,000 for alleged retroactive security costs.

Amended Complaint, ¶83; Stewart Opp. Exs. NN and OO.  ESB subsequently retreated from

this position, but only after threatening legal action on July 25, 2008.  Stewart Opp. Ex. OO.

Faced with another lawsuit, Skyline concluded that it had been fraudulently induced to enter the

May 2005 Agreement.  The inference drawn in Skyline's favor from ESB's refusal to abide by

the basic terms of the May 2005 Agreement designed to enhance Skyline financially – like the

installation of the video monitors, the installation of the directional signs, the promotion of

Skyride at ESB ticket offices – and the continued harassment of Skyline, is that ESB always

desired and devised Skyline to fail.   Again, Skyline's lost profits expert has reviewed the

underlying financial data and concluded that Skyline suffered millions of dollars of damage as a

result of ESB's conduct.  That said, monetary damages are not sufficient, as discussed below.

ESB's breaches are material and willful and go to the heart of the May 2005 Agreement.

---

[6]   To date, ESB has refused to pay this sanction, despite previously stipulating to pay it.  Skyline is entitled to immediate turnover of the monies belonging to Skyline that ESB is holding.  *See Committee of Unsecured Creditors of Operation Open City v. New York State Dep't of State,* 170 B.R. 818, 824-25 (S.D.N.Y. 1994) (affirming order requiring New York State Department of State ("State") to turn over certain disputed funds that State had offset under the contract and holding that, "[b]y withholding money … by way of set-off, the State ran afoul of § 362(a) of the Bankruptcy Code."); *Metromedia Fiber Network Servs. v. Lextent, Inc.,* 290 B.R. 487, 489 (Bankr. S.D.N.Y. 2003) (holding that defendants were required to turnover debtor's property in their possession under 11 U.S.C. 542(b), and rejecting defendants' argument that they need not relinquish control of such property unless and until the debtor provided adequate protection for their security interest).

# ARGUMENT

## I. STANDARDS FOR SUMMARY JUDGMENT

Rule 56 of the Federal Rules of Civil Procedure, made applicable herein through

Bankruptcy Rule 7056, provides that summary judgment is appropriate when "the pleadings,

depositions, answers to interrogatories, and admissions of file, together with the affidavits, if

any, show that there is no genuine issue as to any material fact and that the moving party is

entitled to [summary] judgment as a matter of law." "Summary judgment is appropriate where

there exists no genuine issue of material fact and, based on the undisputed facts, the moving

party is entitled to judgment as a matter of law." *D'Amico v. City of New York*, 132 F.3d 145,

149 (2d Cir.), cert. den., 524 U.S. 911, 118 S. Ct. 2075, 141 L. Ed. 2d 151 (1998). In addressing

a motion for summary judgment, "the court must view the evidence in the light most favorable to

the party against whom summary judgment is sought and must draw all reasonable inferences in

his favor." *L.B. Foster Co. v. America Piles, Inc.*, 138 F.3d 81, 87 (2d Cir. 1998) (citing

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89

L. Ed. 2d 538 (1986)). The Second Circuit has "repeatedly stated that summary judgment is

particularly inappropriate where, as here, it is sought on the basis of 'the inferences which parties

seek to have drawn [as to] questions of motive, intent, and subjective feelings and reactions.'"

*Friedman v. Meyers,* 482 F.2d 435, 439 (2d Cir. 1973).

