```
UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
In re:                                          :
                                                :    Chapter 11
NEW YORK SKYLINE, INC.,                         :
                                                :    Case No. 09-10181 (SMB)
                    Debtor.                     :
------------------------------------------------------------X
EMPIRE STATE BUILDING COMPANY L.L.C.            :
and EMPIRE STATE BUILDING, INC.,                :
                                                :
                    Plaintiffs,                 :    Adversary Proceeding
                                                :
    -against-                                   :    Case No. 09-01107 (SMB)
                                                :
NEW YORK SKYLINE, INC.                          :
                                                :
                    Defendant.                  :
------------------------------------------------------------X
NEW YORK SKYLINE, INC.,                         :
                                                :
                    Plaintiff,                  :    Adversary Proceeding
                                                :
    -against-                                   :    Case No. 09-01145 (SMB)
                                                :
EMPIRE STATE BUILDING COMPANY L.L.C.,           :
EMPIRE STATE BUILDING, INC. and                 :
EMPIRE STATE BUILDING ASSOCIATES                :
L.L.C.,                                         :
                                                :
                    Defendants.                 :
------------------------------------------------------------X
```

## **NEW YORK SKYLINE, INC.'S LOCAL RULE 7056.1(c) STATEMENT**

Pursuant to Local Rule 7056.1(c) of the Rules of the United States Bankruptcy Court for the Southern District of New York, New York Skyline, Inc. ("Skyline"), by its attorneys, Stewart Occhipinti, LLP, submits this counterstatement of material facts in response to the Local Rule 7056.1(a) Statement of Empire State Building Company L.L.C., Empire State Building, Inc. and Empire State Building Associates L.L.C. (collectively, "ESB"):

**THE LEASE AND THE LICENSE**

1. Denied in part and admitted in part. Helmsley-Spear, Inc., as agent for Empire State Building Company, was the entity that executed the lease and license agreement. *See* Halligan Exs. F and G.[1]

2. Admitted. Skyline admits that Zalman Silber retained counsel during his negotiations with ESB in connection with the September 26, 1993 lease and license agreements.

3. Admitted.

4. Admitted in part, denied in part. Helmsley-Spear, Inc. as agent for Empire State Building Company, was the entity that executed the license agreement. Skyline admits that, under the February 26, 1993 license agreement, Empire State Building Company (as Licensor) granted, among other things, a license to Skyline (as Licensee) to have tickets to the Attraction (as defined in the license agreement) sold at Licensor's ticket sales counter where tickets to the Observatory are sold; and Skyline respectfully refers the Court to the license agreement, which is attached as Halligan Ex. G for the terms and conditions thereof.

5. Admitted in part, denied in part. Helmsley-Spear, Inc., as agent for Empire State Building Company, executed the lease modification agreement. *See* Halligan Ex. H.

6. Admitted in part, denied in part. Skyline denies that ESBC executed the agreement. *See* Halligan Ex. I (executed by Helmsley-Spear, Inc., as agent for Empire State Building Company). Skyline admits that it is occupying space on the third floor of the Building

---

[1] "Halligan Ex. __" refers to an exhibit attached to the affidavit of Rosemary Halligan, Esq., sworn to on July 15, 2011, which accompanies ESB's motion for summary judgment and/or dismissal.

in which it maintains offices, and that a portion of the premises is used for the operation of the simulator.

7. Admitted in part, denied in part. Skyline denies that ESBC executed the license modification agreement. *See* Halligan Ex. J (executed by Helmsley-Spear, Inc., as agent for Empire State Building Company). Skyline admits that Halligan Ex. K is a true and accurate copy of the license modification agreement that the parties executed.

8. Admitted in part, denied in part. Skyline denies that ESBC executed either the third amendment of lease or the Second Modification of License Agreement, dated December 30, 1999. Each agreement was executed by Helmsley-Spear, Inc., as agent for Empire State Building Company. *See* Halligan Exs. L and M.

9. Admitted in part, denied in part. Skyline admits that ESBC, ESBI and Skyline executed the May 27, 2005 agreement (the "May 2005 Agreement"). However, Skyline denies that the agreement was executed solely as part of a resolution of litigation and bona fide disputes. The complaint filed by Skyline against ESB on or about May 2, 2005 dealt with the issue of ESB's right to block access to Skyline's premises via the escalators located in the southwest corner of the Building that run from the lobby to the second floor of the Building. *See* Schulman Cert. ¶¶ 8-27. Although the May 2005 Agreement dealt with various issues, *see* Halligan Ex. N, from Skyline's perspective the issues raised by ESB during negotiations were bogus and Skyline's objective was to "live in peace, make money, focus on business …". *See* Stewart Ex. E, Schulman Dep. at 65:21-65:22.

10. Admitted.

11. Denied. Paragraph 7(d) of the May 2005 Agreement, Halligan Ex. N, speaks for itself. It states that "All NYSR employees and representatives who work in the NYSR Premises or in any area of or near the Building (including without limitation the Visitor Center) in the course of performing NYSR-related duties ... [m]ust be salaried employees and not working on commission or other sales incentive."

