UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
In re:                                          :
                                                :      Chapter 11
NEW YORK SKYLINE, INC.,                          :
                                                :      Case No. 09-10181 (SMB)
                        Debtor.                  :
-----------------------------------------------------------X
EMPIRE STATE BUILDING COMPANY L.L.C.   :
and EMPIRE STATE BUILDING, INC.,                 :
                                                :
                        Plaintiffs,              :      Adversary Proceeding
                                                :
        -against-                                :      Case No. 09-01107 (SMB)
                                                :
NEW YORK SKYLINE, INC.                           :
                                                :
                        Defendant.               :
-----------------------------------------------------------X
NEW YORK SKYLINE, INC.,                          :
                                                :
                        Plaintiff,               :      Adversary Proceeding
                                                :
        -against-                                :      Case No. 09-01145 (SMB)
                                                :
EMPIRE STATE BUILDING COMPANY L.L.C.,  :
EMPIRE STATE BUILDING, INC. and                  :
EMPIRE STATE BUILDING ASSOCIATES                 :
L.L.C.,                                          :
                                                :
                        Defendants.              :
-----------------------------------------------------------X

**NEW YORK SKYLINE, INC.'S MEMORANDUM OF LAW
IN OPPOSITION TO THE MOTION OF EMPIRE STATE BUILDING L.L.C.,
EMPIRE STATE BUILDING, INC. AND EMPIRE STATE BUILDING
ASSOCIATES, L.L.C. FOR SUMMARY JUDGMENT AND/OR DISMISSAL**

STEWART OCCHIPINTI, LLP
Charles A. Stewart, III (CS 7099)
Frank S. Occhipinti (FO 7204)
65 West 36th Street, 7th Floor
New York, New York 10018
(212) 239-5500

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................. 1

STATEMENT OF FACTS .................................................. 3

    The Long History of ESB's Attacks of Skyline ................................... 3

    ESB Loses the Cartoon Museum's Tenancy and Blames Skyline ............... 3

    ESB's Efforts to Terminate Skyline in 2005 ........................................ 4

    The Settlement ................................................................ 4

    The Negotiation of the Anti-Commission Clause ....................................... 5

    ESB's Continued Harassment of Skyline ................................................ 6

    ESB's Recent Efforts to Destroy Skyline's Business ................................. 7

ARGUMENT ...................................................................10

I.    This Court Should Not Entertain Jurisdiction Over the Non-Core,
Post-Bankruptcy State Common Law Claims Presented By This
Case, As There Are Serious Questions Whether This Court Has
Subject Matter Jurisdiction Over Them In Any Event ............................... 10

    A.    Skyline Has Consistently Taken the Positions That (1) Its
State Court Claims Should be Litigated in State Court, and
Not in This Court, and (2) This Court Should Abstain From
Resolving ESB's Counterclaims ................................................ 10

        1.    The State Action and ESB's Adversary Proceeding ................... 10

        2.    Skyline Has Steadfastly Opposed Removal of the State Action
And the Related Claims Asserted in ESB's Adversary
Complaint ................................................................ 11

        3.    No Bankruptcy Issues Remain in this Case ........................... 13

    B.    The Bankruptcy Court Should Abstain and Send the Adversary
Proceedings Back to State Court to Avoid Protracted Litigation
Over Jurisdictional Issues ...................................................... 14

        1.    The Bankruptcy Court Lacks Subject Matter Jurisdiction ............. 14

2. Following *Stern v Marshall*, The Bankruptcy Court Lacks Authority to Render a Final Judgment Which Will Likely Result In Protracted Wasteful Litigation ............................ 16

II. Appropriate Standards to Apply to ESB's Summary Judgment Motion .......... 20

III. ESB Is Not Entitled To Attorneys' Fees Because It is Not Seeking to Evict Skyline Or Terminate its Tenancy ................................................. 21

IV. ESB Is Not Entitled to Summary Judgment on its Second Counterclaim To Enjoin Skyline From Paying its Employees a Discretionary Bonus ............. 26

    A. New York Rules of Contract Construction ..................................... 27

    B. The Anti-Commission Clause is Ambiguous ..................................... 30

V. Skyline's Cause of Action Seeking Attorneys' Fees for ESB's Breach Of the Covenant of Good Faith and Fair Dealing is Viable ........................... 33

VI. ESB's Motion to Dismiss Skyline's Prima Facie Tort Claim Should Be Denied ............................................................................... 34

VII. There is a Triable Issue of Fact Regarding the Entities on Whose Behalf The Malkins Act ................................................................. 38

CONCLUSION ............................................................................ 42

# TABLE OF AUTHORITIES

Page

Cases

*930 Fifth Ave. Corp. v. King,* 42 N.Y.2d 886, 397 N.Y.S.2d 788,
366 N.E.2d 875 (1977) ............................................................... 21

*936 Second Avenue L.P. v. Second Corporate Dev. Co., Inc.,* 37 A.D.3d 190,
830 N.Y.S.2d 59 (1st Dep't 2007), *reversed on other grounds,* 10 N.Y.3d 628,
861 N.Y.S.2d 256, 891 N.E.2d 289 (2008) ......................................... 24

*Allerand LLC v. 233 East 18th Street Co., L.L.C.,* 19 A.D.3d 275,
798 N.Y.S.2d 399 (1st Dep't 2005) ................................................. 24

*Altieri v. Net Realty Holding Trust,* 237 A.D.2d 551, 655 N.Y.S.2d 984
(2d Dep't 1997) ..................................................................... 25

*American Soc. of Mech. Eng'rs. v. Hydrolevel Corp.,* 456 U.S. 556,
72 L. Ed. 2d 330, 102 S. Ct. 1935 (1982) .......................................... 41

*Bi-Economy Market, Inc. v. Harleysville Ins. Co. of N.Y.,* 10 N.Y.3d 187,
856 N.Y.S.2d 505, 886 N.E.2d 127 (2008) ......................................... 34

*Carolco Pictures, Inc. v. Sirota,* 700 F. Supp. 169 (S.D.N.Y. 1988) ............ 42

*Celotex Corp. v. Catrett,* 477 U.S. 317, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986) .............. 20

*D'Amico v. City of New York,* 132 F.3d 145 (2d Cir.), cert. den., 524 U.S. 911,
118 S. Ct. 2075, 141 L. Ed. 2d 151 (1998) ......................................... 20

*Duane Reade v. 405 Lexington, LLC,* 5 Misc. 3d 1030A, 799 N.Y.S.2d 160
(Sup. N.Y. 2004), *aff'd,* 19 A.D.3d 179, 798 N.Y.S.2d 393 (1st Dep't 2005) .................. 24

*Duane Reade v. Highpoint Assocs. IX, LLC,* 36 A.D.3d 496, 829 N.Y.S.2d 454
(1st Dep't 2007) ..................................................................... 22

*East 55th Street Joint Venture v. Lichtman,* 126 Misc. 2d 1049,
487 N.Y.S.2d 256 (1st Dep't App. Term 1984) ..................................... 24

*Eskimo Pie Corp. v. Whitelawn Dairies, Inc.,* 284 F. Supp. 987 (S.D.N.Y. 1968) ............. 29

*Evans v. Famous Music Corp.,* 1 N.Y.3d 452, 775 N.Y.S.2d 757, 807 N.E.2d 869
(2004) ............................................................................... 31

*Finger Lakes Bottling Co., Inc. v. Coors Brewing Company*, 2010 U.S. Dist. LEXIS 110562 at *8 (S.D.N.Y. 2010) .................................................................. 20

*Fox Film Corp. v. Springer*, 273 N.Y. 434, 8 N.E.2d 23 (1937) .................................. 29

*Frank B. Hall & Co. v. Orient Overseas Assocs.*, 84 A.D.2d 338, 446 N.Y.S.2d 59 (1st Dep't), *aff'd*, 56 N.Y.2d 965, 453 N.Y.S.2d 680, 439 N.E.2d 395 (1982) ................... 22

*Graev v. Graev*, 11 N.Y.3d 262, 869 N.Y.S.2d 866, 898 N.E.2d 909 (2008) ................... 31

*Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 750 N.Y.S.2d 565, 780 N.E.2d 166 (2002) .......................................................................... 27, 29

*Hantz v. Hillman Housing Corp.*, 2011 N.Y. Misc. LEXIS 2678 (Sup. N.Y. County May 31, 2011) .............................................................. 21

*Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73 (2d Cir. 2002) ....................... 33

*Harza Northeast, Inc. v. Lehrer McGovern Bovis, Inc.*, 255 A.D.2d 935, 680 N.Y.S.2d 379 (4th Dep't 1998) ................................................................ 29

*H.L. Klion, Inc. v. Venimore Bldg. Corp.*, 21 A.D.2d 673, 249 N.Y.S.2d 910 (2d Dep't), *mod* 15 N.Y.2d 601, 255 N.Y.S.2d 264, 203 N.E.2d 651 (1964) ................... 23

*Huron Associates, LLC v. 210 E. 86th St. Corp.*, 18 A.D.3d 231, 794 N.Y.S.2d 360 (1st Dep't 2005) ....................................................................................... 25

*In re Bearingpoint*, 2011 WL 2709295 (Bankr. S.D.N.Y. July 11, 2011) ........................ 16 - 20

*In re General Media, Inc.*, 335 B.R. 66 (Bankr. S.D.N.Y. 2005) .................................. 15

*In re Kassover*, 448 B.R. 625 (S.D.N.Y. 2011) ..................................................... 15

*In re Westview 74th St. Drug Corp.*, 59 B.R. 747, 756-757 (Bankr. S.D.N.Y. 1986) ........... 24

*Integretated Sales, Inc. v. Maxwell Corp. of America*, 94 A.D.2d 221, 463 NYS2d 809 (1st Dep't 1983) ............................................................... 28

*L.B. Foster Co. v. America Piles, Inc.*, 138 F.3d 81 (2d Cir. 1998) ............................... 20

*Matsumura v. Benihana Nat'l Corp.*, 2010 U.S. Dist. LEXIS 22366 S.D.N.Y. Mar. 4, 2010) ................................................................................ 30

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) ....................................................... 20

*Matter of A.G. Ship Maintenance Corp. v. Lezak*, 69 NY2d 1, 511 NYS2d 216, 503 NE2d 681 (1986) ................................................................. 22

*Matter of Pan Am. Sch. of Travel Inc.*, 47 B.R. 242 (Bankr.S.D.N.Y.1985) ................... 15

*McCarthy v. American Intern. Group, Inc.*, 283 F.3d 121 (2d Cir. 2002) ...................... 30

*MG Ref. & Mktg., Inc. v. Knight Enters., Inc.*, 25 F. Supp. 2d 175 (S.D..N.Y. 1998) .......... 29

*M. O'Neil Supply Co. v. Petroleum Heat & Power Co.*, 280 N.Y.50, 19 N.E.2d 676 (1939) ................................................................ 29

*Nationwide Tarps, Inc. v. Midwest Canvas*, 228 F. Supp. 2d 202 (N.D.N.Y. 2002) .......... 37

*Norma Reynolds Realty Inc. v. Edelman*, 29 A.D.3d 969, 817 N.Y.S.2d 85 (2d Dept 2006) ..................................................................... 29

*Novak v. Scarborough Alliance Corp.*, 481 F. Supp. 2d 289 (S.D.N.Y. 2007) ................. 41

*Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182 (2d Cir. 1996) ................... 29

*O'Connell v. 1205-15 First Ave. Assoc., LLC*, 28 A.D.3d 233, 813 N.Y.S.2d 378 (1st Dep't 2006) ................................................................. 21

