UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
In re:                                                        :
                                                              :    Chapter 11
NEW YORK SKYLINE, INC.,                                       :
                                                              :    Case No. 09-10181 (SMB)
                                        Debtor.               :
---------------------------------------------------------------X
EMPIRE STATE BUILDING COMPANY L.L.C.                          :
and EMPIRE STATE BUILDING, INC.,                              :
                                                              :
                                        Plaintiffs,           :    Adversary Proceeding
                                                              :
        -against-                                             :    Case No. 09-01107 (SMB)
                                                              :
NEW YORK SKYLINE, INC.                                        :
                                                              :
                                        Defendant.            :
---------------------------------------------------------------X
NEW YORK SKYLINE, INC.,                                       :
                                                              :
                                        Plaintiff,            :    Adversary Proceeding
                                                              :
        -against-                                             :    Case No. 09-01145 (SMB)
                                                              :
EMPIRE STATE BUILDING COMPANY L.L.C.,                         :
EMPIRE STATE BUILDING, INC. and                               :
EMPIRE STATE BUILDING ASSOCIATES                              :    **CERTIFICATION OF**
L.L.C.,                                                       :    **FREDRICK SCHULMAN**
                                                              :    **IN OPPOSITION TO**
                                        Defendants.           :    **MOTION FOR SUMMARY**
                                                              :    **JUDGMENT**
---------------------------------------------------------------X

FREDRICK SCHULMAN, hereby certifies, pursuant to 28 U.S.C. § 1746, as follows:

1. I am the Chairman of New York Skyline, Inc. ("Skyline") and also function as its General Counsel. I respectfully submit this certification in opposition to the motion of Empire State Building L.L.C., Empire State Building, Inc. and Empire State Building Associates, L.L.C. (collectively, "ESB"), which seeks, among other things, summary judgment on ESB's Second

Counterclaim. ESB's Second Counterclaim seeks an injunction prohibiting Skyline from "compensating its employees and representatives on a prohibited commission basis." The facts below are based on my personal knowledge.

## Background

2. Much of ESB's motion for summary judgment is based on ESB's alleged motivation behind the negotiation of the so-called anti-commission clause in the May, 2005 agreement. ESB, however, has submitted no credible, admissible evidence to support its contentions. I can categorically state that ESB's statements regarding the construction of this clause as prohibiting Skyline from paying a discretionary bonus based on the company's performance as a whole is wrong.

3. Along with Walter Threadgill, I negotiated the May 2005 agreement for Skyline. Tom Keltner, General Counsel of Wein & Malkin, negotiated the agreement for ESB. ESB drafted the May 2005 Agreement.

4. Before June 1, 2005, Skyline's ticket agents were compensated on a salary plus per-ticket commission basis. The commission paid was entirely dependent upon the number of tickets an individual agent sold. If an individual sold X tickets, he could expect to be paid Y; if an individual wanted to earn additional compensation, he was strongly motivated to sell tickets. Under this system, the individual ticket agent was entirely motivated by self-interest, and the company's performance was irrelevant.

5. Skyline did not bargain away the right to award employees of the organization a bonus if the company, as a whole, achieved certain goals, such as attendance milestones, and no reasonable construction of the May 2005 Agreement suggests otherwise.

6. ESB's argument that Skyline's discretionary, company-wide, monthly, attendance-based bonus plan is designed to incentivize individual Skyline employees to use hard sell sales techniques is baseless. Under Skyline's current system, no individual ticket agent can determine his compensation by employing aggressive "hard sell" techniques.

7. Skyline's attendance figures are built upon sales and promotional activities by a number of persons and entities, including ESB, which also sells Skyline tickets. Skyline's monthly attendance figures are dependant, in addition to tickets sales by ESB and Skyline ticket agents, by group sales (i.e., tickets sold through travel agents, tour operators as well as groups that contact Skyline directly); Skyline's internet sales; sales via numerous travel-related internet web sites (such as Expedia, Wiretown, etc.); Skyline advertising in newspapers, brochures, handouts; Skyline promotional activities (e.g., tie-ins with Long Island Railroad, MetroNorth and New Jersey Transit); and direct sales at Skyline's box office at the Empire State Building.

