UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------X

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| NEW YORK SKYLINE, INC., | : | |
| | : | Case No.: 09-10181 (SMB) |
| Debtor. | : | |

---------------------------------------------------------------------X

| | | |
|---|---|---|
| EMPIRE STATE BUILDING COMPANY | : | |
| L.L.C. and EMPIRE STATE BUILDING, INC., | : | |
| | : | Adversary Proceeding |
| Plaintiffs, | : | No. 09-1107 (SMB) |
| v. | : | |
| | : | |
| NEW YORK SKYLINE, INC., | : | |
| | : | |
| Defendant. | : | |

---------------------------------------------------------------------X

| | | |
|---|---|---|
| NEW YORK SKYLINE, INC., | : | |
| | : | Adversary Proceeding |
| Plaintiff, | : | No. 09-1145 (SMB) |
| v. | : | |
| | : | |
| EMPIRE STATE BUILDING COMPANY | : | |
| L.L.C., EMPIRE STATE BUILDING, INC. and | : | |
| EMPIRE STATE BUILDING ASSOCIATES L.L.C. | : | |
| | : | |
| Defendants. | : | |

---------------------------------------------------------------------X

## MEMORANDUM DECISION GRANTING MOTION
## FOR JUDGMENT ON PARTIAL FINDINGS

**A P P E A R A N C E S :**

STERN TANNENBAUM & BELL LLP
*Attorneys for Empire State Building Company L.L.C.,*
   *Empire State Building, Inc., and*
   *Empire State Building Associates L.L.C.*
380 Lexington Avenue
New York, New York 10168

     David S. Tannenbaum, Esq.
     Francine N. Nisim, Esq.
     Brian J. Damiano, Esq.
        Of Counsel

STEWART OCCHIPINTI, LLP
*Attorneys for New York Skyline, Inc.*
65 West 36th Street, 7th Floor
New York, New York 10018

      Charles A. Stewart, III, Esq.
      Elin M. Frey, Esq.
          Of Counsel

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

These adversary proceedings concern numerous disputes between the parties arising under certain lease and license agreements, as modified and amended. The instant dispute relates to the claim by New York Skyline, Inc. ("Skyline"), asserted in the Twelfth Claim for Relief in its Third Amended Complaint, dated July 29, 2009, (ECF Doc. # 30)[1], that its landlord, the Empire State Building Company ("ESB"), overcharged it for electricity in breach of the lease. The lease included several technical terms and concepts relating to the computation of electrical charges, and required extrinsic evidence to explain their meaning. The Court ordered a separate trial, and at the conclusion of Skyline's direct case, ESB moved for judgment on partial findings pursuant to Rule 52(c) of the Federal Rules of Civil Procedure, made applicable to these adversary proceedings by Rule 7052 of the Federal Rules of Bankruptcy Procedure. The Court reserved decision.

The evidence showed that ESB complied with the lease requirements for computing what Skyline had to pay, and except for two instances that ESB corrected, Skyline did not challenge this conclusion. Instead, Skyline's opposition came down to the argument that the lease methodology did not accurately estimate electricity consumption, overcharged Skyline, and ignored other (and fairer) ways to compute consumption. Be that as it may, this is a contract

---

[1]      The "ECF Doc. #" refers to the electronic docket in adversary proceeding no. 09-1145.

case, and Skyline is bound by the agreement it made with ESB. Accordingly, ESB's motion for judgment on partial findings dismissing the claim is granted.

## BACKGROUND

ESB and Skyline signed a lease dated February 26, 1993, for premises known as Rooms 216-WP232 (the "Second Floor Premises") on the second floor of in the Empire State (the "Building"). (DX A.)[2] The lease and its several modifications, (*see* DX A, C, D, F, H, I), are referred to as the "Lease." One of the modifications included additional space on the third floor of the Building (the "Third Floor Premises," and together with the Second Floor Premises, the "Premises"). Article 42 of the Lease obligated Skyline to pay for electricity as additional rent. The amount of the additional rent, or Electrical Rent Inclusion Factor ("ERIF"), was initially set at $2.75 per rentable square foot, but a footnote to Article 42 stated that "the ERIF based on the survey initially made hereunder of Tenant's electricity consumption after it opens for business in the demised premises will be substantially higher than the $2.88 [the "Base ERIF"] being so paid prior to said survey."[3]

The amount charged in the Lease did not reflect the actual consumption of electricity; actual consumption can only be measured by sub-metering. (*See* Tr. 78-79.) Instead, the Lease established a Base ERIF that essentially reflected the amount of electricity that Skyline would

---

[2]    "DX" refers to ESB's trial exhibits, "PX" refers to Skyline's trial exhibits, and "Tr." refers to the trial transcript.