## II. **ESB IS NOT ENTITLED TO SUMMARY JUDGMENT OR DISMISSAL RESPECTING SKYLINE'S CLAIM FOR RESCISSION**

### A. **Recognized Grounds to Rescind A Contract**

As reflected in the authorities cited by ESB (ESB Br. at 10[7]), New York courts permit a contract to be rescinded: (1) where the contract is the product of a fraudulent misrepresentation; or (2) where the breach of the contract is material and willful, or goes to the root of the contract. Under New York law, "there is no hard and fast rule on the subject of rescission, for the right usually depends on the circumstances of the particular case." *Callanan v. Powers,* 199 N.Y. 268, 92 N.E. 747, 752 (1910). Rescission is permitted where there is fraud, or a breach of the contract so substantial that it defeats the object of the parties in making the contract. *See Babylon Assocs. v. County of Suffolk,* 101 A.D.2d 207, 475 N.Y.S.2d 869, 874 (2d Dep't 1984) (citing *Callanan,* 92 N.E. at 752); *Baratta v. Kozlowski,* 94 A.D.2d 454, 464 N.Y.S.2d 803, 806 (2d Dep't 1983) Viewing all inferences from the record in Skyline's favor, ESB has not demonstrated that Skyline's rescission claims should be summarily dismissed, because there is evidence that Skyline has met each of the above grounds for rescission.

### B. **Skyline Was Fraudulently Induced to Enter the May 2005 Agreement By ESB's Promises That It Would Continue to Promote the Combination Ticket At the Observatory Ticket Offices and Its Promises of Peaceful Co-Existence**

New York specifically recognizes causes of action for fraud in the inducement when the misrepresentation is collateral to the contract it induced. *See WIT Holding Corp. v. Klein,* 282 A.D.2d 527, 528, 724 N.Y.S.2d 66 (2d Dep't 2001) ("[A] misrepresentation of material fact,

---

[7]  "ESB Br. at __" refers to ESB's memorandum of law in support of its motion for summary judgment and/or dismissal.

which is collateral to the contract and serves as an inducement for the contract, is sufficient to sustain a cause of action alleging fraud."); *see also Krantz v. Chateau Stores of Canada, Ltd.,* 256 A.D.2d 186, 187, 683 N.Y.S.2d 24 (1ˢᵗ Dep't 1998); *Chase v. Columbia Nat'l Corp.,* 832 F. Supp. 654 (S.D.N.Y. 1993). New York distinguishes between a promissory statement of what will be done in the future that gives rise only to a breach of contract cause of action and a misrepresentation of a present fact that gives rise to a separate cause of action for fraudulent inducement. *See Merrill Lynch & Co., Inc. v. Allegheny Energy, Inc.,* 500 F.3d 171, 184 (2d Cir. 2007). *See also Deerfield Comms. Corp. v. Chesebrough-Ponds, Inc.,* 68 N.Y.2d 954, 510 N.Y.S.2d 88, 502 N.E.2d 1003 (1986); *Channel Master Corp., supra,* 42 N.Y.2d 403; *Sabo, supra,* 3 N.Y.2d 155.

In *Deerfield,* for example, the defendant, a manufacturer and seller of fragrances, sought a buyer to market its product in approved countries outside the United States. The defendant alleged that the plaintiff assured compliance with the restriction. The purchase order and attached letter of terms between the parties stated that it contained all the terms and conditions relating to the agreement, but omitted reference to the geographical restrictions. Defendants subsequently demanded that plaintiff provide assurance that the product would not be sold in the United States, but plaintiff refused to provide such assurance, stating that there was no geographical restriction in the contract. The Court of Appeals affirmed the Appellate Division's decision, which had affirmed a judgment in favor of the defendant, in which it asserted, among other things, a fraudulent inducement claim that "plaintiff had no intention of abiding by the geographical restrictions orally agreed to." 68 N.Y.2d at 956. The *Deerfield* court held that the fraudulent inducement claim was based on "a representation of present fact, not of future intent,

collateral to, but which was the inducement for the contract, and thus was neither duplicative of the second counterclaim [for breach of contract in violating geographic restrictions on resale allegedly agreed to orally] nor barred by the general merger clause contained in the contract." *Id.* (citations omitted).