12. Denied. During the negotiations of the May 2005 Agreement, Thomas Keltner, the lone representative negotiating the agreement for ESB, raised the issue of Skyline paying commissions to its ticket agents. In 2005 and previously, an individual Skyline ticket agent was paid, in part, on a per-ticket commission basis (i.e., $1 or $2 per ticket sold). Mr. Keltner stated that ESB was concerned that an agent working for a per-ticket commission was likely to be aggressive because he was immediately incentivized to sell more tickets since his compensation was directly tied to his sales activities and performance. Schuman Cert. ¶¶ 24-26; Threadgill Cert. ¶ 3.

13. Denied. The evidence relied upon by ESB for its assertion that Skyline "immediately" employed independent contractors does not go this far. Mr. Schulman stated that after the execution of the May 2005 Agreement, Skyline looked at the agreement carefully and it said that "we cannot have any of our people selling on a commission basis at or near the building and we were very careful to make sure that is the case." Halligan Ex. S at 57:21-57:24. Mr. Leeb testified (on May 17, 2011) that the independent contractor program began "three years ago, three and a half years ago." Halligan Ex. T at 48:23-49:11. Thus, the program actually began sometime in approximately 2008, hardly "immediately" after the execution of the May 2005 Agreement.

4

14. Admitted.

15. Denied. As Mr. Schulman testified, "we cannot have any of our people selling on a commission basis at or near the building and we were very careful to make sure that is the case." Halligan Ex. S at 57:21-57:24. Similarly, Mr. Leeb testified, "Independent contractors are not permitted to work on any premises which are on the Empire State Building footprint. So any sidewalks surrounding the Empire State Building the independent contractors are not allowed to work there," Halligan Ex. T at 38:7-38:14.

16. Admitted in part, denied in part. Skyline admits that only salaried employees are permitted to work in the Building or on the footprint. This is what the May 2005 Agreement states. *See* Halligan Ex. N at ¶7.

17. Admitted in part, denied in part. Skyline management, in its discretion, may award bonuses if certain company-wide goals, like attendance, are met. An individual employee, however, does not have the ability, through aggressive sales tactics or otherwise, to guarantee his or her right to receive a bonus. Whether employees receive a bonus is dependent on factors that an individual salesperson cannot control, including whether ESB sells Skyline tickets, whether tour operators and travel agents sell group tickets, whether Skyline promotional activities are successful, and whether customers buy tickets through Skyline's web site or at Skyline's box office. Schulman Cert. ¶ 27; Halligan Ex. T (Leeb 40:19-42:23).

18. Denied. Any bonus awarded is discretionary. Moreover, Skyline's attendance figures are built upon sales and promotional activities by a number of persons and entities, including ESB, which also sells Skyline tickets. Skyline's monthly attendance figures are dependant, in addition to tickets sales by ESB and Skyline ticket agents, by group sales (i.e.,

tickets sold through travel agents, tour operators as well as groups that contact Skyline directly); Skyline's internet sales; sales via numerous travel-related internet web sites (such as Expedia, Wiretown, etc.); Skyline advertising in newspapers, brochures, handouts; Skyline promotional activities (e.g., tie-ins with Long Island Railroad, MetroNorth and New Jersey Transit); and direct sales at Skyline's box office at the Empire State Building. Schulman Cert. ¶ 8.

19. Denied. Bonuses awarded are discretionary. Schulman Cert. ¶ 6; Threadgill Cert. ¶ 6.

20. Denied. Skyline's web advertisement from May 19, 2011 states "Starting salary is $27,500 plus bonuses." Halligan Ex. X. However, Skyline also hires independent contractors who work in areas that are not in or near the building, and these individuals are paid commissions. That said, this is a hearsay document, written by a person unknown.

21. Admitted. That said, this is a hearsay document, written by a person unknown.

22. Admitted in part, denied in part. The Empire State Building is net leased by Associates under a master lease (the "Master Lease"), the term of which will expire after all extensions on January 5, 2076. Associates has a direct economic interest in the monies received by ESBC from Plaintiff because the Operating Sublease requires ESBC to pay substantial annual rent to Associates. For the year ended December 31 2007, ESBC paid Overage Rent of $17,025,749. Overage Rent was $18,791,329 for 2006, $16,324,979 for 2005 and $9,469,543 for 2004. The Master Lease obligates Associates, among other things, to pay all real estate taxes and other impositions, to keep the Building insured against casualty loss, general liability, and certain other risks, to comply with all laws, and to keep the Building, including all structural and non-structural components, in good order and condition and make all necessary

repairs, replacements, renewals, alterations, additions and betterments. The Operating Sublease obligates ESBC to satisfy all Associate's obligations under the Master Lease, including real estate taxes, insurance, and property maintenance, but also explicitly preserves Associates' right to perform ESBC's obligations. *See* Operating Sublease, Article 6, annexed to the Malkin Aff as Exhibit "A." The argument that the Operating Sublease "was drafted to insulate Associates from having any right or authority to direct the operations of ESBC" does not find support in the record. In fact, it is directly refuted by the explicit reservation of rights contained in Article 6 of the Operating Sublease. Indeed, Associates' public filings state that Malkin Holdings performs physical inspections of the Building for Associates and collects rent. Stewart Ex. OO, Associates 10-K.