*Palmieri v. Allstate Ins. Co.*, 445 F.3d 179, 187 (2d Cir. 2006) .............................. 28

*Panasia Estates, Inc. v. Hudson Ins. Co.*, 10 N.Y.3d 200, 856 N.Y.S.2d 513, 886 N.E.2d 135 (2008) .............................................................. 34

*Portside v. Gigabeam*, 557 F. Supp. 2d 427 (S.D.N.Y. 2008) ................................. 28

*REP A8 LLC v. Aventura Technologies, Inc.*, 68 A.D.3d 1087, 893 N.Y.S.2d 83 (2d Dep't 2009) ................................................................. 25

*Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59 (2d Cir. 2000) ................................. 30

*Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091 (2d. Cir. 1993) ................................................................... 28

*Seiden Associates, Inc. v. ANC Holdings, Inc.*, 959 F.2d 425 (2d Cir. 1992) ................. 28

*Sheets v. Sheets*, 22 A.D.2d 176, 254 N.Y.S.2d 320 (1st Dep't 1964) ......................... 27

*Siradas v. Chase Lincoln First Bank, N.A.*, 1999 WL 787658 (S.D.N.Y. Sept. 30, 1999) .......................................................... 33

*Solow v. Stone*, 994. F. Supp 173 (S.D.N.Y. 1998), *aff'd*, 163 F. 3d. 151
(2d Cir. 1998) ..................................................................... 41

*Space Imaging Eur., Ltd. v. Space Imaging L.P.,* 38 F. Supp. 2d 326 (S.D.N.Y. 1999) ......... 29

*State v. Home Indem. Co.,* 66 N.Y.2d 669, 495 N.Y.S.2d 969, 486 N.E.2d 827 (1985) ....... 29

*Stern v Marshall*, 564 U.S.___, 2011, WL 2472792 (June 23, 2011) ........................... 16

*Sun Mei Inc. v. Chen*, 21 A.D.3d 265, 800 N.Y.S.2d 133, 134 (1st Dep't 2005) ............... 25

*Sutton v. East River Sav. Bank*, 55 N.Y.2d 550, 435 N.E.2d 1075,
450 N.Y.S.2d 460 (1982) .......................................................... 28

*TAG 380, LLC v. ComMet 380, Inc.,* 10 N.Y.3d 507, 890 N.E.2d 195 (2008) .................. 25

*Tokio Marine & Fire Ins. Co. v. McDonnell Douglas Corp.*, 617 F.2d 936
(2d Cir. 1980) ................................................................... 28

*Townsquare Media, Inc. v. Brill*, ___ F.3d ___, 2011 WL 2906162
(7th Cir. July 21, 2011) ........................................................... 16

*Trump-Equitable Fifth Ave. Co. v. H.R.H. Construction Corp.*, 106 A.D.2d 242,
485 N.Y.S.2d 65 (1st Dep't), aff'd., 66 N.Y.2d 779, 497 NYS2d 369,
488 N.E.2d 115 (1985) ............................................................ 27

*Trusthouse Forte, Inc. v. 795 Fifth Ave. Corp.*, 1985 U.S. Dist. LEXIS 19474
(S.D.N.Y. May 28, 1985) .......................................................... 22

*United States ex rel. Evergreen Pipeline Constr. Co. v. Merritt Meridian
Constr. Corp.*, 95 F.3d 153, 161 (2d Cir. 1996) ....................................... 35

*Walk-In Medical Centers, Inc. v. Breuer Capital Corp.*, 818 F.2d 260 (2d Cir. 1987) ......... 28, 22

*W.W.W. Assoc., v. Giancontieri*, 77 N.Y.2d 157, 565 N.Y.S.2d 440,
566 N.E.2d 639 (1990) ............................................................ 22

# PRELIMINARY STATEMENT

For the reasons expressed below, Skyline respectfully submits that the Court should abstain from any further involvement in this landlord/tenant dispute and return the matter to state court. However, in the event the Court continues to exercise jurisdiction over the parties' dispute, it should deny ESB's motion for summary judgment in its entirety.

Under New York law, ESB is not entitled to attorneys' fees with respect to any of the counterclaims it asserted in the action Skyline originally filed in state court, and the only claims it could arguably claim to recover attorney' fees, have been resolved. In any event, ESB is not seeking to dispossess or evict Skyline, and the disputes do not involve substantial obligations of the lease. Therefore, the attorneys' fee provision is inapplicable.

Nor is ESB entitled to summary judgment regarding its strained construction of the sentence it drafted in the protocol provision of the May 2005 Agreement regarding compensation of Skyline employees or representatives (hereinafter, the "anti-commission clause"). In 2005, Skyline compensated ticket agents by paying per-ticket commissions. The anti-commission clause was intended to abolish that practice, and nothing more. The May 2005 Agreement does not say that Skyline may only pay employees a set salary. It does not prevent Skyline from paying a discretionary bonus based on achievement of company milestones that reflect the activities of numerous persons and entities, both in and outside of Skyline, including ESB itself.

Skyline's claims for consequential damages to recover legal fees and costs as a result of the baseless actions that ESB has commenced is authorized under New York law.

There are triable issues of fact regarding ESB's motivation in seeking to put Skyline out of business. Indeed, as discussed below, shortly after Skyline emerged from bankruptcy, ESB unleashed its latest effort to terminate Skyline by enlisting the City and the New York City

Police Department to arrest and ticket Skyline ticket agents for selling tickets. ESB's effort to disguise its true intent to destroy Skyline by arguing that it hates Skyline but loves its rent is belied by ESB's hostile actions.

Finally, there are triable issues of fact as to what entity or entities the Malkins are acting through or for when they authorize the acts of harassment to which Skyline is subjected by ESB.

## STATEMENT OF FACTS

For Skyline's Statement of Facts, the Court respectfully is referred to Skyline's Local Rule 7056-1(c) Statement, the Certification of Fredrick Schulman ("Schulman Cert."), dated August 19, 2011, the Certification of Walter Threadgill ("Threadgill Cert."), dated August 18, 2011, the Certification of Charles A. Stewart, III ("Stewart Cert."), dated August 19, 2011, the exhibits attached thereto, and the prior proceedings and pleadings in this matter.

### The Long History of ESB's Attacks on Skyline

The parties' tortured history is spelled out at length in Skyline's Third Amended Complaint and will not be rehearsed here. *See generally* Halligan Ex. C,[1] Third Amended Complaint. In March, 2006, when ESB hired a new general manager, Anthony Malkin made it a point to state: "Please familiarize yourself with the history of the Skyline tenancy. There are a number of irregularities with this Skyline. There is also an extensive litigation history." Stewart Ex. L.

### ESB Loses Cartoon Museum Tenancy and Blames Skyline

It is difficult to determine when exactly the frictions between ESB and Skyline impelled the Malkin family to work towards driving Skyline out of business. However, the genesis

---

[1] "Halligan Ex. __" refers to exhibits attached to the Affidavit of Rosemarie Halligan, which accompanied ESB's motion.

appears to involve ESB's unsuccessful efforts to bring the International Museum of Cartoon Art (the "Cartoon Museum") to the Building. In or about December 2003, the Malkins advised Skyline that ESB wanted to sell tickets for a new proposed tenant, the Cartoon Museum, through its Observatory ticket offices. Because the ESB/Skyline license agreement prohibits ESB from selling tickets to any attraction at the Building other than Skyride, ESB sought a waiver to permit it to sell the Cartoon Museum tickets. Negotiations between ESB and Skyline lasted almost a year. *See* Stewart Exs. N-P. Skyline, however, refused to relinquish its exclusivity rights, notwithstanding ESB negotiation tactics. Internal ESB memoranda reflects that ESB considered measures as extreme as sending a default notice for alleged Skyline lease violations (Stewart Ex. M), to offering concessions "that would be of value to NY Skyride in return for their waiving of exclusivity in combo ticket sales." Stewart Ex. O. Thomas Sullivan, ESB's Director of Leasing, testified that ESB management, including Anthony Malkin and other members of Wein Malkin Properties, the entity that ultimately oversees all ESB operations, participated in regular communications respecting the status of the Skyline/ESB negotiations respecting the waiver issue. Stewart Ex. A, Sullivan Dep., 78-84. When newspaper articles announced that the Cartoon Museum would not be coming to the Empire State Building, Mort Walker, the creator of "Beetle Bailey" and one of the organizers of the museum was quoted in an Associated Press article as stating: "They [Malkins] changed the deal on us ... They were going to sell our tickets when they sold tickets to the observation tower. We were going to split the ticket sales. They turned around and said they couldn't do it. They put our rent at $650,000. We found that too difficult, so our lease was cancelled." Stewart Ex. P. Shortly following the collapse of the Cartoon Museum deal, ESB began aggressive efforts to severely cripple Skyline's business.

3

## ESB's Efforts to Terminate Skyline in 2005

In April 2005, ESB took the extraordinary step of effectively blocking customers from entering Skyline's front door by reversing the direction of the west escalators. On May 2, 2005, Skyline moved by order to show cause to enjoin ESB from reversing the direction of the escalators. Justice Ramos executed this Order to Show Cause, which included TRO provisions prohibiting ESB from blocking ingress to or egress from Skyride via the West Escalators. After Skyline obtained the TRO, ESB forced customers who had purchased combination tickets to exit the Premises after experiencing Skyride, and re-enter the main entrance line and security check in order to use their previously-purchased combination ticket to the Observatory. *See* Stewart Ex. F, Leeb Aff. ¶¶ 11-13. This practice dissuaded customers from purchasing combination tickets – a direct violation of ESB's promise to take steps to promote the Attraction. After the TRO was issued, ESB put up signs stating that Skyride customers had to return to the beginning of the Observatory line, and further stating that "Anyone Telling You Differently Is Not Telling You The Truth!" *Id.* ¶ 14.

## The Settlement

On May 27, 2005, the parties executed the May 2005 Agreement. Although Skyline's purpose in the agreement was to purchase "peace" in light of ESB's history of litigious conduct,[2] ESB had a much different agenda: to further weaken Skyline financially, gain greater controls over Skyline ticket agents, and cover itself from liability once Skyline's business operations failed. As Anthony Malkin gleefully expressed in a memorandum to his "negotiating team" upon the conclusion of the May 2005 Agreement:

---

[2] Skyline's rationale for entering the May 2005 Agreement is set forth in the depositions of Mr. Schulman and Mr. Threadgill. *See* Stewart Exs. E [Schulman] and I [Threadgill].

we have taken a potential lose/lose of having skyride win unfettered access through the lobby in their pre-existing, unprofessional and carnival-like style, and turned it into a win/win requiring them to live with serious restrictions and limits, protecting the lobby and enforcing etiquette and behavior on skyride, requiring them to pay for additional controls and benefits of their position, and putting us in a strong position if/when their business ultimately fails to avoid being blamed for it.

Stewart Ex. C. As another ESB employee put it, ESB had "created a 'silk purse' out of a 'sow's ear.'" Stewart Ex. D.

By 2005, ESB was well aware of Skyline's precarious financial position. ESB has been monitoring Skyline's financial condition for years. Thomas Sullivan, for example, testified that he regularly reviewed the public filings of Skyline Multimedia, Skyline's parent, between 1992 and 2004. Stewart Ex. A, Sullivan Dep., 83:16-84:9. On November 17, 2004, Mr. Sullivan sent Anthony Malkin an email stating: "I do not know if you have reviewed Skyrides 10K. It appears that the individuals who purchased Skyrides debt last year for pennies on the dollar are now running it into the ground." Stewart Ex. M. On May 11, 2005, while the parties were in litigation, Robert Zorn, Directory of the Observatory, sent Stephen Tole, ESB's General Manager, an email discussing Skyline's "financial straits." Stewart Ex. Q. Thomas Keltner, the person selected by ESB to negotiate the May 2005 Agreement and the trustee of several Malkin Family Trusts, testified that he had reviewed a financial presentation about Skyline that showed that "Skyline was pretty thinly capitalized and perhaps skimping a little bit on its operations of its business." Stewart Opp. Ex. B, Keltner Dep., 72:25-73:7. ESB was also very active in Skyline's bankruptcy proceeding and poured over Skyline's financial information.