### The History Leading to the 2005 Agreement

8. ESB's argument, again without evidentiary support, that the payment provision of the protocol clause, paragraph 7 of the May, 2005 Agreement, was the subject of extensive negotiations, also is false. The negotiations that resulted in the May, 2005 Agreement stemmed from ESB's actions that threatened Skyline's very business. The focus of the negotiations was on the issues that were the subject of the pending law suit. None of the areas covered by the protocol paragraph of the May 2005 Agreement was a subject being litigated between the parties.

9. On April 4, 2005, without advance notice, ESB blocked the sole direct access to Skyline's attraction by reversing the direction of the escalators on the west side of the Building so that all escalators ran from the second floor to the lobby, instead of one escalator going up to the Premises and one coming down from the Premises. At the same time, ESB also removed the

signage for Skyline which was located at the Fifth Avenue entrance of the building and at other locations in the Building. Visitors looking to find Skyline could not locate it from the lobby. Even if visitors knew where to find Skyline, it potentially took them hours to arrive there.

10. The west escalator was Skyline's employees and visitors' primary means of direct access to the Premises, and the top of the escalator was approximately ten feet from the entrance to Skyline's Premises. Following the reconfiguration, Skyline's visitors and employees were forced to join the long line of guests going to the Observatory (Skyline's lines are typically much shorter than lines to the Observatory), pass through ESB's area of the second floor on the other side of the Building, often wait up to several hours, pass through the equivalent of an airport security check, where, finally, they would be able to access Skyline after walking down a long corridor. Almost immediately after ESB shut Skyline's front door, Skyline's business dropped by more than 50%.

11. ESB knew that the west escalators were vital for Skyline's business and that its business would suffer drastically if the west elevators were closed. In or about April 2004 and January 2005, ESB had been forced to close the west escalators for maintenance reasons, for a total of four weeks. In recognition of the importance of the west escalators to Skyline's business, ESB had provided Skyline with two months of free rent, or a value at the time of approximately $240,000.

12. On May 2, 2005, with its existence in jeopardy as a result of ESB's actions, Skyline filed a complaint and Order to Show Cause with Temporary Restraining Order in the New York Supreme Court to compel ESB to re-open Skyline's main entrance and for damages. By Order dated May 2, 2005, the Hon. Charles Ramos issued a temporary restraining order prohibiting ESB from interfering with Skyline's rights to ingress and egress from the Premises.

4

13. After Skyline successfully obtained the order to show cause, ESB retaliated by forcing customers who had purchased combination tickets to exit Skyline's premises after experiencing Skyline, and to re-enter the main entrance line and security check in order to use their previously-purchased combination ticket to the Observatory. This practice dissuaded customers from purchasing combination tickets – a direct violation of ESB's promise under the parties' agreements to take steps to promote Skyline's attraction, and posed an enormous threat to the continued existence of Skyline's business.

14. The litigation concerning ESB's improper attempt to cut off direct access to the Premises was ultimately resolved by the parties' agreement as memorialized in the May 2005 Agreement. The chief issues that Mr. Threadgill and I dealt with concerned the issues encompassed within the litigation, which threatened the existence of Skyline.

15. Under the May 2005 Agreement, ESB agreed to provide access to Skyline customers through the west escalator entrance. ESB's agreement to provide access to Skyline's premises via the west escalators is set forth in paragraph 1 of the agreement.

16. Although Skyline believed that the existing agreements required ESB to permit Skyline customers to access the Observatory line from the Premises without going through the security check again, out of a desire to "buy peace" with ESB, the parties further agreed that, in exchange for Skyline paying a $450,000 annual line "access fee," customers who had purchased combination tickets from ESB or Skyline would be permitted to join the Observatory line after experiencing Skyline, just as they had before ESB required them to re-enter through the security area. Skyline's right to access the Observatory line is spelled out in paragraph 2 of the May 2005 Agreement.

17. In order to address the security concerns that ESB had raised as the justification for sending all of Skyline's customers through the lengthy Observatory line, Skyline agreed to pay for security personnel to be located at the west escalator entrance.

18. The May 2005 Agreement provides that Skyline will pay for the security personnel's wages and benefits through an annual fee of $335,000 (paid monthly) if ESB engages the security personnel, or an annual fee of $82,000 if Skyline hires the security services directly. Security, unlike protocol, was an extensively negotiated item.