[3]    The lease modification that added the Third Floor Premises included the following language regarding the Base ERIF for that space:

> For the purposes of Article 42 of the Lease (Electricity), the Additional Space shall be deemed to be 3,995 square feet and the minimum ERIF under said Article shall be $3.23 per rentable square feet, which ERIF shall be subject to increase because of rate changes or based on consumption.

(DX D, at ¶ 7.)

use if it ran ordinary equipment for fifty hours. Each piece of equipment includes a name plate or information that tells how much electricity it uses when operating, *i.e.*, its demand for electricity, expressed in watts. In simplest terms, aggregating the demands of all of the electrical equipment on the Premises yields a number of kilowatts with the technical name "connected load."[4] The connected load is then multiplied by the hours of use to determine the ERIF. Skyline's Base ERIF was the product of the average connected load for ordinary equipment (4.5 watts per rentable square foot) multiplied by ordinary business hours (50 hours per week).[5]

The parties agreed that the ERIF would increase if ESB's electrical consultant conducted a survey that revealed that Skyline was using equipment with a greater connected load or for longer hours. Article 42(B) provided:

> Lessor's electrical consultant may from time to time make surveys in the demised premises of the electrical equipment and fixtures and the use of the current. (i) If any such survey shall reflect a connected load in the demised premises in excess of 4 1/2 watts of electricity for all purposes per rentable square foot and/or energy usage in excess of ordinary business hours (each such excess is hereinafter called "excess electricity"), then the connected load and/or the hours of use portion(s) of the then existing ERIF shall be increased by an amount which is equal to a fraction of the then existing ERIF, the numerator of which is the excess electricity (i.e., excess connected load and/or excess usage) and the denominator of which is the connected load and/or the energy usage which was the basis for the computation of the then existing ERIF.

---

[4]     Skyline's expert witness, Anthony Capitini, defined the "connected load" as the "sum of the *continuous ratings* of the power consuming apparatus connected to the system or any part thereof in watts, kilowatts, or horsepower." (PX 159, PSU Evaluation and Comments, at 3) (emphasis in original) (citing Institute of Electrical and Electronic Engineers ("IEEE") Std. 241).)

[5]     Article 42(B) stated that the ERIF:

has been partially based upon an estimate of the Lessee's connected electrical load, which shall be deemed to be the demand (KW), and hours of use thereof, which shall be deemed to be the energy (KWH), for ordinary lighting and light office equipment and the operation of the usual small business machines, including Xerox or other copying machines (such lighting and equipment are hereinafter called "Ordinary Equipment") during ordinary business hours ("ordinary business hours" shall be deemed to mean 50 hours per week), with Lessor providing an average connected load of 4 1/2 watts of electricity for all purposes per rentable square foot.

4

The Lease also set out a specific procedure for resolving disputes relating to ESB's electrical surveys. Skyline had to protest the survey within fifteen days of receipt failing which the survey became "binding and conclusive" on both parties. Assuming a timely challenge, Skyline would then have to hire its own electrical consultant to make his own determination. The two consultants would attempt to reach agreement, but if they could not, they would choose a third consultant who would make his own determinations, and the third consultant's determinations would be controlling. Thus, Article 42(C) provided in pertinent part:

> The determination by Lessor's electrical consultant shall be binding and conclusive on Lessor and on Lessee from and after the delivery of copies of such determinations to Lessor and Lessee, unless within fifteen (15) days after delivery thereof, Lessee disputes such determination. If Lessee so disputes the determination, it shall, at its own expense, obtain from a reputable, independent electrical consultant its own determinations . . . Lessee's consultant and Lessor's consultant then shall seek to agree. If they cannot agree within thirty (30) days they shall choose a third reputable electrical consultant . . . to make similar determinations which shall be controlling.