If anything, the facts here are stronger than in *Deerfield*, because unlike the contract at issue in *Deerfield,* the May 2005 Agreement contains no integration clause. ESB's collateral promises to continue to promote Skyline's tickets at the Observatory ticket office and halt its harassment of Skyline were extra-contractual promises of present intent that induced Skyline to enter the May 2005 Agreement. Indeed, ESB's collateral promises were the only financial incentives that Skyline – a "pretty thinly capitalized" company in Thomas Keltner's parlance – had for agreeing to take on an additional $735,000 in annual expense and relinquishing license rights. Although it was not apparent, there now is no dispute that ESB never promoted Skyline's tickets at Observatory windows after May 27, 2005, and that it continued to aggressively assert litigious positions, many frivolous, against Skyline after the execution of the May 2005 Agreement. *See* Stewart Opp. Exs. DD-PP (legal notices and correspondence); Second Amended Complaint, ¶¶ 69-114. Moreover, there is an overwhelming amount of evidence demonstrating that ESB's strategy in the agreement was to impose additional fees on a cash-strapped company, force additional controls on Skyline's "hawkers" and strengthen ESB's litigation position once Skyline's business failed.

*Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc.,* 98 F.3d 13 (2d Cir. 1996), *Cougar Audio, Inc. v. Reich,* 2000 WL 420546, *6 (S.D.N.Y. Apr. 18, 2000), and the other seven

cases cited in the block of citations found on pages 11-12 of ESB's brief are inapposite. These cases all involve, unlike here, representations of future intent, such as the defendants' representations that they intended to remit payments to plaintiff which were at issue in *Bridgestone/Firestone,* 98 F.3d at 19. *Compare Wall v. CSX Transportation, Inc.,* 471 F.3d 410, 416 (2d Cir. 2006) (relying on *WIT Holdings,* 282 A.D.2d at 528, *Deerfield,* 68 N.Y.2d at 956, and *Sabo,* 3 N.Y.2d at 160, in holding that plaintiff's "claim for fraudulent inducement is sufficient to survive a motion to dismiss.").

ESB's lengthy discussion respecting the difference between "lack of consideration" and "failure of consideration" (ESB Br. at 12-18) is a puzzling distraction. Skyline acknowledges that New York cases have held that, "[a]bsent a claim of fraud or unconscionability, the adequacy of the consideration is not a proper subject for judicial review." *Spaulding v. Benenati,* 57 N.Y.2d 418, 423, 456 N.Y.S.2d 733, 442 N.E.2d 1244 (1982). Here, however, Skyline charges ESB with fraudulently inducing it to enter the May 2005 Agreement, pursuant to which Skyline forfeited rights under the licensing agreement and agreed to pay hundreds of thousands of dollars *for rights that it always had,* predicated on ESB misrepresentations of present intent. Under these circumstances, the disparity of consideration is a proper issue for the Court to consider when weighing whether or not to rescind the May 2005 Agreement. Certainly, ESB considered the May 2005 Agreement to be a "win/win." Stewart Opp. Ex. D. But for Skyline, it was a "lose/lose" agreement because ESB had no intention to fulfill the economic conditions or halt the harassment.

### C.    ESB's Breaches Go to the Root of the Agreement

The New York Court of Appeals has also stated that rescission may be permitted when a party's breach is "material and willful, or, if not willful, so substantial and fundamental as to strongly tend to defeat the object of the parties in making the contract." *Callanan, supra,* 199 N.Y. at 284.  In New York, a breach is material if it "go[es] to the root of the agreement between the parties," and "is so substantial that it defeats the object of the parties in making the contract." *Felix Frank Assocs., Ltd. v. Austin Drugs, Inc.*, 1997 U.S. App. LEXIS 19795, at *14 (2d Cir. Apr. 10, 1997); s*ee also Canfield v. Reynolds*, 631 F.2d 169, 178 (2d Cir. 1980).  The Court may consider a number of factors in determining whether a party's breach defeats the object of the agreement, including the "special purpose of the contract," *Felix Frank,* 1997 U.S. App. LEXIS 19795, at *14, as well as "the extent to which the injured party will be deprived of the benefit which [it] reasonably expected"; "the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived"; "the extent to which the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances"; and "the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing." *Id.,* citing  Restatement (Second) of Contracts, § 241(a). The material breach of one party relieves, or excuses, the other party from further performance obligations. *Mackinder v. Schawk, Inc.,* 2005 U.S. Dist. LEXIS, 15880, at *23 (S.D.N.Y. Aug. 2, 2005). Court and commentators have stated that the materiality of a breach is ordinarily a question of

fact.  *See Mackinder*, *supra*; Calamari & Perillo, *The Law of Contracts,* § 11-18(a) (3d ed.