23. Admitted.

24. Admitted in part, denied in part. Malkin Holdings is the Supervisor of ESBC. The record reflects that Anthony and Peter Malkin exercise domination and control over all aspects of the Empire State Building through all of their entities, without giving any thought as to which "hat" they are wearing. *See* Stewart Ex. WW, Malkin Dep. at p. 12:11-12:4; *see also* Stewart Ex. OO, Associate's 10-K at 3, 10. As supervisor for ESBC, Malkin Holdings "basically directs the day-to-day activities of the building in concert with and the permission of ownership." Malkin Dep. at 13:2-13:5. Ownership consists of a number of people but the controlling parties are Anthony Malkin, Peter Malkin, the Chairman of Malkin Holdings and Member of both ESBC and Associates, and the Estate of Leona Helmsley. *Id.* at lines 13:6-13:9. As Anthony Malkin testified, decisions concerning management and operations of the Building are done with the tacit or express agreement of the Helmsley Estate. *Id.* 56:13-56:19, 159:11-159:13.

7

According to Anthony Malkin in some instances, for example, where both he and his father agreed on a point, such as whether or not to renew Skyline's lease at the end of its term, whether or not the Helmsley Estate agrees "does not matter." *Id.* at pp.182:22-183:3. As supervisor for Associates, Malkin Holdings is responsible for "servic[ing] the entity." *Id.* at 57:9-57:12. In newspaper articles, including interviews, the Malkins consistently take credit as owners for all that takes place at the Empire State Building. *See, e.g.,* Stewart Ex. PP. The Malkins' personal attention to all aspects of the operations and events taking place at the Empire State Building runs the gamut, from obtaining the financing needed to perform millions of dollars of repairs and install so-called green energy initiatives, to conducting personal inspections of the Building. *See* Stewart Ex. JJ [Peter Malkin memorandum to Anthony Malkin regarding visitor lines, uniforms for Observatory and Skyline personnel, elevator audio and television, tinted coating on windows, and a union demonstration].

25. Denied. *See* response to paragraph 24 above.

26. Denied. *See* response to paragraph 24 above.

27. Admitted.

28. Denied. As detailed at length in the accompanying memorandum of law, ESB consistently seeks to destroy Skyline's business, including in its most recent efforts. Stewart Ex. RR, Leeb Aff.

29. Skyline has no facts to either admit or deny this fact, which is based on a self-serving statement of Skyline's Director of the Observatory. ESB's actions reflect that, contrary to its statements to this Court, it is seeking to destroy Skyline's business.

8

30. Denied. This is a legal argument, not a statement of fact. In response: *see generally* Skyline's brief in opposition to ESB's motion for summary judgment, including the numerous factual citations contained therein revealing that ESB is, in fact, motivated to destroy Skyline.

31. Denied. As reflected at his deposition, Anthony Malkin harbors nothing but contempt for Skyline, its employees and its operations. Stewart Ex. WW, Malkin Dep. at ¶¶ 67:18-67:25, 69:18-69:23, 71:5-71:15, 80:9-80:19, 83:6-83:7, 114:20-114:21, 115:21-115:24, 129:19-129:21, 155:6-155:10, 156:10-156:14, 182:22-182:25, 192:21-193:4.

32. Skyline has no facts to either admit or deny this fact, which is based on a self-serving statement of Skyline's Director of the Observatory. ESB's actions reflect that, contrary to its statements to this Court, it is seeking to destroy Skyline's business.

33. Admitted in part, denied in part. Anthony Malkin certainly "does not believe Skyline is a premium tenant." The Malkins' actions demonstrate that they want Skyline's business destroyed. Peter Malkin conceded in an internal memorandum to Anthony Malkin: "I know that we may not want Skyline to continue, at least in its present format ..." Stewart Ex. NN.

34. No citation is provided for this assertion, and therefore Skyline is not required to admit or deny it. If a response is required, Skyline admits that it was brought to its attention, as a result of ESB receiving and then losing a document provided by the New York City Fire Department, that it needed to renew its public assembly permit.

35. Admitted.

36. Admitted.

Dated: July 24, 2009

**STEWART OCCHIPINTI, LLP**

By: _____/s/_____
    Charles A. Stewart, III (CS 7099)
    Frank S. Occhipinti (FO 7024)
65 West 36th Street, 7th Floor
New York, New York 10018
(212) 239-5500

*Attorneys for New York Skyline, Inc.*