### The Negotiation of the Anti-Commission Clause

During the negotiations of the May 2005 Agreement, Thomas Keltner, General Counsel for Wein Malkin, raised the issue of the manner in which Skyline compensated its ticket agents.

At the time, a Skyline ticket agent was paid a salary plus a $1 or $2 commission per-ticket. Mr. Keltner explained that ESB was concerned that this commission structure could cause a individual ticket agent to employ aggressive sales techniques, because his compensation was directly tied to the number of tickets he sold. Although Skyline representatives disputed Mr. Keltner's rationale, they subsequently agreed to forfeit the per-ticket commission structure then used by Skyline. They did not agree to forfeit Skyline's right to award discretionary bonuses based on the company achieving attendance milestones. *See* Schulman Cert. ¶¶ 20-24; Threadgill Cert. ¶ 3.

### ESB's Continued Harassment of Skyline

After the execution of the May 2005 Agreement, ESB continued to harass Skyline's business operations, and it has failed to live up to its promises in the May 2005 Agreement. *See* Halligan Ex. C, Third Amended Complaint, ¶¶ 69-114. ESB has not halted its aggressive legal tactics, but, if anything, has increased them. *See* Stewart Exs. G, H and S-EE. For example, it issued a $33,000 default notice based on rent that it knew was not owing. Stewart Ex. KK. In a Notice to Cure served in July 2008, ESB asserted that Skyline could not operate a gift shop, notwithstanding a provision in Skyline's lease expressly permitting it to operate a gift shop. Stewart Ex. RR, Leeb Aff. ¶ 15. For making this false assertion, ESB was sanctioned by Justice Ramos.[3] *Id.* ESB also asserted that Skyline owed it $431,000 for alleged retroactive security costs. Third Amended Complaint, ¶83; Stewart Exs. CC and DD. ESB subsequently retreated from this position, but only after it threatened legal action on July 25, 2008 and causing Skyline's management to waste time, energy and resources on a baseless legal claim instead of focusing on Skyline's business. Stewart Ex. DD. Perhaps most incredibly, Skyline recently

---

[3] To date, ESB has refused to pay this sanction, despite previously stipulating to pay it.

learned through discovery in this action that ESB had a "Confidential Informant" within Skyline's ranks.  Stewart Ex. LL.

### ESB's Recent Efforts to Destroy Skyline's Business

Virtually at the end of the discovery cut-off in this case, ESB's most recent efforts to halt Skyline's business came to light.  For approximately eight weeks, until Skyline obtained a temporary restraining order, the New York City Police Department – at the behest of ESB – issued more than a dozen notices of violations and summonses and arrested at least six Skyline ticket agents.  The City's only basis for its actions was a novel, entirely indefensible interpretation of Section 20-453 of the New York City Administrative Code, which penalizes "general vendors" for selling "goods and services" at a particular streets location when they lack a license to conduct sales activities at such location.  Of course, Skyline does no such thing.  Unlike a food cart or handbag stand, its ticket agents do not set up shop at any particular locations.  Rather, its agents are itinerant promoters who roam a several-block radius in the vicinity of the Empire State Building, speak with the public about Skyride, and sell admission tickets to the "Skyride experience" via a hand-held device. Skyline therefore is not a general vendor under the statute.

As a result of the summonses and arrests, Skyline was in grave danger of being put out of business entirely.  Stewart Ex. RR, Leeb Aff. ¶¶ 12, 18. Skyline, however, obtained a TRO, which has been extended.  Based on the prior court proceedings, it anticipates that it will prevail and that Section 20-453 will be determined to be inapplicable to the actions of Skyline ticket agents.

The final depositions of ESB employees, including those of Jean-Yves Ghazi, the Director of the Observatory, and Donald O'Donnell, the current Head of Security, revealed that

7

the steps to try and end Skyline's business by enlisting the City and NYPD to issue summonses and make arrests of Skyline agents was hatched at meetings at the Empire State Building and the office of Malkin Holdings. Stewart Ex. VV, Ghazi Dep. at 60:10-66:17; Stewart Ex. UU, Donnell Dep. at 25:14-31:10, 80:12-80:21. Following these meetings at ESB offices, on April 15, 2011, NYPD Inspector Dennis DeQuatro announced to Skyline representatives and others that the NYPD had decided to begin taking action against Skyline agents who offer to sell or sell admission tickets on the street – an activity in which Skyline has engaged for years in an open and public fashion without a single ticket or summons. In fact, prior to April 15, 2011, NYPD police officers stationed at the Empire State Building supported Skyline's sales by directing pedestrians to Skyline ticket agents, and these officers considered Skyline ticket agents to be "polite." Stewart Ex. FF.

On April 26, 2011, Skyline's ticket agents began receiving tickets from NYPD for violating Section 20-453. This enforcement regime resulted in a series of notices of violation and criminal summonses – including handcuffed arrests. On multiple occasions, the charging officer told Skyline representatives that he was enforcing the statute against Skyline agents at the behest of individuals at the Empire State Building.[4] *See* Stewart Ex. XX, Harris Aff. ¶¶13-15. On April 27, 2011, for example, Officer Hernandez of the Midtown South Precinct revealed to Skyline ticket agent, Luis Cosme, that the CEO of the Empire State Building had told NYPD to cite all Skyline ticket agents selling tickets in front of the building. In addition, on June 7, 2011, a day on which two Skyline tickets were arrested for selling tickets, Skyline's Director of Operations spoke with Police Officer Carney, who stated, "Listen, we never used to do this, but a big shot from your building is constantly making phone calls to our boss and now we have to

---

[4] ESB's documents reflect the fact that it has contacts within the NYPD. *See* Stewart Ex. GG.

do this." *Id.* ¶ 15; *see also* Stewart Ex. QQ, Peton Aff. ¶ 8. On a separate occasion, Officer Asciolla – a beat officer assigned to the Empire State Building – explained to a Skyline representative that he was issuing a summons at the instruction of an individual at the Empire State Building. *Id.* ¶ 13. The same officer had earlier confiscated building passes from two Skyline representatives and handed them over to Empire State Building personnel. Stewart Ex. SS, Calderon Aff. ¶¶ 4-6.

To protect its ticket agents from criminal prosecution, Skyline was forced to alter its business model in ways that eroded its customer base and caused its revenue to drop dramatically. Stewart Ex. RR, Leeb Aff. ¶ 18. ESB, which was an active participant in Skyline's bankruptcy proceedings, as this Court is aware, must have recognized that, having just emerged from bankruptcy reorganization in February 2011, Skyline was particularly vulnerable to a loss of customers and revenue. To make matters worse, in addition to having to alter its business model and suffering the rapid and significant deterioration of its business, Skyline faced the prospect of ESB using the alleged "illegality" of Skyline's sales activities as a pretext to evict it from the Building. Only after Skyline incurred hundreds of thousands of dollars in legal costs and suffered almost $400 thousand dollars in lost sales (*see* Schuman Cert. ¶¶ 33-34) was it able to put a stop to ESB's latest scheme to drive it out of business.

The inference drawn in Skyline's favor from ESB's continuous acts of hostility against Skyline, including its recent enlisting of the City and NYPD to ticket and arrest Skyline ticket agents, as well as its refusal to abide by those terms of the May 2005 Agreement designed to enhance Skyline financially – like the installation of the video monitors, the installation of the directional signs and the interference with Skyline ticket agents – is that ESB always desires

and devises for Skyline to fail. ESB's argument that it does not want Skyline to fail because it

appreciates Skyline's rent is belied by its actions seeking to put Skyline out of business.

## ARGUMENT

I.   **THIS COURT SHOULD NOT ENTERTAIN JURISDICTION OVER THE NON-CORE, POST-BANKRUPTCY STATE COMMON LAW CLAIMS PRESENTED BY THIS CASE, AS THERE ARE SERIOUS QUESTIONS WHETHER THIS COURT HAS SUBJECT MATTER JURISDICTION OVER THEM IN ANY EVENT[5]**

    A.   **Skyline Has Consistently Taken the Positions that (1) Its State Court Claims Should be Litigated in State Court, and Not in This Court, and (2) This Court Should Abstain From Resolving ESB's Counterclaims**

        1.   **The State Action and ESB's Adversary Proceeding**

This dispute is fundamentally a landlord/tenant dispute concerning commercial property

in Manhattan. On July 31, 2008, more than five months before the inception of this bankruptcy

proceeding, and continuing a long line of steps designed to threaten and harass Skyline, ESB

delivered a Notice to Cure threatening to terminate the Lease unless Skyline, among other things,

shut down the gift shop it had operated for 15 years with ESB's approval pursuant to a written

agreement. Thereafter, on August 18, 2008, Skyline commenced this action in New York State

Supreme Court seeking, among other things, a declaratory judgment that ESB could not

terminate Skyline's lease based on the defaults alleged in the July 31, 2008 Notice to Cure. The

Honorable Charles Ramos, the same Justice that had overseen the parties' state court litigation in

2005, entered a temporary restraining order preventing ESB from acting on the alleged defaults

to terminate the Lease. On September 19, 2008, Skyline filed an amended complaint in which it

continued to seek a declaratory judgment that ESB could not terminate the Lease based on the

---

[5]   Skyline has included this section of the brief in furtherance of the issues it raised in its letters to the Court dated August 5 and 17, 2011, and pursuant to the Memorandum Endorsement and Order, dated August 8, 2011.

alleged defaults described in the Notice of Default, but it also added additional claims for damages, including tort claims.

On September 23, 2008, the parties entered into a stipulation and order in which they agreed that ESB would withdraw the Notice to Cure and pay Skyline the sum of $2,500 (relating to sanctions awarded by Justice Ramos) before it served a new Notice to Cure and established a briefing schedule. ESB never served another Notice to Cure and never paid the $2,500 sanction.

On or about January 12, 2009, Skyline filed its petition for relief under Chapter 11. On or about March 4, 2009, ESB commenced an adversary proceeding in Skyline's bankruptcy proceeding, asserting claims under the Lease that should have been filed in the State Action. Skyline then moved by order to show cause for leave to file an amended complaint in the State Action and to further expedite the conclusion of discovery in that matter. Justice Ramos set April 7, 2009 as the return date for Skyline's motion. On March 30, 2008, ESB removed the State Action to the United States District Court for the Southern District of New York.

### 2. Skyline Has Steadfastly Opposed Removal of the State Action and the Related Claims Asserted in ESB's Adversary Complaint

Since ESB's removal was nothing more than an effort to oust the state court of jurisdiction over common law claims, on April 2, 2008, Skyline moved for an order for this Court to abstain from adjudicating the ESB Adversary Proceeding in favor of allowing the parties' landlord/tenant dispute to be resolved in the State Action. Skyline argued that, under 28 U.S.C. § 1334(c)(2), "a bankruptcy court must abstain from a noncore proceeding if, as here, 'an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction.'" Skyline Abstention Br. at 17. Skyline also subsequently moved to remand the State Action that ESB had removed to this Court. In its papers, Skyline took the position (in contrast to ESB's

11

position) that the claims asserted in both the Adversary Proceeding and the State Action were non-core and should be resolved by a state court. For example, Skyline asserted:

> First, notwithstanding ESB's allegation to the contrary, the Adversary Proceeding is a "noncore" proceeding and mandatory abstention is required because each of the six factors listed in 28 U.S.C. § 1334(c)(2) is present.