19. The focus of the negotiations that led to the execution of the May 2005 Agreement was on the issues that directly impacted Skyline's ability to survive as a business – namely, accessing its front door and merging into the Observatory line – the same issues that were the subject of the litigation.

### The Negotiation of the Anti-Commission Clause

20. During the negotiations, ESB did, however, raise items that had no bearing on the parties' dispute in litigation. Some of these items concerned rights that Skyline had obtained from ESB in prior agreements, such as various obligations of ESB to promote Skyline. Other items concerned issues that were not encompassed within existing documents but were areas of friction between the parties, such as ESB's attempts to discipline Skyline employees without notifying or involving Skyline management.

21. In exchange for the promise of "peace" and the right to operate its business as it had since 1994, Skyline subsequently agreed to a number of items that had nothing to do with any of the issues being litigated in the 2005 action. For example, Skyline gave up the right to obtain all ESB Observatory tickets at the "lowest wholesale price," a right that it had obtained in a 1996 license agreement. It also agreed to the "protocol" set forth in paragraph 7 of the May

6

2005 Agreement. The "protocol" concerned Skyline-related issues that had caused friction between ESB and Skyline. For example, Skyline agreed that its customers could only enter the building at the westernmost Building entrance, not line up on the Building sidewalk, and needed to be accompanied into the Building by a Skyline representative.

22. During the negotiations, ESB ownership indicated that ESB did not like the appearance of our employees. Mr. Keltner said that ESB security personnel would be upgrading their uniforms and stated that ESB wanted Skyline employees to be dressed in a manner acceptable to ESB. Skyline agreed that it employees would adopt a dress code.

23. The parties agreed that Skyline employees would stay out of the Building lobby; that Skyline would not solicit customers in the immediate area of the Building; and that Skyline would have no more than a limited number of agents working in the Observatory ticketing area.

### The Negotiation of the "Anti-Commission" Provision

24. Mr. Keltner then raised the issue of Skyline paying commissions to its ticket agents. As Mr. Keltner knew, in 2005 and previously, an individual Skyline ticket agent was paid, in part, on a per-ticket commission basis (i.e., $1 or $2 per ticket sold). Mr. Keltner stated that ESB was concerned that an agent working for a per-ticket commission was likely to be aggressive because he was immediately incentivized to sell more tickets since his compensation was directly tied to his sales activities and performance. Mr. Threadgill and I countered by stating that a ticket agent compensated by salary alone might not be motivated to sell at all. Eventually, Mr. Threadgill and I agreed, with respect to ticket agents working in the Building or on the sidewalks next to the Building, to forfeit the prior structure of paying on a per-ticket commission basis. But we did not agree to forfeit the right to reward Skyline employees –

secretaries, management, accountants or salespeople – a bonus based on the overall performance of the company.

25. Following the execution of the May, 2005 Agreement, Skyline completely altered its compensation structure for ticket agents working in the Building or on its "footprint." Instead of being compensated on a salary plus individual per-ticket commission basis, these employees are paid a salary, like Skyline non-salespersons. However, as Mr. Leeb, Skyline's President, explained at his deposition, Skyline management, in its discretion, may award bonuses if certain company-wide goals, like attendance, are met. An individual employee, however, does not have the ability, through aggressive sales tactics or otherwise, to guarantee his or her right to receive a bonus. Whether employees receive a bonus is dependent on factors that an individual salesperson cannot control, including whether ESB sells Skyline tickets, whether tour operators and travel agents sell group tickets, whether Skyline promotional activities are successful, and whether customers buy tickets through Skyline's web site or at Skyline's box office.

26. ESB's argument in its papers that Skyline agreed to pay its employees only a "set salary" is not correct. Had this been the parties' intent, the agreement would state unambiguously that Skyline's employees shall be compensated solely by salary – period. Based on our discussions with Mr. Keltner and the language ESB employed in the May 2005 Agreement, we understand that Skyline has forfeited the right to incentivize individual salespersons by paying per-ticket commissions, like we were doing in 2005. The May 2005 agreement states that Skyline employees "must be salaried employees and not working on commission or other sales incentive." To construe this sentence to mean that a Skyline secretary, accountant, manager or salesperson, cannot receive a bonus if Skyline monthly attendance figures exceed expectations, particularly when attendance figures are dependent, in

part, on activities conducted by ESB and numerous others, including Skyline customers, travel agents and tour promoters, is unreasonable. It does not make any sense that a tenant would let its landlord tell it that it could not award holiday or seasonal bonuses or is prevented from engaging in conduct that is part of the fabric of American business.