The Base ERIF was also subject to adjustment if the Building's cost of electricity changed as compared to the cost of electricity in the base year set forth in the Lease.[6] (Tr. 172.) The determinations of ESB's electrical consultant regarding the increased cost of electricity to ESB were made quarterly. (Tr. 169.) At trial, Skyline did not dispute ESB's quarterly adjustments (except to the extent they multiplied the increases required by the surveys). (*See* Tr. 54-55.)

Finally, the Lease permitted certain cost of living adjustments ("COLA") that affected the cost of electricity. (Tr. 193-94.) The COLAs are not in dispute although they are ultimately keyed to the ERIF. Hence, if the ERIF was overstated, the COLAs would multiply the error.

---

[6]    Article 42(B) stated that Skyline's "payment obligation, for electricity redistribution, shall change from time to time so as to reflect any such increase in fuel adjustments or charges, and taxes . . . The parties agree that a reputable, independent electrical consultant . . . shall determine the percentage change for the changes in the ERIF due to Lessor's changed costs."

5

A.    **The 2007 Quarterly Adjustment**

In November 2007, ESB wrote two letters to Skyline (DX P, Q) informing it that due to

an error, it had under billed Skyline the aggregate amount of $107,356.85 in connection with the

quarterly fuel adjustment for two quarters of 2007.  On December 19, 2007, Skyline's controller,

Don Bernkopf, wrote to Alex Chin of ESB, following up on an earlier request for additional

information relating to these increases.  Bernkopf stated that "[o]nce we receive this information

we will better be able to respond to ESB's stated rate increase."  The letter added that in order to

preserve its rights, Skyline was invoking paragraph 42(C) under the Lease and paragraph 45(D)

under the Office Lease.[7]  (DX W.)  Skyline also hired Joel Seiler of Consolidated Electric Meter

Co., an electrical consultant, to review the quarterly and cost of living adjustments.  (DX Y.)

Bernkopf followed up with a second letter to Chin, dated Jan. 29, 2008, regarding the

"retroactive electric charges."  (DX Z.)  The second letter stated that the Base ERIF yielded a

monthly electricity charge of $4,274.16, but the December 1, 2007 bill listed a base charge of

$10,824.39.  Bernkopf asked "when and on what basis this change was made."  The letter also

asked ESB to provide a monthly breakdown of the data supporting ESB's conclusion that it had

under billed Skyline for electric usage, and concluded that "we will not be able to justify any of

these charges unless we are furnished with information that only the building can provide."

B.    **The Electrical Surveys**

1.    **January 2008**

In the meantime, ESB's electrical consultant, the Electrical Meter Company, completed

an electrical survey of the Second Floor Premises on or about January 4, 2008 (the "January

---

[7]    The "Office Lease" was not identified at trial.  It may refer to the lease modification under which Skyline
rented the Third Floor Premises, (DX D), but that modification consists of only thirteen paragraphs.

2008 Survey"). (DX NN.) The survey revealed that Skyline had a substantially higher connected load than the estimate in the Lease, and adjusted the monthly electrical charge in accordance with its findings. ESB sent the survey to Bernkopf on February 26, 2008. (DX CC.) Bernkopf sent it to Seiler, (Tr. 291), along with other documents, including the Lease, (*see* Tr. 305), and asked him to review the survey for accuracy. (Tr. 293.)

Seiler responded on February 27, 2008. (*See* DX EE.) His only comment was that the survey incorrectly computed Skyline's electricity charge using a Base ERIF of $3.45 per square foot instead of $2.88 per square foot. Using the lower Base ERIF resulted in a savings of approximately $20,000 per year. (*Id.*) Seiler did not criticize any other aspect of the January 2008 Survey, and except for the disputed charge per square foot, he believed that the electricity charges were properly calculated. (Tr. 305.) This and another error were eventually corrected by ESB, and Skyline received a credit in excess of $200,000.[8] (Tr. 305; *see* DX QQQ.)