1987); Williston, *On Contracts,* § 63:3, 440-41, n. 34 (4th 3d. 2002).

ESB's argument that it has performed, or at least substantially performed, the May 2005

Agreement (ESB Br. at 19), ducks the issue, and *New Paradigm Software Corp. v. New Era of

Networks, Inc.,* 107 F. Supp. 2d 325 (S.D.N.Y. 2000), upon which ESB relies, is inapposite.

Skyline did not enter the May 2005 Agreement so that its customers with combination tickets

could merge into the Observatory line – Skyline already had that right.  And its customers, in

May 2005, had the right to use the public bathrooms.  What Skyline sought, as Fredrick

Schulman explained, and the reason that it agreed to pay an additional $735,000 annually to

ESB, was an opportunity to increase its business in a non-litigious environment. By ESB

continuing, and even increasing, its level of harassment, Skyline's business continued to be

interrupted by ESB's aggressive behavior. Perhaps more importantly, ESB's failure to abide by

its promises that relate directly to Skyline's financial condition – such as ESB's refusal to permit

the installation of the video monitors or directional signage, its failure to promote Skyline's

business at Observatory ticket offices, and its interference with ESB's sales force in the

Observatory ticket office – have caused Skyline's business revenues to continue to plummet.  Far

from gaining the peace and prosperity it sought, and which ESB promised, Skyline has been

brought closer to ruin as a result of ESB's breach of the core components of the May 2005

Agreement.  Unlike the court in *Paradigm,* the Court cannot fairly apply a damage remedy to

remedy wrongs perpetuated by ESB and arising from the May 2005 Agreement.

ESB claims that Skyline had no right to merge into the Observatory line, notwithstanding the fact that it had done so since it began operations in December 2004, because "none of the prior lease or license agreements make any reference to this alleged right to merge." ESB Br. at 18. First, Skyline's right to merge into the Observatory line would not be a right granted by the lease but by its license agreement. Prior license agreements executed by the parties do not preclude Skyline's claim that it has a right to merge. While the 1993 license agreement contains a broad integration clause ("All understandings and agreements heretofore made between the parties hereto are merged into this contract … ") (Nism Ex. B), subsequent license agreements contain much narrower integration clauses. For example, the March 1996 license modification agreement states: "This agreement represents the entire understanding between the parties with respect to the matters addressed herein …" Nism Ex. F. The December 1999 license modification agreement contains no integration clause whatsoever. Nism Ex. H.

*Prospect Owners Corp. v. Sandmeyer,* 2009 N.Y. App. LEXIS 4008 (1st Dep't May 26, 2009) and *Fasolino Foods Co. v. Banca Nazionale Del Lavoro,* 761 F. Supp. 1010 (S.D.N.Y. 1991), cases relied upon by ESB, support Skyline. In *Prospect Owners Corp.,* the First Department affirmed the trial court's decision after a nonjury trial that the defendants' right to use a roof space was pursuant to a license agreement, and not governed by their lease. The trial court, among other things, found that while the plaintiff permitted the defendants to use the roof space, their use was not exclusive and thus created no rights and, accordingly, the cooperative board could revoke the defendants' rights to use the roof space. *Id.,* at **2. Thus, *Prospect Owners Corp.* supports the proposition that Skyline has a license for combination ticket holders to merge into the Observatory line upon exiting Skyride. Unlike the license at issue in *Prospect*

*Owners,* however, Skyline's license for Skyride customers to merge into the Observatory line should be construed to run concurrently with its other lease and license rights, and not be subject to the whim and caprice of ESB to terminate it at will.

In *Fasolino,* the court stated "[a] prior course of dealings between parties is a tool for interpreting existing contract and may not be used to establish contract formation." 761 F. Supp. at 1021, citing Restatement (Second) of Contracts § 223 (1981). Skyline is not seeking to make a new contract. Rather, it argues that the parties' course of dealings over 11 years demonstrates that Skyline's license permits combination ticket holders to merge into the Observatory line upon exiting Skyride.