Skyline Abstention Brief, at 2.

Moreover, Skyline noted that a significant discretionary factor which favored remanding the State Action was Skyline's entitlement to a jury trial for some of its claims. *Id.* at 24. On April 28, 2009, this Court denied Skyline's motions at oral argument. Thereafter, Skyline filed Second and Third Amended Complaints; however, it never unilaterally conceded that its claims, or ESB's counterclaims, were "core." Rather, it based its allegations of jurisdiction on the order of this Court: "For the reasons articulated by the Hon. Stuart M. Bernstein on April 28, 2009 in connection with the denial of Skyline's motion to remand, the causes of action alleged in this Complaint are 'core' matters pursuant to 28 U.S.C. § 157(b)(2)." *See* Halligan Ex. C, Third Amended Complaint, ¶ 26. Further, in response to ESB's allegations of jurisdiction in its Counterclaim, Skyline denied knowledge (as the allegations called for legal conclusions) whether the matters asserted therein were "'core' matters pursuant to 28 U.S.C. § 157(b)(2)(A), (B) and (O), among others" as follows: "Inasmuch as the allegations of paragraph 270 of ESB's Answer and Counterclaims allege legal conclusions, as opposed to factual allegations, denies that a response is necessary; but if a response is deemed necessary, denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 270." Stewart Ex. YY, Skyline Answer to ESB Counterclaims, ¶ 10.

12

### 3. <u>No Bankruptcy Issues Remain In This Case</u>

Skyline has long since successfully emerged from bankruptcy under a new capital structure. None of the issues to be tried will have any impact on Skyline's confirmed plan, the Chapter 11 case, which has been closed, or its prospects going forward. Indeed, ESB has not even served a Notice to Cure with respect to any of the Lease or License Violations that it alleges are occurring.

Skyline has five remaining claims against ESB. Skyline's Fourth Claim alleges that ESB breached the May 2005 Amendment and related lease or license agreements. As set forth in Joint Pretrial Order, Skyline will seek to establish that the following breaches have occurred under such agreements: (a) ESB has interfered with Skyline's right to have four (4) employees work at or near the Observatory ticket counter to solicit business for the Skyline Attraction; (b) ESB has unreasonably refused to permit Skyline's right to install four video monitors in the Visitor Ticketing Area, and additional monitors on the 80th floor; (c) ESB has refused to install signage directing visitors to the Attraction in each and every location as such signage was placed prior to April 4, 2005; and (d) ESB has breached paragraph 8 of the May 2005 agreement by disciplining Skyline employees directly for alleged violations of the protocol set forth in paragraph 7 of such agreement, without properly consulting with Skyline management. Skyline's Twelfth Claim seeks a judgment requiring ESB to charge Skyline based on an estimate of actual consumption of electricity, instead of charging Skyline based on its maximum capacity to consume electricity within a period of operation, and damages for ESB overcharging Skyline for electricity under Article 44 of the Lease. Skyline's Fourteenth Claim seeks damages for breach of good faith and fair dealing with respect to legal fees and costs that Skyline has expended forcing ESB to comply with its lease and license agreements since May 27, 2005.

Skyline's Fifteenth Claim is for prima facie tort, and Skyline's Eighteenth Claim seeks damages for Empire State Building Associate's tortious interference with contractual relationships. ESB has asked this Court to grant it summary judgment with respect to Skyline's Fourteenth, Fifteenth and Eighteenth Claims for Relief.[6]

**B.** **The Bankruptcy Court Should Abstain and Send the Adversary Proceedings Back to State Court to Avoid Protracted Litigation Over Jurisdictional Issues**

**1.** **The Bankruptcy Court Lacks Subject Matter Jurisdiction**

Although subject matter jurisdiction can be raised at any time, Skyline has questioned the prudence of this Court determining purely state law questions from the beginning of this case. As noted above, ESB removed the State Action to the Bankruptcy Court and this Court subsequently denied Skyline's motion to remand or abstain, including Skyline's motion for mandatory abstention, finding, in part, that Skyline's contract rescission claim was important to Skyline's determination as to whether assume or reject the Lease, and that the matter could be handled expeditiously in the Bankruptcy Court. Since (a) the Bankruptcy Court had denied Skyline's abstention and remand motion, (b) ESB's complaint also sought a determination of the rescission issue, and (c) at the time, rescission was an important issue with respect to assumption or rejection of the Lease, Skyline did not then further contest subject matter jurisdiction of the ESB Complaint.

Skyline assumed the Lease before any determination of the rescission claim because sales had not decline as feared following the global economic downturn in 2008. Ultimately, the

---

[6] Of the claims that ESB seeks to resolve before this Court at trial, all but one of these claims was asserted as a counterclaim in the removed State Action. The remaining claim from EBS's complaint involves a claim for attorneys' fees. ESB's counterclaims involve issues regarding the protocol in the May 2005 Agreement, Skyline's right to sell New York City-themed memorabilia at the gift shop, and matters relating to the fire alarm system. Skyline has not issued a Notice to Cure with respect to any of these alleged defaults.

Bankruptcy Court granted ESB summary judgment dismissing the rescission claim. Thereafter, Skyline confirmed its Chapter 11 plan and paid all creditors in full in cash with interest, except for the senior secured creditor which essentially agreed to a stock for debt exchange. On February 28, 2011, the Court entered an order closing the Chapter 11 case but retained jurisdiction over the pending adversary proceedings [See Docket # 164].

Since the plan has long since been confirmed and that part of the Chapter 11 case is formally closed, and since *Stern v. Marshall* has clarified some of the rules governing Bankruptcy Court litigation that apply here, most particularly its lack of jurisdiction over traditional common law claims based solely on state law, the Court should reconsider its earlier decision denying Skyline motion to remand or abstain, and send these cases back to State Court.

Looking at the pending cases now, there simply is no Federal Court subject matter jurisdiction. Indeed, the litigation presently concerns various tort claims, contract claims and lease interpretation declarations which will not affect the rights of any creditors under Skyline's Plan. *In re General Media, Inc.,* 335 B.R. 66, 75 (Bankr. S.D.N.Y. 2005) ("Bankruptcy courts plainly lack jurisdiction over post-confirmation litigation where the case has been fully administered and all of the recovery will go to the reorganized debtor rather than to the creditors."). *Accord In re Kassover,* 448 B.R. 625, 632-33 (S.D.N.Y. 2011) (". . . where the case has been fully administered and the interests of creditors will be unaffected by the resolution of the dispute, bankruptcy courts have declined to exercise post-confirmation subject matter jurisdiction."); *Matter of Pan Am. Sch. of Travel Inc.,* 47 B.R. 242, 244–45 (Bankr.S.D.N.Y.1985) (remanding post-confirmation debtor's request to stay proceedings against him for trademark infringement due to insufficient relation to core bankruptcy proceedings).

15

In summary, following confirmation and consummation of Skyline's plan, the Bankruptcy Court no longer had subject matter jurisdiction over the claims made in the adversary proceedings. And even assuming the Bankruptcy Court did have subject matter jurisdiction as a technical matter, it should still reconsider its earlier determination and remand and/or abstain from the pending adversary proceedings because the reasoning of the cases cited above declining jurisdiction still makes just as much sense. The only prudent reason for the Bankruptcy Court to exercise jurisdiction over this matter was the possibility that resolution of these claims may have been necessary in order for the Court to rule on lease assumption under Section 365. That eventuality never materialized, and now never will. Thus, there is no reason for the Bankruptcy Court to expend its scarce resources resolving post-confirmation matters that will have no effect on the estate and that more appropriately belong in state court. As Judge Posner noted recently in a case involving supplemental jurisdiction over state law claims, "[B]ankruptcy judges are awfully busy ...; they shouldn't be bothered with resolving claims that bear only remotely on the bankruptcy proceeding ... " *Townsquare Media, Inc. v. Brill*, ___ F.3d ___, 2011 WL 2906162, *4 (7th Cir. July 21, 2011). Simply put, the Bankruptcy Court jurisdiction no longer bears any relationship to the parties' rights under the Bankruptcy Code, or creditor's rights under the confirmed plan.

2.      **Following *Stern v Marshall*, The Bankruptcy Court Lacks Authority to Render a Final Judgment Which Will Likely Result In Protracted Wasteful Litigation**

In *Stern v Marshall*, 564 U.S.___, 2011, WL 2472792 (June 23, 2011), the Supreme Court held that a bankruptcy court, as a non-Article III court, did not have the constitutional authority to decide a state law claim brought by a debtor against a creditor, even though the matter was part of the "core" statutory jurisdiction of the bankruptcy court and even though the

creditor consented to bankruptcy court jurisdiction. The Supreme Court's ruling in *Stern* means that many state law causes of action that might properly be brought in the bankruptcy court under the Bankruptcy Code must be decided by a non-bankruptcy court.

In this case, the Court has ruled (over Skyline's objection) that the adversary proceedings are core. Following *Stern v. Marshall*, however, the Court no longer has jurisdiction to decide the matters. If this matter is core, this Court lacks constitutional authority to "determine" this action. However, the alternative process of "report and recommendation" is expressly limited by statute to "non-core" matters. *See* 28 U.S.C. § 157(c). There is no statutory authority for a Bankruptcy Court to issue a report and recommendation in a core matter. Even if the Court had such authority, this adversary proceeding still would need to be resolved by either the state court based upon abstention, or by de novo review in the District Court. To the extent, therefore, that the Bankruptcy Court may have denied abstention and remand based upon the belief that it would be able to decide these cases most expeditiously, that is no longer true following *Stern v. Marshall* and Skyline respectfully urges the Court to reconsider its decision denying abstention.

In a case that has a similar procedural posture, Judge Gerber recently reconsidered his post-confirmation jurisdiction over certain adversary proceedings, and decided to abstain based upon *Stern v. Marshall* and the "Bleak House" like litigation that would have resulted from *de novo* review.

In *In re Bearingpoint*, 2011 WL 2709295 (Bankr. S.D.N.Y. July 11, 2011), the debtor confirmed a plan of reorganization and a trustee (the "Trustee") was empowered under the plan to prosecute claims against Bearingpoint's former officers and directors in the Bankruptcy Court, and nowhere else. The claims in dispute were not "core" but the potential defendants appeared to have consented to exclusive Bankruptcy Court jurisdiction. The Bankruptcy Court explained

that it initially agreed to maintain exclusive jurisdiction to exercise control over the claims the Trustee chose to prosecute, but that the court's gatekeeper responsibilities had since been completed. *Id.* at 2-6. Furthermore, the *Bearingpoint* court explained that if Bankruptcy Court jurisdiction turned out to be mistaken under *Stern v. Marshall,* there was risk of delay by motion practice premised on the Bankruptcy Court's lack of constitutional authority to enter a final judgment. *Id.* at 7.

The Bankruptcy Court wrote at length on the issue of consent because the Supreme Court in *Stern* found that the Bankruptcy Court lacked authority to enter judgment despite the fact that the parties in *Stern* had consented to Bankruptcy Court jurisdiction. The *Bearingpoint* court queried, therefore, whether *Stern v Marshall* means that a party's consent is now immaterial, or whether consent must simply be unequivocal and free of duress. The *Bearingpoint* court did not definitively answer that question. The court nonetheless found that, even if the proper test is that consent must be unequivocal and free of duress, as a factual matter, the potential *Bearingpoint* defendants' consent was by no means unequivocal. *Id.* at 7-8.