27. Skyline respectfully submits that the commission clause reflects the parties' intent that Skyline agreed that it would not incentivize individual Skyline ticket agents to potentially resort to aggressive sales techniques by basing compensation on the number of tickets that an individual sells.

### Skyline's Financial Losses Resulting From ESB's Tortious Conduct

28. Skyline has calculated its special damages as a consequence of ESB's tortious conduct.

29. From June 1, 2005 to the present, Skyline executives, as a direct result of ESB's tortuous conduct, have been forced to devote substantial time and energy working with our attorneys instead of devoting their energies to Skyline's business. Skyline has conservatively calculated the special damages relating to lost executive or employee time at $80,840.71. *See* Exhibit A.

30. From June 1, 2005 to the present, Skyline has been forced to hire attorneys to deal solely with allegations initiated by ESB to drive Skyline out of business.

31. Skyline paid $28,686.47 to the law firm of Pryor Cashman to respond to baseless notices of default.

32. Skyline paid $240,813.13 to the law firm of Greenberg Traurig in connection with ESB's failed efforts in July 2008 to evict Skyline if it did not close its gift shop and pay retroactive security charges totaling $431,000, most of which was not due, as ESB was aware.

33. Skyline paid $617,912.10 to the law firm of Gibson Dunn & Crutcher to thwart ESB's recent scheme to enlist the City and NYPD to arrest its sales agents.

34. Skyline lost sales and suffered damages in the amount of $384,426.14 in connection with the scheme referenced in paragraph 33, as set forth in Exhibit B hereto.

35. The total of the special damages alleged above is $1,352,678.50.

Dated: August 19, 2011

                /s_____
               FREDRICK SCHULMAN

# EXHIBIT

# A

|  | Mercedes Bodon | Michael Leeb | Don Bernkopf | Robert Brady |
| --- | --- | --- | --- | --- |
| 2005 | 46,210.83 | 216,300.10 |  | 114,090.00 |
| 2006 | 51,600.00 | 167,083.55 | 62,291.82 | 79,700.00 |
| 2007 | 48,000.00 | 173,750.00 | 69,000.00 | 14,000.00 |
| 2008 | 50,291.74 | 150,000.00 | 67,979.29 | 3,469.00 |
| 2009 | 54,214.67 | 150,000.00 | 73,138.64 | 2,815.00 |
| 2010 | 57,544.25 | 153,437.50 | 77,332.33 | 1,125.00 |
| 2011 to 2nd Qtr | 39,200.00 | 108,750.00 | 50,000.00 | 1,375.00 |
| Total | 347,061.49 | 1,119,321.15 | 399,742.08 | 216,574.00 |
| to Legal | 1% | 5% | 4% | 2.50% |
|  | 3,470.61 | 55,966.06 | 15,989.68 | 5,414.35 |
|  |  |  |  | 80,840.71 |

Please note, these are salary, and direct payment only. They exclude company paid taxes such as Fica and unemployment, and benefits

# EXHIBIT

# B

|                  | Outside sales | ESB attendance |
|---|---|---|
| 4/1 to 4/23/2011 | 28857 | 263967 |
| 4/24 to 4/30/2011 | 8216 | 92630 |
| 5/1 to 5/31/2010 | 22864 | 366793 |
| 5/1 to 5/31/2011 | 25520 | 330420 |
| paid att grew by 27% over last year tickets we should have sold | 29037 | |
| 6/1 to 6/14/2011 | 6699 | 160134 |
| 6/15 to 6/30/2011 | 17940 | 201650 |

6 Data Trax machines at $1,200 each

**TOTAL LOSS**

| conv. Rate | lost ticket sales | avg tkt price | lost amount |
|---|---|---|---|
| 10.93% | | | |
| 8.87% | 1908 | $30.13 | $57,488.04 |
| | 3517 | $28.89 | $101,614.22 |
| 4.18% | 7558 | $28.86 | $218,123.88 |
| 8.90% | | | |
| | | | $7,200 |
| | | | **$384,426.14** |