### 2. March 2009 Survey

ESB completed a survey for the Third Floor Premises on or about March 2, 2009. (DX PP.) Bernkopf recalled receiving it, but made no separate objection beyond the letters written in December 2007 and January 2008 regarding the quarterly adjustments and COLAs. (Tr. 301-02.)

### 3. February 2011 Survey

ESB completed another survey of the Third Floor Premises on or about February 24, 2011, (DX QQ), and sent it to Skyline on May 2, 2011. (DX GGGG.) Skyline did not send a written objection regarding the survey to ESB. (Tr. 304.)

---

[8]        *See* footnote 9, *infra.*

C.       **Skyline's Twelfth Claim for Relief**

Skyline's Twelfth Claim for Relief, (Third Amended Complaint at ¶¶ 180-92), seeks

declaratory and monetary relief based upon ESB's alleged breach of Article 42 of the Lease.

Skyline asserts that ESB (a) improperly charged tenants, including Skyline, more than it paid for

electricity in violation of public policy, and (b) "has no right to bill [Skyline] for electricity usage

based on a survey that measures its capacity to consume electricity, as opposed to an estimate of

its actual usage of electricity, or to receive cost of living adjustments based on excess ERIF

amounts."  (*Id.* at ¶ 191.)  The Court previously dismissed the public policy objection, *Empire*

*State Bldg. Co. L.L.C. v. New York Skyline, Inc. (In re New York Skyline, Inc.*), 432 B.R. 66, 86-

88 (Bankr. S.D.N.Y. 2010), leaving the second question for the separate trial.

## DISCUSSION

A.       **Judgment on Partial Findings**

Rule 52(c) of the Federal Rules of Civil Procedure governs a motion for judgment on

partial findings.  It states:

> If a party has been fully heard on an issue during a nonjury trial and the court
> finds against the party on that issue, the court may enter judgment against the
> party on a claim or defense that, under the controlling law, can be maintained or
> defeated only with a favorable finding on that issue. The court may, however,
> decline to render any judgment until the close of the evidence.  A judgment on
> partial findings must be supported by findings of fact and conclusions of law as
> required by Rule 52(a).

A court may enter judgment under Rule 52(c) before the end of a non-jury trial on any

claim if "'the court has decided against the party on a particular issue; the claim cannot be

maintained or defeated absent a favorable finding on that issue; and the party has been fully

heard with respect to that issue[,] . . . the party pursuing the claim has failed to demonstrate the

elements of the claim in fact or has failed to do so in law,' or when 'the evidence of the party

pursuing the claim has established one of the opposing party's defenses as a matter of fact or law.'" *Christoforou v. Cadman Plaza N., Inc.*, No. 04 CV. 08403(KMW), 2009 WL 723003, at *10 (S.D.N.Y. Mar. 19, 2009) (quoting 9 JAMES WM. MOORE *ET AL.*, MOORE'S FEDERAL PRACTICE ¶¶ 52.50[1] & [2] (3d ed. 2008)); *accord Regency Holdings (Cayman), Inc. v. Microcap Fund, Inc. (In re Regency Holdings (Cayman), Inc.)*, 216 B.R. 371, 374 (Bankr. S.D.N.Y. 1998). The court does not consider the evidence in the light most favorable to the nonmoving party, or draw any special inferences in the non-movant's favor. *Wechsler v. Hunt Health Sys., Ltd.* 330 F. Supp. 2d 383, 433 (S.D.N.Y. 2004); *Regency Holdings*, 216 B.R. at 374. Instead, the court acts as both judge and jury, and decides the case based upon where the preponderance lies. *Desiderio v. Celebrity Cruise Lines, Inc.*, No. 97 Civ. 5185(AJP), 1999 WL 440775, at *19 (S.D.N.Y. June 28, 2009).