*Altman v. New York Board of Trade, Inc.,* 52 A.D.3d 396, 860 N.Y.S.2d 94 (1st Dep't 2008), on the other hand, is inapposite. Although the court did state, as ESB notes, that "plaintiffs cannot expand the scope of their rights on the basis of a course of conduct," the court completed the thought by adding "[a]ny such course of conduct plaintiffs allege contradicts the plain language of the NYBOT By-Laws, which make clear that Permit Holders do not have the right to vote on a proposed merger or share in merger proceeds." 52 A.D.3d at 396. In contrast, ESB here has not pointed to any provision of the licensing agreement that makes it clear that all of the parties' agreements respecting licensing issues were embodied in a written agreement.

### D. <u>Skyline Acted Promptly In Seeking Rescission</u>

ESB's argument that Skyline "has not and cannot meet its burden to plead and prove that it acted promptly" because it waited "over three years" to assert a rescission claim misapplies the relevant law. The Second Circuit has emphasized that, when a court sitting in equity considers

the effect of a party's alleged dilatory behavior in the context of a rescission claim, "[e]ach case must stand on its own facts."  *Adams-Mitchell Co. v. Cambridge Distrib. Co.,* 189 F.2d 913, 917 (2d Cir. 1951).  Thus, in *Ballow Brasted O'Brien & Rustin P.C. v. Logan,* 435 F.3d 235 (2d Cir. 2006), the Second Circuit approvingly cited *Gannett Co. v. Register Publishing Co.,* 428 F. Supp. 818, 836 (D. Conn. 1977), for the proposition that "'the passage of time [does not] preclude rescission regardless of the circumstances …'"  435 F.3d at 240.

Applying the Second Circuit "case-by-case" analysis and viewing all inferences in favor of Skyline, Skyline has timely asserted its rescission claim. As Fredrick Schulman testified, it was not until 36 months had elapsed and the parties were once again before Justice Ramos that Skyline concluded that ESB had deliberately prevented the objectives of the May 2005 Agreement from being met because it wanted to terminate Skyline's tenancy.  Nism Ex. W, Schulman Dep., 120:17-121:18.  Throughout this time, Skyline persistently sought to have ESB live up to its promises, but ESB waffled, offering one excuse after another. For example, with respect to the installation of the video monitors, ESB took the position that such installations would be permitted, one day, once the Observatory ticket office was finished. To date, the video monitors remain uninstalled.  Indeed, ESB claims in its motion papers that it has not "breached the May 2005 Agreement in any respect."  ESB Br. at 18.

As ESB concedes, the court in *In re Domestic Fuel Corp.,* 79 B.R. 184, 196 (Bankr. S.D.N.Y. 1987), analyzed the promptness of the notice of rescission in terms of laches and the inequity that might result founded upon some change in the condition or relation of the property or the parties. Certainly, ESB cannot reasonably claim it was prejudiced. *See Henkind v.*

*Brauser,* 1989 U.S. Dist. LEXIS 5344 (S.D.N.Y. May 17, 1989) (holding that laches did not bar rescission claim asserted after four years). Between June, 2005 and July, 2008, Skyline paid almost $3 million to ESB under the May 2005 Agreement. ESB, in return, provided Skyline only the opportunity to conduct itself as it had since December 1994, and the resolution of trumped up "disputes" that ESB recognized were legally bogus.

The "control" issue, for example, first raised by ESB in December 2004 when ESB was pressuring Skyline to waive its exclusivity provision to allow ESB to sell Cartoon Museum tickets, was patently absurd. Not only had ESB know for years of Zalman Silber's departure in April 1998, Skyline continued to be owned by Skyline Multimedia, as it had from its inception. *See* Schulman Cert., ¶¶ 2-7. Indeed, in late 1999, ESB negotiated and settled the 1997 litigation with one of the persons that took over oversight responsibilities of the company. ESB, including security personnel, routinely monitored Skyline from information available on the internet, including its public filings.