In this case, the same factors apply as in *Bearingpoint.* First, as in *Bearingpoint,* the Bankruptcy Court's initial reason to maintain jurisdiction no longer applies because the apparent urgency that attached to the rescission claim (in the context of the lease assumption) no longer exists, and that claim has since been decided. Second, *Stern v Marshall* presents a risk of delay because of the need for additional *de novo* review in this case as in *Bearingpoint.* With respect to the issue of consent, the Bankruptcy Court has indicated that Skyline may have consented to Bankruptcy Court jurisdiction of the adversary proceedings. Any such consent would surely have been by implication, but based on the mandate of the Bankruptcy Court after it had rejected Skyline's efforts to return these matters to state court. Indeed, Skyline's motion for

abstention/remand is the opposite of consent. Nonetheless, even if consent may have been impliedly given, such consent does not change the *Stern v. Marshall* analysis or outcome, because the parties gave consent in that case as well. And even if *Stern v. Marshall* only holds that consent must simply be unequivocal and free of duress, that would not be the case here since Skyline had no immediate appeal rights once remand and abstention were denied. Moreover, Skyline abandoned its right to a jury on its tort claims because research disclosed that a motion to withdraw the reference would be futile in June 2011.

In addition, this case presents two additional "Bleak House" implications not present in *Bearingpoint*. First, there was no dispute in *Bearingpoint* as to whether the Bankruptcy Court had subject matter jurisdiction. In this case, as noted above, there is a very real issue as to whether the subject matter jurisdiction still exists now that Skyline's plan has been confirmed and consummated, and the rescission issue decided. Second, these cases are core and thus no statutory basis exists for the report and recommendation procedure available in non-core cases, like *Bearingpoint*. Given the procedural wrangling thus far, there is no doubt that the jurisdictional issue would quickly subsume the dispute resulting in an enormous waste of resources.

In conclusion, this Court should follow the *Bearingpoint* court's analysis and conclude that this

> "action will be tied in procedural knots by motion practice, here and in the District Court, exploiting asserted or actual inabilities on my part, as an Article I bankruptcy judge, to issue findings and orders. Here, I fear, the additional litigation resulting from my inability to fully rule will have its own Bleak House implications, not unlike the Bleak House litigation referred to by the *Stern v. Marshall* court itself . . . . if I cannot enter final judgment, there are no benefits in hearing the action here. To the contrary, requiring the Trustee to endure the procedural hurdles in starting (but evidently, not finishing) the litigation in the bankruptcy court . . . can hardly be said to be in the interests of justice."

19

*Id.* at 1.

Based upon the foregoing, Skyline respectfully submits that the Bankruptcy Court send this litigation back to Justice Ramos where these state court proceedings began.

## II.     APPROPRIATE STANDARDS TO APPLY TO ESB'S MOTION FOR SUMMARY JUDGMENT

Rule 56 of the Federal Rules of Civil Procedure, made applicable herein through Bankruptcy Rule 7056, provides that summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions of file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to [summary] judgment as a matter of law." Summary judgment is only appropriate if the evidence shows that there is no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir.), cert. den., 524 U.S. 911, 118 S. Ct. 2075, 141 L. Ed. 2d 151 (1998); *Finger Lakes Bottling Co., Inc. v. Coors Brewing Co.*, 2010 U.S. Dist. LEXIS 110562 at *8 (S.D.N.Y. 2010). In addressing a motion for summary judgment, "the court must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in his favor." *L.B. Foster Co. v. America Piles, Inc.*, 138 F.3d 81, 87 (2d Cir. 1998) (citing *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)). The party seeking summary judgment bears the initial burden of showing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). Application of these standards warrants the denial of ESB's motion for summary judgment in its entirety.

20

## III. ESB IS NOT ENTITLED TO ATTORNEYS' FEES BECAUSE IT IS NOT SEEKING TO EVICT SKYLINE OR TERMINATE ITS TENANCY

ESB seeks summary judgment on Count XI of its Complaint for attorneys' fees on the ground that "ESB was required to commence this adversary proceeding as a result of Debtor's numerous defaults under the Lease." ESB Adversary Complaint, at ¶ 156. ESB has no right under New York law to bring a claim for attorneys' fees with respect to its counterclaims. The Court of Appeals has held that the landlord is required to bring its claim for attorneys' fees in the same lawsuit in which it prevails on its claims respecting the default under the lease. *930 Fifth Ave. Corp. v. King*, 42 N.Y.2d 886, 397 N.Y.S.2d 788, 366 N.E.2d 875 (1977) (doctrine forbidding fee splitting barred landlord from asserting claim for attorneys fees respecting earlier action in which it prevailed on claim that tenant had defaulted); *O'Connell v. 1205-15 First Ave. Assoc., LLC*, 28 A.D.3d 233, 234, 813 N.Y.S.2d 378 (1st Dep't 2006) ("the prohibition against the splitting of causes of action require[s] plaintiff to seek attorneys' fees within the action in which they were incurred."); *Hantz v. Hillman Housing Corp.*, 2011 N.Y. Misc. LEXIS 2678 (Sup. N.Y. County May 31, 2011) (same). In *930 Fifth Avenue,* the Court of Appeals affirmed the dismissal of the landlord's action for attorneys' fees, which was based on a prior action in which the tenant had been found to be in default of the lease. The Court of Appeals held that "[t]he lease entails a single obligation which thus requires the plaintiff to assert its entire claim in one action." 42 N.Y.2d at 887. Thus, ESB, which did not assert a claim for attorneys' fees with respect to its counterclaims in the State Action, has no right to recover legal fees allegedly incurred pursuing such counterclaims. Moreover, as ESB concedes, all counts of its adversary complaint, except for Count XI, the count regarding attorneys' fees, have been dismissed. *See* ESB Br. at 3 ("the parties' have stipulated to dismiss … Counts I through X in the ESB

21

Proceeding ...").  At this juncture, ESB has no claims for which it can be awarded attorneys' fees by this Court.

Yet, even if ESB had remaining claims in an action in which it could recover attorneys' fees, which it does not, ESB still would not be entitled to them.  As ESB acknowledges in its brief, attorneys' fees are generally considered incidental to litigation, and each party is presumed responsible for his or her own attorneys' fees unless an award is authorized by agreement statute or court rule.  *See Matter of A.G. Ship Maintenance Corp. v. Lezak,* 69 NY2d 1, 511 NYS2d 216, 503 NE2d 681 (1986).  New York courts hold that "[l]egal fee clauses must be strictly construed," *Duane Reade v. Highpoint Assocs. IX, LLC,* 36 A.D.3d 496, 497, 829 N.Y.S.2d 454 (1st Dep't 2007), and, under attorneys' fees' provisions like those in ESB's lease, attorneys' fees can only be recovered "'where the landlord has undertaken some action, either by summary proceedings or otherwise, to re-enter the demised premises or to dispossess the tenant.'"  *Trusthouse Forte, Inc. v. 795 Fifth Ave. Corp.,* 1985 U.S. Dist. LEXIS 19474, at *8 (S.D.N.Y. May 28, 1985), quoting *Frank B. Hall & Co. v. Orient Overseas Assocs.,* 84 A.D.2d 338, 446 N.Y.S.2d 59 (1st Dep't), *aff'd,* 56 N.Y.2d 965, 453 N.Y.S.2d 680, 439 N.E.2d 395 (1982).  In the instant case, ESB has not taken any step whatsoever to re-enter the premises or dispossess Skyline, such as serving a Notice to Cure or other default notice.  On the contrary, it takes the position in its papers that it is not seeking to evict or dispossess Skyline in this proceeding.

The only lease provision addressing the allowance of attorneys' fees is paragraph 5, entitled "RELETTING, ETC."  Properly construed, that paragraph states that ESB may deduct expenses for attorneys' fees and costs or pursue a claim for attorneys' fees and costs that ESB

incurs in connection with pursuing legal actions to obtain possession or re-let the premises.[7] The claims asserted by ESB in its adversary complaint, dated March 4, 2009, do not seek to evict Skyline but merely mirror the declaratory judgment claims that Skyline previously had framed more than five months before in Skyline's Amended Complaint in the State Court Action. *Compare* Third Amended Complaint, ¶¶ 136-40, with ESB Adversary Complaint, ¶¶ 105-152. It appears that ESB's sole reason for commencing the ESB proceeding – as opposed to removing Skyline's State Court Action and asserting counterclaims in such action – is to buttress a claim for attorneys' fees.

ESB's attorneys' fees have not been incurred in connection with an effort to recover the demised premises. In *Hall, supra,* the court refused to allow attorneys' fees to a landlord for the successful defense of a declaratory judgment action brought by a tenant, holding that the attorneys' fees provision was activated only if the landlord engaged in affirmative action "to re-enter the demised premises or to dispossess the tenant." 84 A.D.2d at 342. *See also H.L. Klion, Inc. v. Venimore Bldg. Corp.,* 21 A.D.2d 673, 674, 249 N.Y.S.2d 910 (2d Dep't), *mod* 15 N.Y.2d 601, 255 N.Y.S.2d 264, 203 N.E.2d 651 (1964) (rejecting landlord claim for attorneys' fees because landlord's counterclaim for declaratory judgment and additional rent was not "the equivalent of the institution by [landlord] of 'an action or summary proceeding.'"); *Trusthouse Forte, Inc., supra,* 1985 U.S. Dist. LEXIS 19474, at *9 (denying landlord request for attorneys' fees after determining that landlord's declaratory judgment action was not "*necessary* to reclaim possession of the premises ...") (emphasis in original). When landlords take such affirmative

---

[7] Paragraph 5 of the lease states in pertinent part, "lessor may deduct all expenses incurred in obtaining possession or re-letting the premises, including legal expenses, attorneys' fees ..." and further states: "If Lessee shall at any time default hereunder, and if Lessee shall institute an action or summary proceedings against Lessee based on such default, then Lessee will reimburse Lessor for the expense of reasonable attorneys' fees and disbursements thereby incurred by Lessor." *See* Silber Ex. A.

steps to recover the demised premises, some New York courts have awarded attorneys' fees. *See, e.g., Duane Reade v. 405 Lexington, LLC*, 5 Misc. 3d 1030A, 799 N.Y.S.2d 160 (Sup. N.Y. 2004), *aff'd*, 19 A.D.3d 179, 798 N.Y.S.2d 393 (1st Dep't 2005) (distinguishing *Hall* and stating that "attorneys' fees may be awarded" because "defendant-landlord first took action by serving a notice of default, which is the necessary predicate to commencement of a summary proceeding"); *In re Westview 74th St. Drug Corp.*, 59 B.R. 747, 756-757 (Bankr. S.D.N.Y. 1986) (Brozman, J.) ("an express contractual provision for attorney's fees gives rise to a right to obtain a reasonable attorney's fee as part of curing the debtor's default and in compensation for the landlord's actual pecuniary loss"). Since ESB has not sought to evict Skyline, these cases are inapposite.