**B.    The Lease Requirements**

As explained above, the Lease based the ERIF on the connected load multiplied by fifty hours. It also provided that the electricity charges would increase if ESB's electrical consultant conducted a survey that showed either that Skyline's equipment had a greater connected load than 4.5 watts per rentable square foot or Skyline used its equipment for more than fifty hours per week. Skyline did not prove that ESB's electrical consultant failed to compute the connected load in accordance with the Lease, or that ESB failed to correctly compute the electricity charges based on those surveys. In fact, Skyline's consultant Joel Seiler reviewed the January 2008 Survey with Lease in hand, and commented only that ESB incorrectly used an ERIF of $3.45 instead of $2.88 per square foot.[9] In addition, Skyline's trial expert, Anthony Capitini, an

---

[9]    In early 2010, ESB advised Skyline that it had made corrections to the January 2008 Survey and an earlier 2005 survey. The corrections substituted a Base ERIF of $2.88 per square foot for $3.45 per square foot and a base year of 1989 for 1993. These corrections resulted in over $200,000 of credits in Skyline's favor. (*See* DX QQQ.)

electrical consultant, conceded that ESB's electrical consultant had used the correct methodology

required under the Lease.  (*See* Tr. 47.)

In any event, any challenge to the methodology or the results would be barred based on

Skyline's failure to comply with the Lease's contractual dispute resolution procedure.  Paragraph

42(C) provided that the determinations by ESB's electrical consultant shall be "binding and

conclusive" on Skyline and ESB unless Skyline disputed the determination within fifteen days

after it was delivered.  In addition, Skyline would then have to hire its own consultant, the

Skyline consultant would have to make his "own determinations," and if the two consultants

could not agree, they were required to select a third consultant whose determinations would be

binding.[10]

The evidence at trial showed that Skyline never protested the surveys, except for the error

in using a Base ERIF of $3.45 per square foot in the January 2008 Survey, and ESB corrected

that mistake.  The only "protests" that Skyline sent were the December 19, 2007 and January 29,

2008 letters.  (DX W, Z.)  Both concerned the retroactive quarterly rent adjustments which

Skyline is not challenging.  The December 19, 2007 letter merely reiterated an earlier request for

back up information, stating that "[o]nce we receive this information we will better be able to

respond to ESB's stated rate increases."  The January 29, 2008 letter asked for more specific

information, and stated that based on an ERIF of $2.88 per square foot, the monthly electricity

charge should be $4,274.16 – not $10,824.39 as indicated in the December 1, 2007 bill.  It asked

ESB to "[p]lease provide a by month breakdown of the data that supports Landlord's conclusion

that Skyline was under billed for electric usage.  Your cooperation in this matter is greatly

---

[10]      There was no evidence that Seiler conducted a survey for Skyline.  Capitini, Skyline's trial expert,
recommended that a survey be done but never performed one.  (Tr. 138.)

appreciated as we will not be able to justify any of these charges unless we are furnished with information that only the building can provide."

The two letters predated the three surveys at issue, obviously did not mention them, merely requested more information about the retroactive quarterly adjustments and did not satisfy the requirements of Article 42(C) as they related to the surveys.  Under well settled New York law, the failure to follow a contractual rent dispute resolution procedure that results in a binding and conclusive nature of the landlord's determination bars a later breach of contract claim.  *Salomon Smith Barney Holdings, Inc. v. 7 World Trade Co., L.P.*, 718 N.Y.S.2d 298, 299 (N.Y. App. Div. 2000) ("Plaintiff tenant's failure to object to various rent charges within 270 days, as required by the lease, precludes it from instituting this action for breach of contract and declaratory judgment");  *Home Ins. Co. v. Olympia & York Maiden Lane Co.*, 631 N.Y.S.2d 158, 158-59 (N.Y. App. Div. 1995) (failure to challenge operating statements forwarded by landlord within sixty days made them "conclusive and binding" under the lease and precluded tenant's claims for overpayment of rent); *Europe Craft Imports Inc. v. Hilson Mgmt. Corp.*, 613 N.Y.S.2d 176, 176-77 (N.Y. App. Div. 1994) (failure to challenge electrical consultant's determination of tenant's average monthly electrical usage within thirty days rendered the findings "conclusive and binding" under the lease and barred claim for overpayment of rent); *New York Plaza Bldg. Co. v. Oppenheim, Appel, Dixon & Co.*, 479 N.Y.S.2d 217, 221 (N.Y. App. Div. 1984) (failure to challenge accountant's statement of additional rent charges within sixty days rendered the statement a "final and binding" determination under the lease and precluded tenant from invoking arbitration to resolve disputes regarding statement).