The issues respecting the West Escalators and Skyline's customers' entitlement to use the adjacent public bathroom were similarly bogus. The Lease plainly gave Skyline the right to have the West Escalators convey its business invitees to the door of its premises. Skyline 7056-1 Statement, ¶ 26. Skyline's customers always had used the public bathrooms adjacent to Skyline, and, indeed, most of these customers were visitors to the Observatory too. What Skyline paid for was "peace" and the opportunity to be restored to its prior business model. *See* Stewart Op. Ex. T. As reflected in the Second Amended Complaint and in the record, by July 2008, Skyline realized, with ESB's serving a Notice to Cure that Skyline was improperly

operating a gift shop (ESB was sanctioned by Justice Ramos for making this argument) and owed over $300,000 dollars in security charges (ESB later admitted that this assertion was baseless and withdrew it), that the May 25, 2005 Agreement, and ESB's attendant promises and assurances, were a hoax.

## E.  <u>This Court Can Fashion the Appropriate Remedy to Return the Parties to the Status Quo</u>

ESB's argument that it is impossible to return the parties to the position that they were in prior to the execution of the May 2005 Agreement (ESB Br. at 22-24) is without merit.  If the Court denies that Skyline customers had a right to merge from Skyride into the Observatory line, it will determine the amount that Skyline should have paid for this right between May 27, 2005 and the present.  Obviously, the amount that the parties themselves placed on the value of this "right" will assist the Court in its determination.

Similarly, if the Court determines that Skyline had no right to have the West Escalators convey its customers to its front door, the Court will determine the amount Skyline should have paid ESB for this right.  Again, the amount that the parties agreed that Skyline would pay for the security station at the top of the West Escalators is relevant in making this determination.

Putting aside the fact that ESB had not served Skyline with a Notice to Cure in April or May of 2005, the Court may fashion relief affording ESB an opportunity to serve a Notice to Cure and thereafter commence an action respecting such claims as it allegedly believes it had against Skyline in May 2005 that were covered by the releases exchanged between the parties in connection with the rescinded May 2005 Agreement.  ESB does not seriously claim it would be

prejudiced by the delay in prosecuting such claim. Indeed, the limited discovery in this case has focused, in part, on the same issues as ESB would raise in such litigation.

ESB's grant of the "most favored nation" provision in the May 2005 Agreement respecting certain categories of Observatory tickets (*see* Nism Ex. I, ¶ 2(e)), was, in reality, a monetary concession by Skyline. Prior to the May 25, 2005 Agreement, Skyline had "most favored nation" rights respecting its purchase of all Observatory tickets. The May 2005 Agreement eliminated adults as a discounted category, and adults, by far, make up the largest percentage of purchasers of Observatory tickets from Skyride. In any event, the parties' computerized records can easily determine the amount that ESB owes Skyline. Similarly, the testimony of Skyline's and ESB's loss profits experts can assist the Court in determining the amount lost as a result of Skyline having given up its license right to have ESB promote Skyride at Observatory ticket windows.[8]

Courts applying equitable remedies and this Court in particular are capable of fashioning appropriate relief. *See Swann* v. *Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 1, 15, 91 S. Ct. 1267, 28 L. Ed. 2d 554 (1971) ("Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies").

---

[8]  The other "rights" that ESB cites in its brief as having been afforded by it to Skyline under the May 2005 Agreement (ESB Br. at 18-19), like Skyline customers using the bathrooms next to Skyride, are hardly worth addressing. ESB does not allege it incurred any additional expense or burden because Skyride customers used public restrooms and, indeed, most of these customers were also Observatory visitors. Similarly, Skyline's rights respecting placing representatives in the Observatory ticket office and having certain signage were rights it had in prior agreements. Nothing about ESB's relocation of its ticket office would have altered these rights.