Also, New York courts hold that, for the landlord to be awarded attorneys' fees, the lawsuit must involve the tenant's "breach of a basic obligation of the lease." *Allerand LLC v. 233 East 18th Street Co., L.L.C.*, 19 A.D.3d 275, 277, 798 N.Y.S.2d 399 (1st Dep't 2005) (awarding attorneys' fees to landlord where tenant withheld rent "while in possession of the demised premises – a violation of a fundamental covenant of the lease, regardless of any breach by defendants"); *see also 936 Second Avenue L.P. v. Second Corporate Dev. Co., Inc.*, 37 A.D.3d 190, 191, 830 N.Y.S.2d 59 (1st Dep't 2007) (rejecting landlord claim for attorneys' fees and distinguishing *Allerand* because "tenant's incorrect interpretation of the net lease's valuation provisions does not amount to a breach of a basic lease obligation"), *reversed on other grounds,* 10 N.Y.3d 628, 861 N.Y.S.2d 256, 891 N.E.2d 289 (2008); *East 55th Street Joint Venture v. Lichtman*, 126 Misc. 2d 1049, 1051, 487 N.Y.S.2d 256 (1st Dep't App. Term 1984) ("We think the standard attorneys' fee provision, earlier quoted, is more preferably reserved for the ordinary eviction proceeding premised upon a substantial breach of the lease or default in the payment of

rent"). The alleged lease and license violations that ESB complains of in this proceeding – e.g., tourist memorabilia in Skyline's gift shop, the alleged violation of the anti-commission clause, disclaimers on tickets – do not amount to a breach of a basic lease obligation.

Where a party is merely seeking a judicial declaration of its rights under the lease, New York courts routinely deny attorneys' fees to the winning party. *See Altieri v. Net Realty Holding Trust*, 237 A.D.2d 551, 655 N.Y.S.2d 984 (2d Dep't 1997) (denying landlord's claim for attorneys' fees in action involving amount of additional rent due under lease); *H.L. Klion, Inc. v. Venimore Building Corp.*, 21 A.D.2d at 674 (denying claim for attorneys' fees in case involving amount of taxes that landlord could pass along to tenant under the lease).

The landlord cases cited by ESB in its brief involve dispossess/eviction claims by the landlord, generally in the context of a summary proceeding, or a substantial lease violation by the tenant. In *TAG 380, LLC v. ComMet 380, Inc.*, 10 N.Y.3d 507, 890 N.E.2d 195 (2008), for example, the landlord served the tenant with a 10-day notice to cure for failing to procure the appropriate insurance, and the tenant countered this effort to dispossess it by moving for a *Yellowstone* injunction. 10 N.Y.3d at 511-512. In *REP A8 LLC v. Aventura Technologies, Inc.*, 68 A.D.3d 1087, 893 N.Y.S.2d 83 (2d Dep't 2009), the landlord, which initiated two summary proceedings after the tenant defaulted in payment of rent and abandoned the property, had been granted judgment of possession in its favor. 68 A.D.3d at 1087. *See also Sun Mei Inc. v. Chen*, 21 A.D.3d 265, 266, 800 N.Y.S.2d 133, 134 (1st Dep't 2005) (legal fees awarded to landlord in tenant's unsuccessful action challenging existence and validity of lease – issues that had been resolved in prior landlord/tenant nonpayment proceedings); *Huron Associates, LLC v. 210 E. 86th St. Corp.*, 18 A.D.3d 231, 232, 794 N.Y.S.2d 360 (1st Dep't 2005) (court awarded attorneys' fees following nonjury trial which found that tenant was in default of lease for failing to provide

landlord with access to the premises to perform steel bracing and column reinforcement work in the tenant's premises). Even if ESB had claims for which attorneys' fees arguably could be awarded, the claims it has asserted against Skyline do not involve a basic, fundamental lease obligation and thus do not warrant granting attorneys' fees under New York law.[8]

## IV.   ESB IS NOT ENTITLED TO SUMMARY JUDGMENT ON ITS SECOND COUNTERCLAIM TO ENJOIN SKYLINE FROM PROVIDING ITS EMPLOYEES A DISCRETIONARY BONUS

The anti-commission clause does not bar Skyline from paying a discretionary bonus based on the company reaching attendance milestones. As Mr. Schulman explains in his Certification, Skyline's attendance figures are built upon sales and promotional activities by a number of persons and entities, including ESB, which also sells Skyline tickets. Schulman Cert. ¶ 7. Specifically, Skyline's monthly attendance figures are dependant, in addition to tickets sales by ESB and Skyline ticket agents, by group sales (i.e., tickets sold through travel agents, tour operators as well as groups that contact Skyline directly); Skyline's internet sales; sales via numerous travel-related internet web sites (such as Expedia, Wiretown, etc.); Skyline advertising in newspapers, brochures, handouts; Skyline promotional activities (e.g., tie-ins with Long Island Railroad, MetroNorth and New Jersey Transit); and direct sales at Skyline's box office at the Empire State Building. *Id.*; Threadgill Cert. ¶ 6.

As ESB concedes, ESB's concern in 2005 was to "prevent compensation formats which incentivize and reward aggressive pressure tactics and 'hard sell' sales techniques ..." ESB Br. at 9. In 2005, a Skyline salesman was paid a salary and a commission based on the number of tickets that he sold ($1 or $2 per ticket). In ESB's view, that compensation structure conceivably would cause an individual salesman to be aggressive, because his compensation was directly tied

---

[8]   To date, as ESB concedes, it has provided no evidence regarding its damages for attorneys fees'.

to his performance. Threadgill Cert. ¶ 3. Skyline's current system – which mirrors what many companies do – does not "incentivize and reward aggressive pressure tactics." Currently, as Michael Leeb, Skyline's President, explained at his deposition (Halligan Ex. T), Skyline, in its discretion, might decide to award a bonus to its employees if certain attendance milestones are met. There has been no evidence that this policy in any way causes a particular salesperson to engage in aggressive sales activities. In fact, as a practical matter, nothing an individual salesperson does will directly impact whether or not he receives a bonus, because Skyline's attendance figures are derived from too many sources, many of them third parties, like ESB, tour operators, groups, internet users, and direct buyers. What ESB is seeking to do through this proceeding is argue for a tortured construction of a contract provision within an agreement that it drafted in order to economically punish Skyline and its employees.

## A.   NEW YORK RULES OF CONTRACT CONSTRUCTION

Two fundamental principles of contract interpretation are that "agreements are to be construed in accord with the parties' intent" and "the best evidence of what parties to a written agreement intend is what they say in their writing." *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569, 750 N.Y.S.2d 565, 780 N.E.2d 166 (2002). Before looking to evidence of what was in the parties' minds, the Court must give due weight to what words were actually used in the anti-commission clause of the May 2005 Agreement. *W.W.W. Assoc., v. Giancontieri*, 77 N.Y.2d 157, 565 N.Y.S.2d 440, 566 N.E.2d 639 (1990). In interpreting a contract, the intent of the parties governs. *Sheets v. Sheets*, 22 A.D.2d 176, 180, 254 N.Y.S.2d 320 (1st Dep't 1964). A contract should be construed so as to give full meaning and effect to all of its provisions. *Trump-Equitable Fifth Ave. Co. v. H.R.H. Construction Corp.*, 106 A.D.2d 242, 244, 485 N.Y.S.2d 65

(1st Dep't), aff'd., 66 N.Y.2d 779, 497 NYS2d 369, 488 N.E.2d 115 (1985); *Integretated Sales, Inc. v. Maxwell Corp. of America*, 94 A.D.2d 221, 227, 463 NYS2d 809 (1st Dep't 1983).

Under New York law, the initial interpretation of a contract is a matter of law for the court to decide. The key inquiry at the initial interpretation stage is whether the contract is unambiguous with respect to the question disputed by the parties. *Sutton v. East River Sav. Bank*, 55 N.Y.2d 550, 554, 435 N.E.2d 1075, 1077, 450 N.Y.S.2d 460, 462 (1982); *see also Walk-In Medical Centers, Inc. v. Breuer Capital Corp.*, 818 F.2d 260, 263 (2d Cir. 1987); *Tokio Marine & Fire Ins. Co. v. McDonnell Douglas Corp.*, 617 F.2d 936, 940 (2d Cir. 1980).

On a motion for summary judgment involving a question of contractual interpretation, "a court should accord that language its plain meaning giving due consideration to the surrounding circumstances and apparent purpose which the parties sought to accomplish." *Portside v. Gigabeam*, 557 F. Supp. 2d 427, 430 (S.D.N.Y. 2008) (citing *Palmieri v. Allstate Ins. Co.*, 445 F.3d 179, 187 (2d Cir. 2006)). As the United States Court of Appeals for the Second Circuit stated in *Seiden Associates, Inc. v. ANC Holdings, Inc.*, 959 F.2d 425 (2d Cir. 1992):

> In reviewing a written contract, a trial court's primary objective is to give effect to the intent of the parties as revealed by the language that they chose to use. When the question is the contract's proper construction, summary judgment may be granted when its words convey a definite and precise meaning absent any ambiguity. Where the language used is susceptible to differing interpretations, each of which may be said to be as reasonable as another, and where there is relevant extrinsic evidence of the parties' actual intent, the meaning of the words becomes an issue of fact and summary judgment is inappropriate, since it is only where there is no genuine issue as to any material fact that the moving party is entitled to judgment as a matter of law.

*Id.,* at 428 (citations omitted); *see also Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1094 (2d Cir. 1993) (summary judgment may be granted "only where the agreement's language is unambiguous and conveys a definite meaning").

28

For this Court to determine that anti-commission clause means, as ESB claims, that Skyline can only pay its employees a "set salary" and nothing else, the Court must determine that no other interpretation reasonably can be gleaned from the language used in the May 2005 Agreement. *Norma Reynolds Realty Inc. v. Edelman*, 29 A.D.3d 969, 817 N.Y.S.2d 85 (2d Dept 2006); *Greenfield v. Philles Records*, 98 N.Y.2d at 569. If the Court determines that the anti-commission provision is capable of more than one meaning, it must determine that the phrase is ambiguous. Under New York law, "[a]n 'ambiguous' word or phrase is one capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Eskimo Pie Corp. v. Whitelawn Dairies, Inc.*, 284 F. Supp. 987, 994 (S.D.N.Y. 1968); *see also Fox Film Corp. v. Springer*, 273 N.Y. 434, 8 N.E.2d 23 (1937); *State v. Home Indem. Co.*, 66 N.Y.2d 669, 671, 495 N.Y.S.2d 969, 486 N.E.2d 827 (1985) (contract is ambiguous if susceptible to two or more reasonable determinations); *Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1192 (2d Cir. 1996); *MG Ref. & Mktg., Inc. v. Knight Enters., Inc.*, 25 F. Supp. 2d 175, 180 (S.D..N.Y. 1998). If the language of the contract is ambiguous, extrinsic evidence of the parties' intent is admissible. *Space Imaging Eur., Ltd. v. Space Imaging L.P.*, 38 F. Supp. 2d 326, 334 (S.D.N.Y. 1999). Where the meaning of an agreement is ambiguous, its construction is an issue to be resolved by the fact finder, who is allowed to consider extrinsic evidence of intent. *M. O'Neil Supply Co. v. Petroleum Heat & Power Co.*, 280 N.Y.50, 19 N.E.2d 676 (1939); *see also Harza Northeast, Inc. v. Lehrer McGovern Bovis, Inc.*, 255 A.D.2d 935, 936, 680 N.Y.S.2d 379 (4th Dep't 1998) (finding that summary judgment is not appropriate where "the determination of the parties' intent 'depends upon the credibility of extrinsic evidence or a

choice of inferences to be drawn from extrinsic evidence'"). In construing ambiguous language in the May 2005 Agreement, this Court should construe such language against ESB, the party that drafted the agreement. *McCarthy v. American Intern. Group, Inc.*, 283 F.3d 121, 124 (2d Cir. 2002) ("New York follows the well established *contra proferentem* principle which requires that equivocal contract provisions are generally to be construed against the drafter"); *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59, 67 (2d Cir. 2000) (same).