The request for more information regarding the retroactive quarterly adjustment contained in the two letters, the general reservation of rights and even the suggestion that a

11

challenge might be forthcoming were insufficient to preserve Skyline's right to challenge the

surveys. *See Europe Craft Imports*, 613 N.Y.S.2d at 177; *New York Plaza Bldg.*, 479 N.Y.S.2d

at 221. Accordingly, Skyline's argument that the December 19, 2007 letter and other written

communications to and dealings with ESB were "sufficient to apprise ESB that Skyline was

disputing ESB's method of billing for its electrical usage and that Skyline wanted to understand

where these numbers come from" lacks merit. (*Memorandum of Law in Opposition to ESB's*

*Motion for Judgment on Partial Findings*, dated Jan. 7, 2013 ("*Skyline Opposition*"), at 30 (ECF

Doc. # 89).) Similarly, ESB's compliance with Skyline's request for information and

willingness to discuss a survey did not waive ESB's right to insist on strict compliance with

Article 42(C).[11]  *See New York Plaza Bldg.*, 479 N.Y.S.2d at 221. Finally, willingness to

reconsider and correct earlier surveys for the benefit of Skyline did not waive ESB's right to rely

on the "binding and conclusive" nature of the surveys as to alleged errors that were never raised.

*See id.*

### C.    Skyline's Interpretation the Lease

As noted, Skyline does not (and cannot) challenge the methodology employed by ESB's

electrical consultant, or argue that he failed to conduct the three connected load surveys in

accordance with the Lease. Instead, Skyline primarily contends that the Lease should not be

interpreted to permit electrical charges based on a connected load survey, and moreover, that the

parties reached a different agreement during their pre-Lease negotiations. As to the former,

Skyline argues that the type of surveys ESB conducted overestimate the costs associated with the

---

[11]    Skyline also contends that ESB failed to distribute its surveys (until Skyline asked for them). If true, this would merely extends the time within which Skyline could dispute those surveys before they became "binding and conclusive." Whatever the delay, the trial evidence demonstrated that Skyline received the three surveys at issue and failed to dispute them within fifteen days.

tenant's actual use of electricity, and a more accurate (and more favorable) estimate would be reached by performing a "demand load" survey. A demand load survey recognizes that equipment does not run continuously; it reduces the connected load by a flat percentage to arrive at the demand load.[12]  (Tr. 144-45.)  In particular, Skyline's largest energy consuming pieces of equipment, the two Moog machines, almost never run at the same time.  (Tr. 235-36, *see* 106.) While a demand load survey may provide a more accurate estimate of actual consumption, the argument ignores the terms of the Lease which call for a connected load survey, not a demand load survey, and permit ESB to increase Skyline's rent based on the results of the former.

In an effort to bolster its position, Skyline argues that Article 42 of the Lease, and in particular, the phrase "connected electrical load" is ambiguous and should be construed in Skyline's favor and against ESB, the party that drafted it.  It further contends that leases should be interpreted in accordance with the meaning afforded by businessmen, not by electrical experts.  Although Article 42(B) is hardly a model of clarity given its technical terms and concepts, the trial evidence clarified any ambiguity and made its meaning clear.  Parol evidence is admissible to show the meaning of technical terms and allow the court to understand words the parties used in reducing their agreement to writing.  *Murdock v. Gould*, 86 N.E. 12, 14 (N.Y. 1908); *Brauer v. Oceanic Steam Navigation Co.*, 70 N.E. 863, 865 (N.Y. 1904); *Loonsk Bros., Inc. v. Sinclair Motor Corp.*, 4 N.Y.S.2d 416, 419 (N.Y. App. Div. 1938).  "'Technical words are to be interpreted as usually understood by the persons in the profession or business to which they related, and must be taken in the technical sense unless the context of the instrument or an applicable usage or the surrounding circumstances clearly indicate a different meaning.'"  *Haber*

---

[12]    Mr. Capitini also identified a further required reduction based on the "diversity" factor.  A diversity factor is a number between one and two that utilities use to reduce the total demand load and size the wires and transformers in a building.  (Tr. 146.)