**III. ESB IS NOT ENTITLED TO SUMMARY JUDGMENT DISMISSING SKYLINE'S CLAIMS BASED ON ESB'S MISINTERPRETATION AND ITS ELECTRICAL CONSULTANT'S MISAPPLICATION OF ARTICLE 42 OF THE LEASE RESPECTING THE CALCULATION OF ELECTRICAL CHARGES**

As Skyline demonstrated in connection with its motion for summary judgment, Article 42 of the Lease, the provision pursuant to which Skyline pays "additional rent" for electricity on a "rent inclusion basis," is ambiguous. For years, unbeknownst to Skyline and contrary to the representations that ESB made to Skyline at the inception of the Lease that ESB's electrical survey would be an estimate of Skyline's actual "consumption," ESB's electrical consultant has measured Skyline's electricity on the basis of its capacity to consume electricity. Discovery has revealed that ESB has utilized this standard form lease provision to earn substantial profits from unwitting tenants, like Skyline, that pay ESB additional rent for electricity in amounts that are substantially greater than the sums that ESB pays its electricity generators and suppliers for such electricity. ESB's overvaluation of Skyline's electrical usage impacts Skyline's financial position in two ways. First, Skyline is overpaying for its electrical usage on a month-to-month basis. Moreover, because the lease provides for Cost of Living Adjustments ("COLA") with respect to both fixed annual rent and additional rent (i.e., electricity, including periodic adjustments), Skyline is paying, and has paid, periodic COLA based on inflated electrical charges. Skyline's Eleventh and Twelfth Claims for Relief address the electricity issues.

ESB's argument that Skyline has not properly followed the procedure for initiating an arbitration (ESB Br. at 26-27) is without merit. Until the Court determines how Article 42 should be construed, no arbitration can take place. Reasonably construed, the arbitration provision contained in Article 42 reflects that the parties' electrical consultants are adhering to

the same interpretation of the lease – i.e., both consultants are either estimating Skyline's actual consumption of electricity (Skyline's construction of Article 42) or Skyline's capacity for consumption (ESB's construction). Certainly, Article 42 is not intended to empower a third "reputable electrical consultant" (*see* Article 42) with the responsibility of construing the Lease. Colloquially, before the arbitration provision can be triggered, the parties need to be on the same page as to what the Lease requires in terms of the methodology to be employed by the electrical consultants. None of the cases cited on page 27 of ESB's brief involve a remotely similar issue and, accordingly, all are inapposite. Nor can ESB fairly rely on these condition precedent cases, since "the non-performance of the conditions was caused or consented to by itself." *Cauff, Lippman & Co. v. Bernstein,* 807 F. Supp. 1007, 1022-24 (S.D.N.Y. 1992) (allowing claims to go forward for both breach of contract and unjust enrichment).

Skyline's Twelfth Claim for Relief, entitled "Unjust Enrichment" is, in Skyline's view, and as alleged in the Second Amended Complaint, a hybrid claim combining elements of breach of contract (i.e., ESB's measurement of electrical consumption on the basis of capacity to use electricity rather than to estimate actual electrical use) and unjust enrichment (ESB's overall profits made from unsuspecting ERIF tenants to circumvent New York State public policy prohibiting landlords from re-selling electricity). For the reasons expressed in Skyline's motion for summary judgment, which will not be rehearsed here, Skyline contends that its Twelfth Claim for Relief sets forth a claim for breach of contract based on ESB having charged Skyline additional rent based on an electrical survey that measured Skyline's capacity to consume electricity, as opposed to estimating Skyline's actual electrical use. To the extent the Court

believes that Skyline should amend its complaint to re-caption the Twelfth Claim for Relief, Skyline respectfully requests leave to do so.

Skyline also believes that it is entitled to damages from ESB for the unjust enrichment component of its Twelfth Claim for Relief that are unrelated to its contract damage claims, such as its costs in exposing ESB's overall deceptive practices respecting the billing of electricity to ERIF tenants at the Building. As reflected in ESB's insistence that certain electrical information be redacted from public filings in this case even though this very same information has been disseminated to Building tenants in other forms (*see, e.g.,* Stewart Opp. Ex. P, Utilities Research Associates report reflecting monthly electrical costs, including Con Edison and ESCO (i.e., Pepco) costs and associated taxes), ESB's desire is to shield all information from tenants about this issue. Indeed, in other litigations, including lawsuits upon which it relies in its papers here, ESB has refused to produce basic information explaining its ERIF electrical billing.