**B.      The Anti-Commission Clause is Ambiguous[9]**

ESB claims that the anti-commission clause means that Skyline cannot compensate its employees "on any basis other than a set salary." ESB Br. at 8. The anti-commission clause, however, does not use the words ESB uses in its brief. Rather, it states that "All NYSR employees and representatives who work in the NYSR Premises or in any area of or near the Building ... [m]ust be salaried employees and not working on commission or other sales incentive." A "commission" is commonly understood to be "[a] fee or percentage allowed to a salesman or agent for his services." *See* The American Heritage Dictionary (2d College Ed.) A discretionary bonus is not a sales commission.[10] New York Labor Law § 191-a defines commission as "compensation accruing to a sales representative for payment by a principal, the rate of which is expressed as a percentage of the dollar amount of wholesale orders or sales." Similarly, the meaning of the phrase "sales incentive", which itself is ambiguous because it is subject to different reasonable interpretations, is limited by the definition of the word

---

[9]  ESB attacks Skyline's use of Independent Contractors as flouting the May 2005 Agreement, but then notes that the Court has directed this issue to be tried. ESB Br. at 10, fn. 5. The protocol provision only applies to Skyline employees working "in" or "near" the Building. Skyline maintains that the May 2005 Agreement permits it to employ Independent Contractors and pay them commissions only, provided that they are not working "in" the Building or on the sidewalk abutting the Building, *i.e.*, the Building's footprint. For ESB to lead with an argument that the Court has already determined is an issue to be tried reflects the weakness of its argument.

[10] *See Truelove v. Northeast Capital & Advisory, Inc.*, 95 N.Y.2d 220, 715 N.Y.S.2d 366, 738 N.E.2d 770 (2000).

"commission," which precedes it. *Matsumura v. Benihana Nat'l Corp.,* 2010 U.S. Dist. LEXIS 22366, at *22 (S.D.N.Y. Mar. 4, 2010) (limiting contract term under rule of construction known as *ejusdem generis*, which provides that general words near a specific list are not to be construed to their widest extent, but are to be held as applying only to things of the same kind as those specifically listed).

New York courts have repeatedly found contracts to be ambiguous upon a determination that the parties failed to use precise language to adequately reflect their intent. *Evans v. Famous Music Corp.,* 1 N.Y.3d 452, 458, 775 N.Y.S.2d 757, 807 N.E.2d 869 (2004), for example, involved the interpretation of a provision in a music royalty contract detailing the manner in which income from the exploitation of songs had to be apportioned between the plaintiff songwriters and the defendant corporation. 1 N.Y.3d at 454.[11] The issue was whether the provision obligated the corporation to share with the songwriters certain tax savings resulting from foreign tax credits. *Id.,* at 454. The Court of Appeals, looking at evidence of beyond the four corners of the contract, found the contract phrase was ambiguous and stating: "The reasonable expectation of the parties, the wording of the contracts and industry practice all demonstrate that the foreign tax credits should not result in additional compensation to plaintiff." *Id.,* at 460.

---

[11] The relevant contractual provision stated that the corporation was required to pay the songwriters

> "[f]or both words and music an amount equal to fifty per centum (50%) of all net sums actually received by the Corporation with respect to such song or musical composition from any other source or right now known or which may hereafter come into existence ... less all expenses and charges in connection with administering said rights or collecting such sums ... and less all deductions for taxes."

*Id.,* at 455.

Relying on the same contract interpretation principles, the Court of Appeals in *Graev v. Graev,* 11 N.Y.3d 262, 869 N.Y.S.2d 866, 898 N.E.2d 909 (2008), held that the word "cohabitation" was ambiguous as used in the parties' separation agreement. In *Graev,* the parties' settlement agreement obligated the former husband to pay spousal support until the earlier of August 10, 2009 or, among other things, "[t]he cohabitation of the Wife with an unrelated adult for a period of sixty (60) substantially consecutive days." *Id.,* at 266. The word "cohabitation" was not defined in the settlement agreement. When Mr. Graev learned his former wife was living with an unrelated adult male, he ceased making spousal support payments, invoking the separation agreement's provision for termination in the event of cohabitation. The Court of Appeals determined that the word "cohabitation" as used in the Separation Agreement was ambiguous and remitted the case to the lower court to review extrinsic evidence bearing on the parties' construction of "cohabitation," holding:

> [T]he word "cohabitation" does not have a "plain" meaning in this separation agreement. Without extrinsic evidence as to the parties' intent, there is no way to assess the particular factors inherent in the dictionary meanings or case law discussions of "cohabitation" the parties may have meant to embrace or emphasize.

*Id.,* at 274.

In *Walk-In Medical Centers, Inc. v. Breuer Capital Corp.,* 818 F.2d 260 (2d Cir. 1987), the Second Circuit, relying on New York law, determined that the phrase "adverse market conditions" in an investment banking letter was an ambiguous term where the opposing sides each relied on different dictionary definitions of the word "adverse." *Id.,* at 264. Because the court found that the terms "adverse market conditions" was susceptible of at least two reasonable interpretations, the Second Circuit held that the trial court had properly denied summary judgment. *Id.*

32

Skyline's reasonable understanding of the anti-commission clause drafted by ESB is that Skyline agreed only to forfeit its prior structure of paying ticket agents working in the Building or on the Building footprint a per-ticket commission – the system that was in effect in 2005, to which ESB objected. Given the circumstances in which the provision was negotiated, such a construction is patently reasonable. In fact, Mr. Keltner himself, in internal communications reporting about the negotiation of the anti-commission clause, stated that the clause meant "no commissions" or "no commissions to hawkers." Stewart Exs. HH and II. ESB's tortured construction of the anti-commission clause as barring Skyline from awarding a discretionary bonus, or any compensation beyond a "set salary," is patently unreasonable and would not further the purposes for which ESB concedes the anti-competition clause was inserted in the May 2005 Agreement. Because ESB drafted the May 2005 Agreement, any ambiguities are construed against it. At a minimum, there is a triable issue as to what the parties intended respecting the anti-commission provision.[12]

## V.  SKYLINE'S CAUSE OF ACTION SEEKING DAMAGES FOR ATTORNEYS' FEES AS A RESULT OF ESB'S BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING IS VIABLE

Skyline concedes that New York law does not support a separate claim for the breach of implied covenant of good faith and fair dealing when it is based on the same facts as the breach of contract claim. *Harris v. Provident Life & Accident Ins. Co.,* 310 F.3d 73, 81 (2d Cir. 2002); *Siradas v. Chase Lincoln First Bank, N.A.,* 1999 WL 787658, at *6 (S.D.N.Y. Sept. 30, 1999). However, as ESB concedes, and as reflected in the Joint Pretrial Order, Skyline's Fourteenth

---

[12] ESB's statements regarding its motivation to "preserve the image and atmosphere of one of New York's treasured and most visited sites" and "to protect the safety and public access of ESB's visitors and tenants, as well as pedestrians passing by, including commuters to and from Penn Station, " ESB Br. at 12, is nowhere supported in the record. At most, it demonstrates the necessity for trial regarding the construction of the anti-commission clause.

Claim seeks recovery of attorneys' fees that Skyline has spent to force ESB to comply with its agreements and to respond to ESB's continuous and baseless allegations. Such claims for consequential damages based on a party's failure to act in good faith under its contract are permitted pursuant to the Court of Appeals' decisions in *Bi-Economy Market, Inc. v. Harleysville Insurance Company of N.Y.*, 10 N.Y.3d 187, 856 N.Y.S.2d 505, 886 N.E.2d 127 (2008) and *Panasia Estates, Inc. v. Hudson Insurance Company*, 10 N.Y.3d 200, 856 N.Y.S.2d 513, 886 N.E.2d 135 (2008).

In *Bi-Economy*, the Court of Appeals held that the lower courts erred in dismissing plaintiff's claim for consequential damages resulting from defendant insurance company's failure to fulfill its obligations under a commercial property contract of insurance. The Court stated held that, in a breach of contract action, the "nonbreaching party may recover general damages which are the natural and probable consequence of the breach." 10 N.Y.3d at 192.

As set forth in the Complaint and in the accompanying Skyline certifications, since May 2005, ESB has asserted several legal positions against Skyline which threatened its tenancy that were determined to be without merit. In response, Skyline incurred legal expenses that were the natural and probable consequence of ESB's actions in initiating baseless proceedings. Under *Bi-Economy* and *Panasia Estates*, as well as the authorities relied upon therein, Skyline has a valid claim for consequential damages as a result of ESB's breach of the lease and license agreements.

## VI. ESB'S MOTION FOR SUMMARY JUDGMENT TO DISMISS SKYLINE'S PRIMA FACIE TORT CLAIM SHOULD BE DENIED

ESB's attack on Skyline's prima facie tort claim is based entirely on the allegations of the complaint. It is, in reality, a Rule 12 motion to dismiss. Under New York law, there are four elements to a claim of prima facie tort: "(1) an intentional infliction of harm; (2) without excuse or justification and motivated solely by malice; (3) resulting in special damages; (4) by an act

34

that would otherwise be lawful." *United States ex rel. Evergreen Pipeline Constr. Co. v. Merritt Meridian Constr. Corp.,* 95 F.3d 153, 161 (2d Cir. 1996).[13] There are triable issues with respect to each of these elements.

Discovery reveals that ESB detests everything about Skyline and wants to drive it out of business. By 2004, ESB had a "low opinion" of Skyline. Stewart Ex. R. Two years later, Peter Malkin acknowledged in an internal memorandum to his son, Anthony Malkin: "I know that we may not want Skyline to continue, at least in its present format ..." Stewart Ex. NN. ESB, in internal memoranda, repeatedly refers to Skyline and its personnel as "unprofessional and carnival-like," "not a desirable tenant," and "not a real addition to this building." Stewart Exs. C, K and L. ESB management has referred to Skyline ticket agents as "riff raff." Stewart Ex. RR, Leeb Aff. ¶ 14. At his recent deposition, Anthony Malkin's animosity towards Skyline, its employees and operations was on full display, as revealed, in part, by the following *bon mots* from his testimony:

- "[Skyline's] operations are crap ... It remains my sentiment today ... I have always had that sentiment."

- "As to a fullness of an appreciation that their operation is crap, it's a crappy operation, and this is something which really developed more fully over time, as I became aware of the – more aware of the Empire State Building and more aware of Skyride."

- "The gift shop is definitely crappy."

- "The people who are working there, with whom I've come into contact ... I guess they may be professional at what they do, accosting people to try to get them to stop and talk and try to sell them tickets."

---

[13] The standard New York Jury Instruction for Prima Facie Tort states: "A person who, without justification and solely to harm another person, intentionally does an act that would otherwise be lawful and by that act causes financial loss to the other person is liable for the damages caused to that other person." PJI 3:7.

- "A lot of things bother me.  You bother me … Does it bother me when they [Skyline ticket agents] are accosting people on the street?  Yes."

- "I look forward to the day when they will be gone."

- "I think they hawk poorly.  Sure, I think they're bad hawkers."

- "The Salvation Army, or people who hawk the New York Post, or people who hawk invitations to strip clubs, I mean, these are – you know, put Skyline within that whole universe of hawking."

- "When their [Skyline's lease] ultimately comes up for termination, based on what we know today and the way we look at it, we would not renew them."

- "I mean, you already have me on record saying I think their operation is crap, so clearly there's a difference between whether they're a good tenant or a bad tenant and what I think of them as a business."

- "Let me be really clear with regard to Skyline and why I don't look at its numbers and why I'm not so focused on it: I think they are liars.  I think they're cheaters.  I think that they're rule breakers."

- "[T]hat Skyline's lease will not be renewed is certainly shared by my father and me …"

- "Let's be really clear: There's a fabric here.  You want to pull away at the threads, I'm not going to provide you with details unless something you say prompts a specific recollection, but in general, I'm very conscious of the fact that, as far as I'm concerned, these [Skyline] are not the sort of people with whom I wanted to do business over the long time."