*v. Fireman's Fund Ins. Co.*, No. 98 Civ.1740 (LLS), 2000 WL 943562, at *3 (S.D.N.Y. July 10, 2000) (quoting 22 N.Y. JUR. 2D, CONTRACTS, § 242 (1989)); *accord Estate of Hatch v. NYCO Minerals, Inc.*, 666 N.Y.S.2d 296, 298 (N.Y. App. Div. 1997).

The evidence explained what "connected load" and a "connected load" survey meant to an electrical consultant. Skyline has not proposed a different meaning, and hence, any ambiguity has been eliminated. Instead, Skyline essentially argues that the Court should interpret the Lease to require that "ESB's surveys must attempt, in good faith, to estimate Skyline's actual use of electricity at the Premises." (*Skyline Opposition* at 11.) However, this is not what the Lease says or requires.

For similar reasons, I also decline Skyline's invitation to apply the doctrine *contra proferentem* and construe any ambiguities against ESB. This rule of interpretation is one of last resort, to be applied only after extrinsic evidence has failed to explain the contract's ambiguity. *O'Neil v. Ret. Plan for Salaried Emps. of RKO Gen., Inc.*, 37 F.3d 55, 61 (2d Cir. 1994); *Record Club of Am. Inc., v. United Artists Records, Inc.*, 890 F.2d 1264, 1271 (2d Cir. 1989); *Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 10 n.2 (2d Cir. 1983). Here, the trial evidence eliminated the ambiguities arising from the use of technical terms and concepts in the Lease. In addition, the evidence showed that Skyline's principal, Zalman Silber, was a sophisticated businessman who negotiated the lease with ESB, and those negotiations led to a modification of Article 42.[13] (*See* Third Amended Complaint at ¶ 184.) *Contra proferentem* is inapplicable where the party asserting that a lease or contract is ambiguous participated in negotiating its terms. *Westfield*

---

[13]     Zalman, Skyline's founder, testified that he is a money manager for high net worth individuals. He started out working for New York Life Insurance Company in 1987, and testified that he became its number one agent in the country. (Tr. 215.)

14

*Family Physicians, P.C. v. Healthnow New York, Inc.*, 873 N.Y.S.2d 793, 795 (N.Y. App. Div. 2009); *Coliseum Towers Assocs. v. County of Nassau*, 769 N.Y.S.2d 293, 296-97 (N.Y. App. Div. 2003).

Finally, Skyline maintains that during the negotiations of the Lease, ESB told Skyline that it would be billed for electricity based on consumption, and in fact, Article 42 of the Lease and the modification relating to the Third Floor Premises refer to Skyline's consumption. While I allowed this testimony over ESB's objection, I conclude that it violated the parol evidence rule. Article 26 of the Lease contained a merger clause which provided that "this lease contains the entire agreement between the parties, and no modification thereof, shall be binding unless in writing and signed by the party concerned." "The purpose of a merger clause is to require the full application of the parol evidence rule in order to bar the introduction of extrinsic evidence to alter, vary or contradict the terms of the writing." *Jarecki v. Shung Moo Louie*, 745 N.E.2d 1006, 1009 (N.Y. 2001); *accord Interpharm, Inc. v. Wells Fargo Bank. N.A.*, 655 F.3d 136, 145 (2d Cir. 2011). The Lease does not provide for electricity charges based on actual consumption or a different method of estimating actual consumption, and the merger clause bars the admission of testimony to the effect that the parties reached a contradictory agreement during earlier negotiations.

## CONCLUSION

ESB is entitled to judgment on partial findings dismissing the Twelfth Claim for Relief in the Third Amended Complaint. The Court has considered Skyline's remaining arguments, and to the extent not specifically addressed above, concludes that they lack merit. The parties are directed to contact chambers and arrange a pre-trial conference for the purpose of scheduling the

15

trial on the remaining issues.  The foregoing constitutes the Court's findings of fact and

conclusions of law.  Settle order on notice.

Dated: New York, New York
       February 22, 2013

                                        /s/ *Stuart M. Bernstein*
                                        STUART M. BERNSTEIN
                                        United States Bankruptcy Judge