The unjust enrichment component of Skyline's claim is premised on ESB's violation of Public Service Commission regulation, opinion and order dated July 25, 1951, authorizing and approving Con Edison tariffs filed with the Public Service Commission. That regulation provides: "The Customer may redistribute or furnish electric energy for the use of his (non-residential) tenants or (non-residential) occupants in the building or premises at which the Customer is supplied with electric service under this Service Classification, provided that the Customer shall not resell, make a specific charge for, or remeter (or submeter) or measure any of the electric energy so redistributed or furnished." *See Compton Advertising, Inc. v. Madison-*

*59th Street Corp.,* 91 Misc. 2d 768, 398 N.Y.S.2d 607, 609 (Sup. N.Y. 1977).  As the *Compton*

court explained:

> The purpose of the tariff and the regulation was to bring about the
> discontinuance of the prior practice of submetering and reselling
> current for a profit.  It was an attempt by the PSC and Con. Ed. And
> other utilities to put electric service on the same basis as gas service,
> elevator service, janitor service, heating, hot and cold water,
> refrigeration, interconnecting telephone service and the like.  To the
> extent that such services are furnished by the landlord they are not
> separately charged or billed.  The rent remains the same irrespective
> of the quantity or variation in the amount of such service utilized by
> the tenant.  However, such rent necessarily must cover landlord's
> cost for such services, although they are not separately billed or
> charged.  Escalation clauses are commonly used in commercial
> leases to cover anticipated cost increases in long-term leases.

*Id.*

Although ESB refuses in this case to disclose the profits it makes from the provision of

electricity to ERIF tenants at the Building, discovery reveals that it is substantial and

contravenes New York public policy prohibiting landlords from earning windfall profits from

the resale of electricity.   For a commercial building containing approximately 2.8 million

square feet of commercial space, which is dramatically illuminated during evening hours, total

electric costs are presently only $1.1 million per month, or approximately $.40 for each square

feet of commercial space.  Skyline, in contrast, is paying approximately $12 per square foot for

electricity.  ESB is not renting "electrical wires," it is reselling electricity.

*George Becker Management Corp. v. Acme Quilting Co., Inc.,* 46 N.Y.2d 211, 413

N.Y.S.2d 135, 385 N.E.2d 1062 (1978) offers ESB no protection.  In contrast to the

unambiguous escalation provisions at issue in *George Becker Management,* Article 42 of the

lease is designed to be deliberately ambiguous.  In fact, as demonstrated in Skyline's opening

brief, Thomas Sullivan, Director of Leasing at ESB from 1996 to 2006, believes that the survey

conducted pursuant to Article 42 is designed to estimate the tenant's actual consumption of

electricity.  Electric Meter Co., however, takes the position that Article 42 requires it to measure

a tenant's "capacity for consumption."  Put simply, the deliberate ambiguity of the standard

form language of Article 42 in the document drafted by ESB, combined with the regular

practice of ESB leasing agents, like Thomas Sullivan, to represent that ERIF tenants would pay

for electricity based on an estimate of their actual electricity consumption, reflects a scheme to

generate massive hidden profits for ESB and circumvent New York public policy.  To the extent

that the Court concurs with this proposition after trial, Skyline should be awarded damages for

unjust enrichment.

**CONCLUSION**

For the foregoing reasons, Skyline respectfully requests that the Court deny ESB's

motion for summary judgment and/or dismissal, as well as grant Skyline such other and further

relief as the Court deems just and proper.

Dated:  New York, New York
        July 24, 2009


                Respectfully submitted,

                **STEWART OCCHIPINTI, LLP**


                By:_____/S_____
                     Charles A. Stewart, III (CS 7099)
                     Frank S. Occhipinti (FO 7024)
                65 West 36th Street, 7th Floor
                New York, New York 10018
                Tel.: (212) 239-5500
                Fax:  (212) 239-7030

                *Attorneys for New York Skyline, Inc.*