Stewart Ex. WW, Malkin Dep. at ¶¶ 67:18-67:25, 69:18-69:23, 71:5-71:15, 80:9-80:19, 83:6-83:7, 114:20-114:21, 115:21-115:24, 129:19-129:21, 155:6-155:10, 156:10-156:14, 182:22-182:25, 192:21-193:4.

ESB employees have even told potential Skyline guests that ESB is "attempting to build a case against [Skyline] to get them out of the building."  Stewart Ex. MM.

As discussed above, after first managing to force Skyline into bankruptcy, ESB greeted its emergence from bankruptcy by spearheading an effort to drive Skyline ticket agents off New York City streets through a campaign of official intimidation including arrests. This conduct continued until a New York court put a stop to it.

There are numerous triable issues of fact as to whether ESB's motivations in complaining about certain lease and license issues – like the bogus gift shop and security guard claims or feigned objections regarding popcorn aromas or sales of tourist brochures and tchotchkes – or instigating the recent police action to ticket and arrest Skyline ticket agents, are motivated solely by malice and taken as part of ESB's campaign to drive Skyline out of business as opposed to being motivated, even in part, by bona fide concerns of a landlord. *Nationwide Tarps, Inc. v. Midwest Canvas,* 228 F. Supp. 2d 202, 215 (N.D.N.Y. 2002) (summary judgment denied where there were issues of fact as to whether letter was written solely out of disinterested malevolence).

ESB seeks to avoid any inquiry at trial into its motivations by arguing that it is a landlord merely exercising its lease rights, and that whatever it did was motivated by its economic self-interest because it may detest Skyline but likes its rent. *See* ESB Br. at 16. This argument ignores Skyline's allegations regarding ESB's ill-will toward Skyline, and the substantial evidence indicating that ESB will not hesitate to drive Skyline out of business, even at the risk of losing rent. Unlike the cases cited by ESB, there is evidence from which a reasonable fact finder could determine that ESB acted with the sole intent to harm Skyline. Furthermore, contrary to ESB's assertions, Skyline has adequately alleged that "Defendants' campaign of harassment and interference in Skyline's operations ... was undertaken by them for the sole purpose of destroying or taking over Skyline's business." Third Amended Complaint at ¶ 205. Finally, Skyline has provided a certification regarding the amount of its financial loss (*see*

37

Schulman Cert. ¶¶ 28-35),[14] and thus ESB's cases regarding alleged pleading deficiencies (*see* ESB Br. at 17-18) are inapposite.[15] Skyline has met its obligation of establishing "reasonably identifiable financial loss" as a result of ESB's tortious conduct.

## VII. THERE IS A TRIABLE ISSUE OF FACT REGARDING THE ENTITIES ON WHOSE BEHALF THE MALKINS ARE ACTING

ESB seeks dismissal of Skyline's Eighteenth Claim for damages arising from Empire State Building Associates L.L.C.'s ("Associates") tortuous interference with Skyline's lease. ESB's argument is based on the premise that Associates has "no authority to direct the operations of ESBC" and that it "plays no role in directing the operations of ESBC." *See* Affidavit of Anthony E. Malkin, sworn to on July 15, 2011 ("Malkin Aff.") at ¶ 4. The record does not unequivocally support this conclusion, and therefore, ESB's request for summary adjudication of this point fails.

Associate's predecessor-in-interest was a general partnership created by Lawrence A. Wien and Peter L. Malkin in 1961 to acquire the master lease of the Building and the underlying land (collectively, the "Property"). Associates simultaneously net subleased the Property under a net operating sublease (the "Operating Sublease") to ESB. Associates was converted to a limited liability company in 2001, and acquired fee title to the Property through its wholly-owned subsidiary, Empire State Building Land Associates L.L.C., in 2002. The Empire State Building is net leased by Associates under a master lease (the "Master Lease"), the term of

---

[14] Skyline's expert, Maurice Whalen, submitted a report in this case expressing an opinion that Skyline has lost millions of dollars as a result of ESB's conduct. *See* Stewart Ex. J. Mr. Whalen died during the pendency of this action.

[15] The recommended Special Verdict Form for Prima Facie Tort contains five questions: (1) Did the defendant [*state act alleged*]?; (2) Did the defendant act solely to cause harm to the plaintiffs?; Did the plaintiff suffer financial loss?; (4) Was the defendant's act a substantial factor in causing plaintiff's financial loss?; and (5) State the amount of the financial loss. *See* New York Pattern Jury Instructions, Vol. 2, at p. 80.

which will expire after all extensions on January 5, 2076. Associates has a direct economic interest in the monies received by ESBC from Plaintiff because the Operating Sublease requires ESBC to pay substantial annual rent to Associates. For the year ended December 31 2007, ESBC paid Overage Rent of $17,025,749. Overage Rent was $18,791,329 for 2006, $16,324,979 for 2005 and $9,469,543 for 2004.

The Master Lease obligates Associates, among other things, to pay all real estate taxes and other impositions, to keep the Building insured against casualty loss, general liability, and certain other risks, to comply with all laws, and to keep the Building, including all structural and non-structural components, in good order and condition and make all necessary repairs, replacements, renewals, alterations, additions and betterments. The Operating Sublease obligates ESBC to satisfy all Associate's obligations under the Master Lease, including real estate taxes, insurance, and property maintenance, but also explicitly preserves Associates' right to perform ESBC's obligations. *See* Operating Sublease, Article 6, annexed to the Malkin Aff as Exhibit "A."

ESB argues that the Operating Sublease "was drafted to insulate Associates from having any right or authority to direct the operations of ESBC." *See* Malkin Aff. at ¶ 4 (emphasis in original). This argument, however, does not find support in the record. In fact, it is directly refuted by the explicit reservation of rights contained in Article 6 of the Operating Sublease. Moreover, Associates' public filings state that hat Malkin Holdings performs physical inspections of the Building for Associates and collects rent. Stewart Ex. OO, Associates 10-K at 10. Associates, not ESBC, is the entity responsible for financing improvements at the Building. *Id.* at 5. ESB concedes that Malkin Holdings is the agent for both ESBC and Associates. Malkin Holdings is the successor to Wein & Malkin, LLP, the entity that had previously entered

39

into an operating agreement with ESBC. *See* Stewart Ex. WW, Malkin Dep. at p. 12:11-12:4; *see also* Stewart Ex. OO, Associate's 10-K at 3, 10. As supervisor for ESBC, Malkin Holdings "basically directs the day-to-day activities of the building in concert with and the permission of ownership." *Id.*, at 13:2-13:5. Ownership consists of a number of people but the controlling parties are Anthony Malkin, Peter Malkin, the Chairman of Malkin Holdings and Member of both ESBC and Associates, and the Estate of Leona Helmsley. *Id.* at lines 13:6-13:9. As Anthony Malkin testified, decisions concerning management and operations of the Building are done with the tacit or express agreement of the Helmsley Estate. *Id.* 56:13-56:19, 159:11-159:13. According to Anthony Malkin in some instances, for example, where both he and his father agreed on a point, such as whether or not to renew Skyline's lease at the end of its term, whether or not the Helmsley Estate agrees "does not matter." *Id.* at pp.182:22-183:3. As supervisor for Associates, Malkin Holdings is responsible for "servic[ing] the entity." *Id.* at 57:9-57:12.

In newspaper articles, including interviews, the Malkins consistently take credit as owners for all that takes place at the Empire State Building. *See, e.g.,* Stewart Ex. PP. The Malkins' personal attention to all aspects of the operations and events taking place at the Empire State Building runs the gamut, from obtaining the financing needed to perform millions of dollars of repairs and install so-called green energy initiatives, to conducting personal inspections of the Building. *See* Stewart Ex. JJ [Peter Malkin memorandum to Anthony Malkin regarding visitor lines, uniforms for Observatory and Skyline personnel, elevator audio and television, tinted coating on windows, and a union demonstration].

For all intents and purposes, it is clear that Peter and Anthony Malkin, through Malkin Holdings and its affiliated entities, particularly as their actions pertain to Skyline, control the

operations of the Empire State Building. Whether and to what extent the Malkins undertake a particular action on behalf of ESBC or Associates is never entirely clear, and as Anthony Malkin testified, he often undertakes business activities on behalf of one or more of the Empire State Building organizations. *See* Stewart WW, Malkin Dep. at p. 102:23-103:6. In other instances, such as the when a decision had to be made as to whether to send a default notice as a reaction to Skyline's objections concerning unjustified limitations being placed on the number of customers that could enter the Observatory, Malkin testified that such a decision was simply made by Wein & Malkin "as Supervisor." *See Id.* at 10:8-10:11. Thus, contrary to ESB's argument that Malkin Holdings (and its predecessor) act only on behalf of ESBC "with respect to Skyline and the building at large," *see* ESB Br. at 19, there are questions of fact as to which entity Malkin Holdings acted on behalf of, precluding summary judgment as to Associates' liability.

ESB's argument that an agent cannot be liable for inducing his principal to breach a contract so long as he is acting in his official capacity misses the point. Skyline is not arguing that Malkin Holdings is liable for inducing Associates to breach its contract. Associates has no contractual (lessor-lessee) relationship with Skyline. Skyline is seeking to hold Associates responsible for its agents' tortuous conduct that interfered and is interfering with and impairing Skyline's rights under its lease. Thus, ESB's reliance on *Solow v. Stone*, 994. F. Supp 173 (S.D.N.Y. 1998), *aff'd*, 163 F. 3d. 151 (2d Cir. 1998) and *Novak v. Scarborough Alliance Corp.*, 481 F. Supp. 2d 289 (S.D.N.Y. 2007) is misplaced. More to the point, a principal is liable for the actions of an agent that are within the scope of apparent, as well as actual, authority. *American Soc. of Mech. Eng'rs. v. Hydrolevel Corp.*, 456 U.S. 556, 566, 72 L. Ed. 2d 330, 102 S. Ct. 1935 (1982). Associates' attempt to avoid liability by disclaiming involvement in direct operational involvement in Malkin Holding's activities is, therefore, irrelevant to the issue of scope of

41

agency that properly determines its liability. *Carolco Pictures, Inc. v. Sirota*, 700 F. Supp. 169, 172 (S.D.N.Y. 1988).

Regardless of ESB's position in this summary judgment motion, it is beyond cavil that the Malkins wear numerous "hats" when they dictate the activities that take place at the Empire State Building. When Anthony Malkin is interviewed about the Empire State Building, he does not take the position that he is merely an employee of an agent for the landlord; rather, he takes the position that the Malkins own the Building and control what happens there. In view of the foregoing and the many issues of fact that permeate the question of what hat Anthony and Peter Malkin wore when undertaking the activities complained of in this action, it would be inappropriate to award summary judgment to ESB on Plaintiff's Eighteenth Claim.

## CONCLUSION

For the foregoing reasons, Skyline respectfully requests that the Court deny ESB's motion for summary judgment and/or dismissal, as well as grant Skyline such other and further relief as the Court deems just and proper.

Dated: New York, New York
August 19, 2011

Respectfully submitted,

**STEWART OCCHIPINTI, LLP**

By:_____/s_____
        Charles A. Stewart, III (CS 7099)
        Frank S. Occhipinti (FO 7024)
65 West 36th Street, 7th Floor
New York, New York 10018
Tel.: (212) 239-5500
Fax: (212) 239-7030

*Attorneys for New York Skyline, Inc.*

42

**OF COUNSEL**

**BACKENROTH FRANKEL & KRINSKY, LLP**
Mark Frankel (MF 8417)
489 Fifth Avenue, 28th Floor
New York, New York 10017
(212) 593-1100