UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
IN RE:  NEW YORK SKYLINE, INC.,        :      Chapter 11
                                       :      Case No. 09-10181 (SMB)
                Debtor.        :
------------------------------------------------------------X
NEW YORK SKYLINE, INC.,          :
                                       :      Adv. P. No. 09-01145 (SMB)
                Plaintiff,    :
                                       :
            -against-       :
                                       :
EMPIRE STATE BUILDING COMPANY L.L.C., :
EMPIRE STATE BUILDING, INC. and    :
EMPIRE STATE BUILDING ASSOCIATES    :
L.L.C.                                :
             Defendants.    :
------------------------------------------------------------X
EMPIRE STATE BUILDING COMPANY L.L.C., :
and EMPIRE STATE BUILDING, INC.,    :
                                       :
           Plaintiffs,   :
                                       :      Adv. P. No. 09-01107 (SMB)
            -against-       :
                                       :
NEW YORK SKYLINE, INC.,          :
                                       :
            Defendant.    :
------------------------------------------------------------X

## POST-TRIAL FINDINGS OF FACT
## AND CONCLUSIONS OF LAW

**A P P E A R A N C E S :**

STEWART OCCHIPINTI, LLP
65 West 36th Street, 7th Floor
New York, New York  10018

      Charles A. Stewart, III, Esq.
      Elin M. Frey, Esq.
         Of Counsel

*Attorneys for New York Skyline, Inc.*

STERN TANNENBAUM & BELL LLP
380 Lexington Avenue
New York, NY 10168

     Francine Nisim, Esq.
     Karen S. Frieman, Esq.
     David S. Tannenbaum, Esq.
       Of Counsel

*Attorneys for Empire State Building Company L.L.C.,*
*Empire State Realty Observatory TRS, LLC, and Empire State Building, Inc.*

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

     This long-running dispute, which has already involved a separate trial on one issue and generated three reported decisions,[1] went to trial a second time on all but one of the unresolved issues.[2]  The remaining, discrete contract claims were tried over a two day period and concerned the rights of the Debtor, New York Skyline, Inc. ("Skyline"), to install television monitors and signage and run a gift shop in the Empire State Building (the "Building") and solicit business at or near the Building using salespeople who were paid commissions or other sales incentives.  As explained in more detail below, the Court concludes that (1) ESB (as defined below) did not breach the parties' agreements relating to the installation of television monitors and signage, (2) Skyline breached the lease by (a) paying independent contractors on a commission basis to sell tickets to Skyline's attraction "of or near the Building" and (b) selling souvenirs that were not

---

[1]    *See Empire State Bldg. Co. v. New York Skyline, Inc. (In re New York Skyline, Inc.)*, 432 B.R. 66 (Bankr. S.D.N.Y. 2010) ("*Skyline I*"); *Empire State Bldg. Co. v. New York Skyline, Inc. (In re New York Skyline, Inc.)*, 471 B.R. 69 (Bankr. S.D.N.Y. 2012) ("*Skyline II*"); *Empire State Bldg. Co. v. New York Skyline, Inc. (In re New York Skyline, Inc.)*, Adv. P. Nos. 09-1107, 09-1145, 2013 WL 655991 (Bankr. S.D.N.Y. Feb. 22, 2013) ("*Skyline III*").

[2]    The untried issue concerns the right of the Empire State Building Company L.L.C. to recover attorneys' fees as part of the cure costs incurred by the Debtor when it assumed its lease.  That issue has been referred to mediation.

"readily identifiable with the Attraction," but (3) did not breach the provision of the lease that

prohibits Skyline from paying a "commission or other sales incentive" to its salaried employees.[3]

## FACTS

At all relevant times, Skyline has operated an attraction in the Building involving a

simulated helicopter ride over New York City (the "Attraction").  *Skyline II*, 471 B.R. at 76.  The

Building is owned by non-party Empire State Land Associates L.L.C.  *Id.*  The defendant Empire

State Building Associates, L.L.C. is the master lessee of the Building and subleases the Building

to defendant Empire State Building Company L.L.C. ("ESBC").  The defendant Empire State

Realty Observatory TRS, LLC ("ESRO"), successor to defendant Empire State Building Inc.,

operates the observation decks located on the 86th and 102nd floors of the Building (the

"Observatory").  *Id.*  ESBC and ESRO are sometimes referred to collectively as "ESB."

ESBC, as lessor, and Skyline, as lessee, are parties to a lease, dated February 26, 1993

(the "Lease") (ESB Exhibit ("EX") A), which allows Skyline to operate the Attraction in the

leased space.  The Lease has been amended and modified by agreements dated October 28, 1993

(the "October 1993 Lease Modification"), February 8, 1994, March 1996, December 30, 1999,

and May 27, 2005 (the "May 2005 Agreement"), (EX C, D, F, H, I), and unless otherwise stated,

references to the Lease include the relevant amendments.  ESBC, as licensor, and Skyline, as

licensee, are also parties to a license agreement, dated February 26, 1993 (the "License") (EX B)

which has been amended and modified by agreements dated March, 1996 (the "March 1996

License Modification") and December 30, 1999, and by the May 2005 Agreement.  (EX E, G, I.)

Unless otherwise stated, references to the License include the relevant amendments.

---

[3]     Both sides have consented to the Court's authority to enter a final judgment in this matter.  *Skyline II*, 471
B.R. at 79-80.

It is unnecessary to recount the long history of the litigation between the parties and the

many issues raised by their respective pleadings. Each of the claims identified in the first

paragraph of this decision are discussed separately below.

**A.      Skyline's Breach of Contract Claims**

**1.      Video Monitors**

Skyline's Fourth Claim for Relief in its *Third Amended Complaint*, dated July 29, 2009

("*TAC*") (ECF Doc. # 30),[4] alleged, *inter alia*, that ESB breached the May 2005 Agreement by

failing to "permit Skyline to install eight (8) video advertisements on ESBC's premises." (*TAC* at

¶¶ 137, 140.) In the joint pre-trial order, Skyline modified its claim contending that "ESB has

unreasonably refused to permit Skyline's right to install four video monitors in the Visitor

Ticketing Area, and additional monitors on the 80th floor." (*Joint Final Pretrial Order*, dated

June 16, 2011 ("*PTO*"), at ¶ 3(a)(i) (ECF Doc. # 48).)[5] Skyline also dismissed its claim for

damages with prejudice, and now seeks only declaratory relief that ESB breached the May 2005

Agreement, and an injunction preventing further breaches and requiring ESB "to take such steps

as the Court determines so as not to be in breach of the May 2005 Agreement." (*PTO* at ¶

2(a)(iii); *see PTO* at ¶ 3(a)(i).)

**a.      Facts**

Although Skyline bases its contract claim on the May 2005 Agreement, it is necessary to

consider the parties' earlier agreements. The video monitors advertised the Attraction, and

---

[4]      "ECF Doc. #" refers to the electronic docket in Adv. P. No. 09-1145.

[5]      "'The pre-trial order supersedes the pleadings and becomes the governing pattern of the lawsuit.'" *Rompe v. Yablon*, 277 F. Supp. 662, 663 (S.D.N.Y. 1967) (quoting *Case v. Abrams*, 352 F.2d 193, 195 (10th Cir. 1965)); *accord* 3 DANIEL R. COQUILLETTE, ET AL. MOORE'S FEDERAL PRACTICE § 16.78[3], at 16-210 (3rd ed. 2013); *see* FED. R. CIV. P. 16(d) (A pre-trial order "controls the course of the action unless the court modifies it.")

4

Skyline targeted the patrons buying tickets to the popular Observatory.  The goal was to induce

an Observatory patron to purchase a combination ticket sold by ESB that included the Attraction.

Skyline's right to install video monitors arose under paragraph 2 of the March 1996 License

Modification (EX E) which stated, in relevant part:

> Supplementing Article 5 of the License, Licensee shall be permitted, subject to
> Licensor's prior written approval which shall not be unreasonably withheld, to
> install in locations reasonably designated by Lessor (x) four (4) 32" video
> monitors displaying only advertisements regarding the Attraction in the (i) 80th
> floor Observatory lobby staging area maintained by Licensor . . . and (ii)
> Licensor's ticket sales office for the Observatory . . . .

One of the main issues regarding the monitors was whether the March 1996 License

Modification allowed Skyline to install a total of eight monitors (four in ESB's ticket office and

four on the 80th floor Observatory lobby staging area) or a total of four monitors spread over the

two locations.  The March 1996 License Modification could be read either way.  It was,

therefore, ambiguous, and the Court resorted to parol evidence.

The evidence regarding the negotiation of the quoted provision and the subsequent course

of dealing supports the finding that the parties agreed to a total of four monitors.  Tom Sullivan,

the Assistant Director of Leasing and Assistant General Manager of the Building at that time,

negotiated the March 1996 License Modification Agreement with Zalman Silber, Skyline's

president and chief executive officer.  (Tr. at 119:2-24, 140:24.)[6]  Sullivan testified that during

negotiations, he and Silber discussed that Skyline would be entitled to a total of four monitors.

(Tr. at 120:3-17.)  Silber contradicted Sullivan, denying that he ever negotiated the March 1996

License Modification with Sullivan.  He referred to Sullivan as a "simple bus boy" and a

"lackey" for Steven Tole, the then-Director of Leasing.  (Tr. at 267:16-268:5, 275:21-276:7.)  He

---

[6]      "Tr." refers to the trial transcript which was prepared in two consecutively numbered volumes.  (*See* ECF
Doc. ## 98, 99.)

testified that he and Tole discussed four monitors in the concourse area (where the ESB ticket office was located) and four monitors on the 80th or 86th floor where the visitors to the Observatory gathered.  (Tr. at 280:8-21.)

Silber lacked credibility, and his efforts to minimize Sullivan's role in the negotiations were belied by a nearly contemporaneous April 29, 1996 letter of complaint (EX JJJJJJJ) that Silber wrote to Sullivan regarding their negotiations.  Silber began by complaining that Sullivan had ignored twenty-three messages that Silber had left over ten days.  The letter went on to say that Silber had relied heavily "on your integrity" and against the advice of counsel "to negotiate in good faith" and made broad and sweeping concessions to ESB.  Skyline was also negotiating for additional space and Silber wrote that he had indicated to Sullivan "countless times that these are integral parts of the deal."  He ended his letter stating that he had tremendous respect and affection for Sullivan, and had put his "reputation, job and company on the line based on promises you made to me against the advice of friend and counsel."  He concluded that if things did not change he had serious doubts that he would be able to forestall "a major wave of litigation about to erupt."

Confronted with the letter during cross-examination, Silber tried to rehabilitate his testimony and again minimize Sullivan's importance saying the letter merely asked Sullivan for an executed copy of the modification agreement.  (Tr. at 275:21-276:7.)  Obviously, the letter said much more, confirming that Silber had relied on Sullivan's integrity in negotiating in good faith, had told Sullivan "countless times" that the additional space was an integral part of the deal, and put his reputation, job and company on the line based on "promises" that Sullivan had made and Silber had accepted against the advice of friends and counsel.  Furthermore, Silber did

6

not copy Tole on the letter which threatened to unleash a wave of litigation.  Consequently, I credit Sullivan's testimony regarding the negotiations and discredit Silber's testimony.

The parties' subsequent conduct confirmed that they did not agree to eight monitors. Following the execution of the March 1996 License Modification, Sullivan had dozens of conversations with Silber and Michael Leeb, Skyline's chief operating officer, regarding the installation of four monitors.  (Tr. at 139:6-21.)  Additionally, until ESB moved its ticket office to another space in the Building concourse, Skyline had only two or three monitors in the ticket office.  Leeb testified that after ESB relocated the ticket office in 1997 or 1998, Skyline had five or six monitors in the ticket office.  (Tr. at 19:18-24.)  Sullivan explained that during periods of disruption, such as construction or when the ticket office was being moved to the second floor, ESB accommodated Skyline by allowing additional signage.  (Tr. at 120:18-121:3.)  Finally, as discussed below, each time ESB designated four locations for the monitors, Skyline never suggested that it was entitled to eight.

The tensions between the parties increased in April 2005, when ESB moved its ticket office from the concourse to the new Visitor Center on the second floor.  The move raised a host of issues and triggered litigation brought by Skyline relating primarily to access to its space. These events are described in *Skyline I*, 432 B.R. at 71-72.  Shortly thereafter, the parties entered into the May 2005 Agreement through which they intended to resolve the dispute that triggered the litigation as well as some but not all of their remaining disagreements.  *Id.* at 72.  Each party was represented by counsel in connection with negotiation and execution of the May 2005 Agreement, (*PTO*, Ex. A (*Stipulation of Undisputed Facts*), at ¶ 10), and the parties exchanged mutual releases of all existing claims.  (*Id.*, Ex. A, at ¶ 11.)

7

One of the subjects mentioned in the May 2005 Agreement was the monitors.  The
relocation of the ticket office had rendered it necessary to relocate Skyline's monitors.  The May
2005 Agreement, on which Skyline relies, did not give Skyline the right to install any video
monitors at any particular location.  Instead, it obligated Skyline to negotiate "suitable
alternatives" with ESB in good faith:

> ESBC acknowledges the License provisions concerning [Skyline's] plasma
> television screens ("the Screens").  Without waiving or in any way compromising
> the aforementioned provisions, [Skyline] agrees to explore suitable alternatives
> with ESBC in good faith.

(EX I, at ¶ 11.)

Following the execution of the May 2005 Agreement, ESB asked Skyline to hold off on
the monitors until ESB completed renovations to the Visitor Center because the monitors would
have to be taken down during the renovations.  (Tr. at 27:10-18.)  ESB also wanted its architects
to approve appropriate locations for Skyline's monitors because ESB wanted the monitors to
work with the design and renovations to its Visitor Center.  (Tr. at 201:21-202:9.)  During an
October 2005 meeting, Leeb agreed that Skyline would wait six months before revisiting the
issue, but expressed Skyline's concern that it needed the monitors to combat dwindling sales.
(EX CCCCC.)

Approximately three months later, however, Skyline raised the monitor issue.  In a
January 26, 2006 letter from Robert K. Brady of Skyline to ESB's Sullivan (EX EEEEE), Brady
complained that over the past seven months, Skyline had tried to negotiate an agreement to place
four plasma screens in the ticket office "as contemplated by the License and the May 27
agreements," but as of the end of 2005, ESB had only provided space for two screens on

temporary mountings. ESB had failed to grant Skyline access to its ticket office for the screens contemplated by the parties' agreements.

ESB responded four weeks later. In a letter dated February 22, 2006 (EX GGGGG), it designated four monitor locations on the second floor. Three of the designated locations were in the ESB ticket office queue area. (Tr. at 198:13-16; *see* EX GGGGG, at p. 3 (locations 2, 3 and 4).) One designated location was in the security queue area. (Tr. at 198:19-21; *see* EX GGGGG, at p. 3 (location 1).) All four locations were in areas where Observatory visitors gathered before purchasing their tickets. Leeb testified that the four designated locations were "satisfactory," (Tr. at 29:3-6), "very acceptable," (Tr. at 63:20-23), and "okay." (Tr. at 78:9-13.) Notably, Skyline did not insist on eight monitors. (Tr. at 61:18-25.)

The February 22, 2006 letter (EX GGGGG) asked Skyline to provide ESB, "for its approval, with plans and specifications indicating the manner in which such video monitors will be installed."[7] Skyline admitted at trial that it never did. (Tr. at 62:1-7, 63:2-6.) According to Leeb, Robert Zorn, ESB's Director of the Observatory, made clear that notwithstanding the February 22, 2006 letter, Skyline could not install the monitors because ESB was still working with its architects on the renovation of the ticket office. (Tr. at 32:12-33:2, 79:22-80:12.)

There were conflicting accounts regarding the effect of the renovations on the installation of the monitors. The February 22, 2006 letter acknowledged that ESB was in the process of completing renovations, but Zorn testified that areas still undergoing renovation did not include the four designated locations, and the renovations would not have impacted the installation of the

---

[7]    The installation of the monitors was subject to ESB's approval which it could not unreasonably withhold. (EX E, at ¶ 2.)

9

monitors.  (Tr. at 201:2-9.)  In addition, he testified that while he asked Leeb to delay installation before February 2006 for the reasons stated, he did not ask Leeb to delay the installation of the monitors after that time.  (Tr. at 201:10-202:16.)  On the other hand, an April 25, 2008 email from Leeb to Zorn's successor, Jean-Yves Ghazi (EX OOOOO), referred to past discussions regarding the effect of continuing delays in the renovation project on the installation of the monitors and the desire to "consider an installation as soon as possible."

It is not clear, however, which discussions Leeb was referring to because Ghazi had just joined ESB as Director of the Observatory in 2008.  (*See* Tr. at 88:22-25.)  Moreover, when Ghazi designated four new locations in October 2009 (discussed below), he was not even aware of the February 2006 locations.  (Tr. at 108:24-109:2.)  This undercuts the notion that Leeb had ever discussed the installation of monitors with Ghazi; if he had, he would undoubtedly have mentioned the February 2006 designations which were acceptable to Skyline.

Instead, the chronology implies that Leeb was referring to the earlier discussions with Zorn, and Skyline failed to rebut Zorn's testimony that he never asked Leeb to delay the installation of the monitors after the February 2006 letter.  In addition, Zorn prepared an internal memorandum on October 4, 2006 (EX MMMMM) regarding the May 2005 Agreement in which he stated his understanding that that Skyline was permitted to have five monitors within the ticket office area, but that the parties had agreed that Skyline would hang three monitors–two in Visitor's Center ticket office and one in the pre-security area.  (*Id.* at Bates No. ESB-03998.)  According to Zorn, Skyline instituted the change from four monitors provided for in the February 2006 designation to three as reflected in his memorandum.  (Tr. at 235:2-7.)  His memorandum concluded that Skyline had not hung any of these monitors, and had only one portable monitor in the ticket office area.  (EX MMMMM, at Bates No. ESB-03998.)  Notably,

10

the memorandum did not refer to any delay caused by the renovations, and implied that Skyline failed to do what the parties agreed it could and would do.

Moreover, the evidence supports the finding that Skyline never followed up Zorn's February 2006 request for plans because it could not come up with a satisfactory concept for its monitors. It was working with several companies to design a system that fit its needs. (*See* Tr. at 29:18-32:11.) Leeb sketched out a design in which four "slave" computers located in Skyline's space would control four "slave" monitors in ESB's ticket office area, (*see* Tr. at 64:21-65:11; EX HHHHH), but never submitted anything to ESB. (*See* Tr. at 63:25-65:14.) Skyline could not solve its own technological problems, (*see* Tr. at 86:1-14), and never provided the plans that ESB asked for.

The issue of monitors again became the subject of discussion in October 2009, during Court-ordered mediation. (*See* Tr. at 109:10-21.) By letter dated October 15, 2009 (EX QQQQQ), Ghazi designated four locations for Skyline's monitors on the 2nd and 80th floors: one monitor in the ticket office queue, one in the corridor near Skyline's premises, one on the 80th floor "up" queue and one on the 80th floor "down" queue. (Tr. at 90:20-24, 92:22-93:20; *see* EX QQQQQ.) The letter reminded Leeb to submit plans and specifications for ESB's approval. According to Ghazi, ESB selected these locations after considering their ability to raise the awareness of the Attraction to potential customers before they reached the point where they could purchase combination tickets to the Observatory and the Attraction from ESB or solely to the Attraction from Skyline and before and after they left the Observatory. (*See* Tr. at 92:22-93:20, 96:19-97:21.)

Leeb objected to any locations on the 80th floor notwithstanding the provisions of the

March 1996 License Modification (and Skyline's current position as stated in the *PTO*).  He

testified that a tourist who went to the Observatory would have to leave the Building and reenter

it to visit the Attraction, (Tr. at 39:20-40:7), although Ghazi contradicted this.  (Tr. at 94:10-11.)

In addition, monitors on the 80th floor would have been limited to a static feed showing one

video.  (Tr. at 40:22-41:7.)  Again, Leeb did not ask for a total of eight monitors instead of four.

(Tr. at 65:24-66:2.)  For whatever its reasons, Skyline never responded to Ghazi's October 2009

letter, (Tr. at 66:16-18, 95:16-17), and never submitted any plans and specifications to ESB.  (Tr.

at 66:22-25, 100:23-101:4.)

In March 2010, and following a walk-through with Leeb, Ghazi again designated four

locations for Skyline's monitors.  (EX TTTTT.)  This time, one monitor was placed in the

security queue, one in the ESB ticket office queue, one near Skyline's premises prior to

Skyline's ticket counter and one "down" queue on the 80th floor.  (Tr. at 96:4-97:21; EX

TTTTT.)  The difference between this designation and the October 2009 designation was that the

monitor on the "up" queue on the 80th floor was relocated to the security queue.  During the

walk-through, Leeb neither agreed with nor objected to the proposed locations, (Tr. at 100:17-

22), and Leeb testified that the monitors proposed by ESB in in the security queue and ESB

ticket office queue were acceptable.  (Tr. at 79:9-16.)

### b.    Discussion

Initially, I briefly state the principles of law that govern this contract action and apply to

all of the claims that were tried.  Under New York law, "an action for breach of contract requires

proof of (1) a contract; (2) performance of the contract by one party; (3) breach by the other

party; and (4) damages." *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525 (2d Cir. 1994);

*accord Fischer & Mandell LLP v. Citibank, N.A.*, 632 F.3d 793, 799 (2d Cir. 2011); *First Investors Corp. v. Liberty Mut. Ins. Co.,* 152 F.3d 162, 168 (2d Cir. 1998).  Where a party seeks an injunction granting specific performance, "a party can be compelled to perform its contractual obligations if (1) there is a valid contract; (2) plaintiff has substantially performed under the contract and is willing and able to perform its remaining obligations; (3) defendant is able to perform its obligations; and (4) plaintiff has no adequate remedy at law." *La Mirada Prods. Co., Inc. v. Wassall PLC*, 823 F. Supp. 138, 140 (S.D.N.Y. 1993); *accord Wells Fargo Bank, N.A. v. Bank of Am., N.A.*, No. 11 Civ. 4062 (JPO), 2013 WL 372149, at *8 (S.D.N.Y. Jan. 31, 2013).

"A written agreement that is clear, complete and subject to only one reasonable interpretation must be enforced according to the plain meaning of the language chosen by the contracting parties." *Brad H. v. City of New York*, 951 N.E.2d 743, 746 (N.Y. 2011).  A court does not read the words of the contract in a vacuum, and must give "due consideration to 'the surrounding circumstances [and] apparent purpose which the parties sought to accomplish.'" *Thompson v. Gjivoje*, 896 F.2d 716, 721 (2d Cir. 1990) (quoting *William C. Atwater & Co., Inc. v. Panama R. Co.*, 159 N.E. 418, 419 (N.Y. 1927)); *accord Dev. Specialists, Inc. v. Peabody Energy Corp. (In re Coudert Bros.)*, 487 B.R. 375, 389 (S.D.N.Y. 2013) ("[I]n analyzing contractual text, a court need not turn a blind eye to context.").  Where a contract is unambiguous, extrinsic evidence concerning the parties' course of conduct is irrelevant.  *TNT USA Inc. v. DHL Express (USA), Inc.*, No. 09–CV–0481 (JS) (ARL), 2012 WL 601452, at *6 (E.D.N.Y. Feb. 23, 2012); *Nat'l Abatement Corp. v. Nat'l Union Fire Insur. Co.*, 824 N.Y.S.2d 230, 232 (N.Y. App. Div. 2006); *239 East 79th Owners Corp. v. Lamb 79 & 2 Corp.*, 818 N.Y.S.2d 194, 195 (N.Y. App. Div. 2006).

If the contract is ambiguous, the court may resort to extrinsic evidence. In determining the meaning of an ambiguous provision, reasonable certainty rather than absolute certainty is the goal. *Travellers Int'l AG v. Trans World Airlines, Inc.*, 722 F. Supp. 1087, 1102 (S.D.N.Y. 1989). The Court should consider the specific language of the contract, the context within which the contract was formed, the course of dealing between the parties and trade practice. *See Paper Corp. of the U.S. v. Schoeller Technical Papers, Inc.*, 807 F. Supp. 337, 347 (S.D.N.Y. 1992); *Travellers Int'l*, 722 F. Supp. at 1102. In addition, "[t]he practical interpretation of a contract by the parties, manifested by their conduct subsequent to its formation for any considerable length of time before it becomes a subject of controversy, is entitled to great, if not controlling weight in the construction of the contract." *Viacom Int'l, Inc. v. Lorimar Prods., Inc.*, 486 F. Supp. 95, 98 n.3 (S.D.N.Y. 1980) (citing cases); *accord Dar El-Bina Eng'g & Contracting Co., Ltd. v. The Republic of Iraq*, 79 F. Supp. 2d 374, 384-385 (S.D.N.Y. 2000) ("There is a long line of New York case law endorsing the doctrine of practical construction and allowing courts to look to the parties' practical interpretations of a contract, as demonstrated by their conduct, in determining their intentions with regard to ambiguous contractual language.").

According to the *PTO*, Skyline contends that ESB breached the May 2005 Agreement by unreasonably refusing to allow Skyline to install four video monitors in the Visitor Ticketing Area and additional monitors on the 80th floor. (*PTO* at ¶ 3(a)(i).) The Court did not receive any direct evidence regarding the reason for the inclusion of the monitor clause in the May 2005 Agreement. It does not appear that any issue arose until ESB moved its ticket office on the concourse of the Building to the new Visitor Center on the second floor. The combination of the second floor construction, the smaller ticket office and the new traffic pattern affected Skyline's view of desirable locations.

14

The monitor clause in the May 2005 Agreement must be read in conjunction with the March 1996 License Agreement to which it referred. The clause reflected the parties' understanding that it was no longer feasible to place four or even fewer monitors in the new ticket office. In fact, ESB did not advertise there either. Instead, ESB advertised in the pre-security area to encourage its patrons to make their decisions before they reached the ticket office and thereby speed the purchase of tickets and the movement of the patrons. (Tr. at 198:22-199:21.) Skyline was content with any designated location where the Observatory visitors gathered and before they purchased their tickets because Skyline hoped to generate ticket sales to the Attraction through ESB's sale of combination tickets. This is why Skyline did not object to the designated locations in the security queue or the Visitor Center ticket queue. Reading the two agreements together, ESB was required to reasonably designate a total of four monitor locations in the pre-ticketing area of Visitor Center, including the area of the security queue, and/or the 80th floor staging area. If the parties could not agree on the locations, Skyline had to negotiate "suitable alternatives" in good faith.

In February 2006, ESB complied with its obligation to reasonably designate four monitor locations when it designated one location in the security queue and three locations in the area of the Visitor Center ticket queue. Skyline found the designations acceptable, but failed to submit plans and specifications for ESB's approval as required by the March 1996 License Modification. Skyline failed to follow up and submit plans and specifications because it could not develop the concept it wanted for its monitors that was technologically feasible.

In October 2009, ESB made a second designation. This time, it placed two monitors on the 80th floor and two on the second floor–one in the ESB ticket queue and one after the ESB ticket office but before Skyline's ticket office. The March 1996 License Modification expressly

15

permitted designations in the 80th floor staging area, and Skyline failed to demonstrate that the 80th floor designations did not comply with the agreement.  Furthermore, the designation near the ESB ticket queue was reasonable and should have been acceptable to Skyline.

The designation of the location between the ESB ticket office and Skyline's premises was subjectively unreasonable to Skyline because it hindered the sale of a combination ticket. However, this monitor was located along the traffic pattern moving toward the Observatory, and was equally as effective as the monitors Skyline had bargained for in the 80th floor staging area. Furthermore, Ghazi's testimony demonstrated that ESB had considered Skyline's interests in designating the four locations, and their selection was objectively reasonable.  If it did not like a designated location, Skyline was obligated under the May 2005 Agreement to negotiate a "suitable alternative" in good faith.  It failed to adduce any evidence that it did so except to the extent that this can be inferred from ESB's third designation in March 2010.

The March 2010 designation moved the "up" queue 80th floor monitor to the security queue on the second floor.  The change was acceptable to Skyline, but it still objected to the one 80th floor monitor, which was permitted by the parties' agreement, and the designated location between the ESB ticket office and Skyline's premises.  These designated locations were more satisfactory to Skyline, and were reasonable for the reasons stated.  If Skyline had complaints, Skyline was obligated to negotiate a "suitable alternative" in good faith, but it failed to do so.

Instead, Skyline's entire approach to the monitor issue has been that unless ESB hit the "right" locations spot on, there was nothing to discuss.  When ESB did hit it spot on in February 2006, Skyline failed to submit plans for ESB's approval pursuant to the March 1996 License Modification.  When ESB designated four locations on two subsequent locations, Skyline

16

objected to some of the locations, but failed to negotiate "suitable alternatives" in good faith as required by the May 2005 Agreement. Accordingly, Skyline failed to prove that ESB breached its obligations relating to Skyline's right to install monitors, and this aspect of Skyline's Fourth Claim for Relief is dismissed.

### 2.    Signage

Skyline's Fourth Claim for Relief also alleged that ESB breached the May 2005 Agreement by failing to "permit Skyline to erect specified signage on ESBC's premises" (the "Signs"). (*TAC* at ¶ 137(e).) In the *PTO*, Skyline contended that "ESB has refused to install signage directing visitors to the Attraction in each and every location as such signage was placed prior to April 4, 2005." (*PTO* at ¶ 3(a)(i).) Skyline initially sought damages, but withdrew its damage claim with prejudice. According to the *PTO*, it now seeks a declaration that ESB breached the May 2005 Amendment, an injunction against the continuing breach and a direction requiring ESB to comply with the May 2005 Agreement. (*PTO* at ¶¶ 2(a)(iii), 3(a)(i).)

Prior to the renovation of the Building's lobby in 2005, Skyline had nine or ten back-lit, wall-mounted signs in the lobby which had been designed and installed by ESB. (Tr. at 18:11-19:3.) After the renovation and the relocation of the ticket office to the second floor, only one sign remained in the lobby. (Tr. at 21:9-14.) The May 2005 Agreement granted Skyline the right to replace the Signs at its own expense:

> ESBC agrees that, effective May 31, 2005, ESBC will permit NYSR to install *at NYSR's expense* the following:
>
> (a) Signage directing ESCB [sic] and NYSR visitors to the NYSR Premises with the same content and design and not less than same quality, and in each and every same location, as such signage was placed prior to April 4, 2005, an example of such new signage being attached as Exhibit A to this agreement.

(EX I, at ¶ 10(a) (emphasis added).)

17

Skyline never installed the new Signs or addressed the issue with Zorn before he left his position as Director of the Observatory in January 2008.  (Tr. at 194:2-4, 206:22-207:5.)  Ghazi replaced Zorn as Director of the Observatory in 2008 and Skyline raised the issue of the Signs during the 2009 mediation.  (Tr. at 102:12-15, 109:16-21.)  On March 8, 2010, Ghazi and Leeb walked through the lobby of the Building to identify the locations where the signs had been placed prior to April 4, 2005.  (*See* Tr. at 47:18-22, 102:16-18; EX TTTTT.)  The next day, Ghazi sent an email to Leeb enclosing a diagram of the lobby indicating the location of the removed signs and asking Leeb to "please confirm the attached accurately represents NYSL's request for lobby signage."  (Exhibit XXXXX; *see* Tr. at 102:19-23.)  Leeb responded eight minutes later confirming that the diagram accurately reflected the location of the signs prior to April 4, 2005.  (EX XXXXX.)  After this email exchange, Skyline did not install or take any steps to install the Signs (and still has not done so).  (Tr. at 49:13-20, 103:10-12.)  Nor did it later communicate with ESB regarding the Signs or submit any plans for their installation, (Tr. at 103:13-18), as required by the Lease.  (*See* EX A, at ¶ 44 G.)

Skyline claimed at trial that it could not install the Signs because ESB failed to return the old signs.  However, the May 2005 Agreement did not require ESB to return the old signs, and Skyline could not use them anyway.  They were removed because they pointed to the concourse ticket office, and after ESB moved its ticket office to the second floor, the old signs pointed in the wrong direction.  (Tr. at 57:15-58:23.)  Skyline had no reason to put the same signs in the same locations.  In addition, ESB designed and installed the old signs, and Skyline failed to demonstrate that it had any property interest in them.

Skyline also argued at trial that it could not install the Signs because ESB did not obtain permission for their installation from the Landmarks' Preservation Commission ("Landmarks").

18

Neither the Lease nor the License required ESB to obtain Landmarks' approval for Skyline.  To

the contrary, the Lease required Skyline to obtain any required Landmarks approval for its

signage at its own expense.  (EX A, at ¶ 44 G.)  Furthermore, Skyline never asked ESB to assist

it in obtaining Landmarks' approval to install the Signs and ESB never refused to assist Skyline

in obtaining Landmarks' approval to reinstall the Signs.  (Tr. at 103:7-9, 113:22-114:2.)

Accordingly, Skyline has failed to prove that ESB breached any contractual duty relating

to lobby signage, and this aspect of the Fourth Claim for Relief is also dismissed.  Since there are

no remaining claims encompassed within the Fourth Claim for Relief, it is dismissed in its

entirety.

**B.     ESB's Breach of Contract Claims**

**1.     Commissions and Sales Incentives**

Paragraph 7(d) of the May 2005 Agreement provides, in pertinent part:

> All NYSR employees and representatives who work in the NYSR Premises or in
> any area of or near the Building (including without limitation the Visitor Center)
> in the course of performing NYSR-related duties:
>
> . . . .
>
> • Must be salaried employees and not working on commission or other sales
> incentive.

ESB's Second Counterclaim in its *Answer to Third Amended Complaint and Counterclaims*,

dated Sept. 15, 2009 ("*TAC Answer*") (ECF Doc. # 33) alleged, *inter alia*, that Skyline breached

the May 2005 Agreement by "[c]ompensating its employees and/or independent contractor

representatives on a commission or other sales incentive basis."  (*TAC Answer*, at ¶ 320(b);

*accord PTO* at ¶ (3)(c)(iv) ("Skyline . . . compensates employees working on the Building

sidewalks on an hourly basis plus a monthly bonus if a certain level of sales are met.  Skyline

also compensates independent contractors working across the street from the Building solely on a commission basis.").)

The Court previously determined that the relevant portion of the May 2005 Agreement concerning the geographical and compensation limitations is ambiguous. *Skyline II*, 471 B.R. at 87. Both sides agree the clause was intended to stem aggressive sales tactics by Skyline agents selling tickets to the Attraction at or near the Building, (Tr. at 143:11-20, 224:4-10, 244:9-19, 283:21-284:10), but especially in front of the Building, (Tr. at 209:7-22), and on the sidewalk footprint. (Tr. at 224:24-225:2.) They disagree over whether Skyline can consider an employee's sales performance in fixing his salary and whether "any area of or near the Building" includes the sidewalks directly across the street from the Building and west of the Building footprint but east of Sixth Avenue on 33rd and 34th Streets.

### a.    Facts

#### i.    The Geographical Limitations

Prior to the May 2005 Agreement, Skyline compensated its sales agents through a combination of hourly wages and commissions. (Tr. at 143:7-10, 362:18-23.) ESB believed that paying Skyline's employees on an hourly or salaried basis would help lessen Skyline's overreaching or overselling of tickets, and the resulting negative impact on the Building. (Tr. at 207:23-208:15, 208:20-209:22.) ESB insisted on the language "commission or sales incentive" to capture any type of incentive that went beyond salary. (Tr. at 209:24-210:6, 257:8-11.) ESB's intent was to prevent Skyline from rewarding its employees for specific transactions, (Tr. at 260:4-11), but acknowledged that it did not prevent Skyline from adjusting salaries annually to reward employees for superior performance. (Tr. at 258:15-25.)

The parties did not discuss any precise definition of the phrase "of or near the Building." (Tr. at 261:7-262:4, 360:24-361:2.)[8]  In fact, ESB believed that there was no geographic limit. (Tr. at 261:7-20.)  According to Thomas Keltner, general counsel to Malkin Holdings and the individual who spearheaded the negotiations for ESB leading to the May 2005 Agreement, the prohibited selling zone reached any area where Skyline salespersons started to encounter tenants and visitors to the Building in a concentrated number, and could include areas as far from the Building as Penn Station.  (Tr. at 250:11-20.)  Skyline witnesses testified that they viewed the limitation differently.  At the time, ESB was seeking to upgrade the operations, look and feel of the Building, and they understood the phrase to refer to the Building itself and its footprint, *i.e.*, the sidewalk area adjacent to the Building.  (Tr. at 353:2-15.)

Despite its view at trial that the restriction on commission-based selling was limited to the Building and its footprint, other evidence showed that Skyline recognized a broader restricted zone.  Following the May 2005 Agreement, Skyline established a system using two different types of sales agents on the street:  the blue jackets and the orange jackets.  (Tr. at 288:10-15.)  The blue jackets, or blue team, were employees of Skyline who sold tickets on the footprint.  (Tr. at 288:16-21, 289:6-19, 304:9-16.)  The orange jackets, or orange team, were independent contractors of Skyline who sold tickets on all areas outside of the footprint of the Building.  (Tr. at 288:16-21, 289:6-15.)  Skyline admitted that it compensated the independent contractors on a commission basis.

---

[8]     In contrast, Paragraph 7(d) of the May 2005 Agreement prohibited Skyline employees and representatives from standing, soliciting or conducting Skyline-related business "in the immediate area of the Building sidewalk (from Building line to curb) which is directly in front of any Building entrance (at Fifth Avenue, 33rd Street, or 34th Street)."

Beginning in 2009, at roughly the same time that ESB asserted the instant counterclaim, Skyline entered into contracts with at least some of its independent contractors.  The contracts contained an addendum, and paragraph 4 of the addendum established an area within which the independent contractors could not sell Skyline tickets:

> All individuals are required to sell tickets outside of the Empire State Building zone.  Tickets may be sold above 36th Street, below 31st Street, higher than Madison Avenue, and lower than Broadway.  Absolutely no selling around the building.

In some of the agreements produced in discovery and received in evidence, part or all of this paragraph was deleted, but the deletions were not initialed by the parties and there was no explanation regarding how the deletions came about.  (*See* EX DDDDDD, at Bates nos. 23508, 23556, 23566, 23394, 23495, 23423, 23481, 23437.)  The majority, however, did not delete any part of paragraph 4 to the addendum.  (*See* EX DDDDDD, at Bates nos. 23445, 23492, 23465, 23526; EX EEEEEE; EX FFFFFF; EX GGGGGG.)  In November 2010, Skyline entered into a series of agreements that prohibited the independent contractors "from working on any part of any sidewalk which borders the Empire State Building."  (*See* EX IIIIII, Addendum B, at ¶ 2.)

Leeb acknowledged that the area bounded by 36th Street on the north, 31st  Street on the south, Madison Avenue on the east and Broadway on the west defined the Empire State Building zone (the "Zone").  (Tr. at 156:25-157:8, 158:17-20.)  Only salaried Skyline employees could sell tickets inside the Zone.  In explaining the changes made in the November 2010 agreements, Leeb testified that it was impossible to supervise employees working within the Zone.  Consequently, Skyline decided to shrink the Zone, bring the employees within the footprint, and allow the independent contractors to fill the void.  (Tr. at 161:18-162:9.)  As a result, Skyline's independent contractors started selling tickets inside the Zone, including across the street and

down the block from the Building–areas that were previously restricted to employees.  (*See* Tr. at 304:17-306:9, 334:6-16.)

### ii.    Employee Compensation

As noted, the May 2005 Agreement did not impose any geographical limit on where Skyline's employees could sell tickets, but required that if they sold tickets "of or near the Building" they had to be salaried "and not working on commission or other sales incentive." Skyline's blue team employees are paid an hourly rate ranging from $8 per hour (for trainees) to $20 per hour.  (Tr. at 166:18-23.)

Although Skyline contended that it did not pay commissions or bonuses to employees based on sales, evidence suggested that Skyline had a policy of doing so.  For example, the Court received a commission schedule for "employees."  (EX KKKKKK.)  Leeb testified that it applied to independent contractors, not employees.  (Tr. at 165:16-166:2.)  Since May 2011, and as recently as May 6, 2013, Skyline's website has advertised that it pays its employees a "competitive hourly base salary, plus commissions on ticket sales!!" (Exhibits LLLLLL, MMMMMM, QQQQQQ.)  Leeb stated that this was "wrong."  (Tr. at 175:2-7, 175:19-176:20.) Finally, Skyline's employee handbook states that "[s]taff should speak to their managers/supervisors regarding revenue goals which will yield bonuses," (Skyline Ex. 190, at 12), but Leeb said this statement was "misleading" and "incorrect."  (Tr. at 343:17-344:6.) While Leeb's denials strained credibility, ESB failed to offer evidence that Skyline paid any employee a commission or other sales incentive based directly on specific sales that the employee made.

Skyline nevertheless concedes that sales performance had an indirect effect on employee compensation. The employee's hourly wage was based upon a variety of factors that included attendance, sales record, presence or absence of complaints against the employee and good on-time performance. (*See* Tr. at 167:4-13.) In addition, although Skyline contends that it did not pay incentive bonuses to individuals based solely on their sales performances, it concedes that it set shift or company sales goals. (Tr. at 170:21-171:11; *see* Tr. at 308:15-309:3.) Supervisors communicated the sales goals to managers, (*see* Tr. at 309:16-20), and the managers communicated the goals to the employees on each shift. (Tr. at 308:15-24.) The supervisors and managers monitored the number of sales employees made throughout their shifts. (Tr. at 309:21-310:8.) Employees with consistently high sales received bonuses and could become independent contractors working on a straight commission. (Tr. at 307:16-308:14; *see* Tr. at 322:8-20.) On the other hand, an employee who failed to perform satisfactorily might be sent home, forced to clock out and not get paid, sit and wait until he was ready to perform better, or be terminated. (Tr. at 172:12-21, 310:9-21, 311:5-16.)

### b.    Discussion

As noted, the parties agreed to restrict commission salespersons to areas that were not "of or near the Building" to protect the Building's tenants and visitors from aggressive sales tactics. The parties understood that a commission salesperson who received compensation based on the number of tickets he sold was more likely to engage in the type of aggressive behavior ESB sought to forestall. ESB's primary areas of concern were the Building entrances and the sidewalk footprint. The parties did not discuss a specific geographic limitation on commission selling, and agreed to a broader but vaguer clause.

24

The most probative evidence of what the parties intended is evidenced by Skyline's understanding of the Zone as reflected in Leeb's testimony and the independent contractor agreements signed prior to November 2010. These agreements created a two block, one avenue frozen zone around the Building, bordered by 36th Street, 31st Street, Madison Avenue and Broadway, which was off limits to the independent contractors. Only salaried employees could sell tickets within that area. The limitation was a reasonable one and accomplished its purpose– preventing aggressive sales persons from accosting tenants and visitors "of or near the Building." In November 2010, Skyline narrowed the Zone to the Building's footprint, not because it had changed its view of the Zone but because it could not supervise employees selling tickets in the Zone.

Accordingly, ESB is entitled to a declaration that all areas within the Zone, *i.e.*, south of 36th Street, north of 31st Street, west of Madison Avenue and east of Broadway, are areas "of or near the Building" within the meaning of the May 2005 Agreement, and Skyline breached the May 2005 Agreement by compensating its orange team of independent contractors selling within the Zone on a commission basis.[9] ESB lacks an adequate remedy at law for this continuing breach, and it is entitled to an injunction prohibiting Skyline from paying its employees or representatives that work in the Zone a commission or other sales incentive.

It does not follow, however, that Skyline has breached the May 2005 Agreement's prohibition against paying a commission or other sales incentive to its employees who sell tickets

---

[9] I reject ESB's view that the geographical limit extended to any area where tenants and visitors started to concentrate. The clause limits selling "of or near the Building." "Near" is a relative term, but connotes a close proximity. *See* BLACK'S LAW DICTIONARY 1129 (9th ed. 2009) ("Close to; not far away, as a measure of distance"); WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY UNABRIDGED 1510 (1981) ("WEBSTER'S") ("not far distant in time, place, or degree"). ESB's interpretation ignores the proximity requirement and focuses on where the tenants and visitors concentrate. Under this view, the restricted zone could extend to an outer borough or even another state where a tour group waited to board a bus to take a trip to the Building.

within the Zone.[10]  In denying ESB's motion for summary judgment on this aspect of its claim in

*Skyline II*, the Court stated:

> A "commission" refers to "a fee paid to an agent or employee for transacting a piece of business or performing a service . . . *esp[ecially]:* a percentage of the money received in a sale or other transaction paid to the agent responsible for the business." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY UNABRIDGED 457 (1981) (emphasis in original).  Thus, a "commission" generally refers to the compensation a salesman receives on a particular sale.  On the other hand, a "sales incentive" is broader, and can include the more traditional commission as well as any other monetary or non-monetary consideration based on sales.

*Skyline II*, 471 B.R. at 87.  This definition of "commission" meshed with ESB's understanding of

what it was prohibiting–increased compensation measured by specific sales transactions.

Similarly, "other sales incentive" referred to any form of compensation other than a commission

that was measured by specific sales transactions.  The May 2005 Agreement did not prevent

Skyline from establishing annual or shift-based sales goals as long as they did not tie an

employee's compensation to specific transactions.

Furthermore, Skyline is in the business of selling tickets to the Attraction, and may

naturally take into account the employee's success as a salesperson as well as the other factors

including punctuality, attendance and absence of complaints in fixing his salary.  Even Keltner

conceded that the May 2005 Agreement allowed Skyline to "reward superior performance in

employees."  (Tr. at 258:22-23.)  He sought to distinguish between an "annual adjustment of

base salary" and "special bonuses . . . tied to the metrics of specific sales results," (Tr. at 258:21-

25), but the distinction is difficult to apply.  Skyline cannot measure the "superior performance"

without considering that employee's "specific sales results."  Moreover, the distinction between

---

[10]    The prohibition on paying commissions or other sales incentives applies to all employees (selling and non-selling) who work "of or near the Building."  However, the clause was inserted to control selling, and ESB did not offer evidence that Skyline paid its non-selling employees a commission or other sales incentive.

annual adjustments and other, shorter periodic adjustments (weekly, monthly) is not one the May 2005 Agreement will bear.

In addition, some of the arguments that ESB has made regarding the reach of this clause lead to absurd results. For example, ESB makes much of the fact that Skyline disciplines poor performance, whether sales, attendance or otherwise, by forcing the employee to clock out and/or go home and/or lose his job. ESB contends that disciplining poor salespersons is a prohibited sales incentive. (*See ESB's Proposed Findings of Fact*, dated June 28, 2013, at ¶¶ 208-10 (ECF Doc. # 101).) But Skyline should be able to discipline and, if need be, fire incompetent employees. ESB's position creates a perverse incentive to perform poorly–Skyline can only reward its ineffective salespersons and discipline its effective sales persons without running afoul of the May 2005 Agreement. ESB even goes so far as to argue that paying a bonus to an employee for good attendance is a prohibited sales incentive under the May 2005 Agreement. (*See id.* at ¶ 207.)

ESB's interpretation of "sales incentive" is inconsistent with its chief negotiator's view of what is permissible, and is unreasonable. The clause was intended to prevent Skyline from tying an employee's compensation to specific sales the employee made. While the evidence demonstrated that Skyline considered a person's sales performance along with other factors in fixing his wages, ESB failed to prove that Skyline paid any employee a "commission or sales incentive" based on a specific selling metric, and Skyline is entitled to judgment dismissing ESB's Second Counterclaim.

### 2.    The Gift Shop

Article 1 of the Lease provides that Skyline, as "Lessee shall use and occupy the premises only as permitted in Article 44 and they shall be used for no other purposes by Lessee or any other person." (EX A.)  Paragraph 1 of the October 1993 Lease Modification modified Article 44.A. of the Lease to permit Skyline to "sell first class, tasteful souvenir gift items which are readily identifiable with the Attraction." (EX C, at ¶ 1.)  ESB's Fourth and Fifth Counterclaims allege that Skyline is violating the Lease by selling souvenirs in its gift shop that are "not readily identified with the Attraction," and seek declaratory and permanent injunctive relief. (*TAC Answer* at ¶¶ 325-33; *accord PTO* ¶ 3(c)(vi).)

The provision allowing the sale of souvenirs was added because Silber wanted to open a concession stand in Skyline's space that his brother could run. (Tr. at 121:15-24.)  Sullivan told Skyline (presumably Silber) that ESB had a large tenant on the 86th floor (Host) that had the exclusive right to sell general souvenirs to tourists, and ESB received a percentage of the sales revenues as additional rent.  ESB did not want to cut into its percentage rent, and consequently, specifically excluded souvenirs other than those associated with the Attraction. (Tr. at 122:4-20.)  As a result, Skyline could not sell generic New York City souvenirs. (Tr. at 129:14-21.)  At the time, Silber knew that Host was selling souvenirs, (Tr. at 271:24-272:1), but did not recall any discussions about the Host gift shop during the negotiations. (Tr. at 272:4-6.)  In his view, the provision allowed Skyline to sell any generic New York City-related souvenir. (Tr. at 266:7-9.)

Since the amendment, Skyline has sold generic New York City-related souvenirs that did

not include Skyline's name or logo.[11]  (Tr. at 266:7-12, 271:2-13.)  Skyline continues to sell such

generic New York City-related items as well as tangential or wholly unrelated items, including "I

♥ N.Y." coffee mugs, (EX BBBBBBB), a stuffed bear wearing an "Uncle Sam" hat with the

words "New York" and a police car on its stomach, (EX RRRRRR), a President Obama bobble

head, (EX SSSSSS), tank tops emblazoned with the logo and shield of the New York Police

Department, (EX TTTTTT), t-shirts and pot holders bearing the words "New York" and listing

various tourist attractions in the city, (EX UUUUUU, ZZZZZZ), pajama bottoms with drawings

of New York City taxis and the words "New York," (EX VVVVVV), key rings with charms

depicting New York license plates and the word "Sexy," (EX WWWWWW), t-shirts saying

"Irish New York," (EX XXXXXX), full sized New York City license plates with the words "#1

Mom," (EX YYYYYY), baseball caps bearing the words "CSI New York" (EX AAAAAAA),

purses with the words "New York," (EX CCCCCCC), replica New York Yankees baseballs, (EX

DDDDDDD), "Rollin' In Money" toilet paper, (EX EEEEEEE), "New York City Firefighters"

wall calendars, (EX FFFFFFF), and American flag magnets, (EX GGGGGGG).

Skyline conceded at trial that it had no right to sell some of these items even under its

own interpretation.  Leeb acknowledged that President Obama bobble heads and "Rollin in

Money" toilet paper were not "readily identifiable with the Attraction."  (Tr. at 179:6-8, 179:13-

15.)  Although Skyline contended that it could sell anything that depicted a New York City site

or landmark over which (or through which) the Attraction "flew," Leeb admitted that the

---

[11]      At some point, Skyline granted Skyline Souvenirs, Inc., a separate entity, a license to operate the gift shop.
(Tr. at 182:18-183:6.)  Skyline did not advise its licensee of the limitations on items that could be sold in the gift
shop.  (Tr. at 184:7-23.)  It is not clear who is currently operating the gift shop; nevertheless, Skyline cannot avoid
the scope of the gift shop clause by assigning its rights.  Accordingly, this Court's decision ignores any license.

Attraction did not depict anything about the television show, "CSI," (Tr. at 182:8-9), or Irish

New Yorkers.  (Tr. at 182:15-17.)

I conclude that Skyline breached the October 1993 Lease Modification by selling generic

New York City souvenirs and souvenirs unrelated to New York City because they are not readily

identifiable with the Attraction.  Under Skyline's view, anything readily identifiable with New

York is also readily identifiable with the Attraction because the Attraction involves a simulated

helicopter ride over New York.  This interpretation ignores the unambiguous, limiting language

of the October 1993 Lease Modification, and is unreasonable.  The adverb "readily" as used in

the Lease means "with a fair degree of ease **:** without much difficulty **:** with facility **:** EASILY."

WEBSTER'S 1889.  Yankee baseballs, items with the "I ♥ N.Y." logo, clothing with the words

"New York," and American flag magnets, to name a few, do not call the Attraction to mind, and

anyone seeing these items would not identify them with the Attraction, much less *readily*

identify them with the Attraction.  And the President Obama bobble head and "Rollin' in

Money" toilet paper do not require any further comment.  To be readily identifiable with the

Attraction, the item must say "Skyline" or "Skyride" or, at a minimum, bear a logo or other

characteristic that easily connects the souvenir with the Attraction in the mind of the consumer.

Although the Lease is unambiguous and I need go no farther, this conclusion is also

consistent with the understanding of the parties reflected in the trial evidence.  Sullivan told

Silber at the time they negotiated the October 1993 Lease Modification that ESB received a

percentage of the revenues earned by Host from its sale of souvenirs on the 86th floor.  ESB did

not have a similar deal with Skyline and was not looking to set up a competitor that could take

business from Host.  This is why the souvenirs that Skyline intended to sell had to be "readily

identifiable with the Attraction" and not generic New York City souvenirs.

30

09-01145-smb    Doc 103    Filed 08/20/13    Entered 08/20/13 11:53:41    Main Document
Pg 31 of 32

Silber obviously understood this. The October 1993 Lease Modification was only two pages long, did not deal with any other issue, and was entered into because Skyline, not ESB, wanted it. It is incredible that Silber paid no attention to the limiting language and reasonably believed that the October 1993 Lease Modification allowed Skyline to sell generic New York City-related items.

Skyline defends its violation of the October 1993 Lease Modification by arguing that ESB knowingly permitted it to go on for many years and implies that ESB's course of conduct is relevant to the interpretation of the gift shop limitation. (*New York Skyline's Proposed Statement of Facts and Conclusions of Law*, filed June 28, 2013 ("*Skyline's Proposed Findings*"), at 4, 22 (ECF Doc. # 100).) Skyline has not argued that ESB waived a contractual right and certainly did not prove a waiver. A "[w]aiver is an intentional relinquishment of a known right and should not be lightly presumed." *Gilbert Frank Corp. v. Fed. Ins. Co.*, 520 N.E.2d 512, 514 (N.Y. 1988). The failure to exercise a known right, standing alone, does not support a finding that the holder of the right intentionally waived it. Furthermore, Article 26 of the Lease contains a "no waiver" clause.[12] ESB's course of conduct is, in any event, irrelevant to the issue of interpretation because the Court has concluded that the phrase "readily identifiable with the Attraction" is unambiguous, particularly in light of its context.[13]

---

[12]     Article 26 states, in pertinent part:

> No waiver of any provision of this lease shall be effective, unless such waiver be in writing signed by Lessor. This lease contains the entire agreement between the parties, and no modification thereof shall be binding unless in writing and signed by the party concerned. . . . Failure of Lessor to enforce any provision of this lease, or any rule or regulation, shall not be construed as the waiver of any subsequent violation of a provision of this lease, or any rule or regulation.

(EX A.)

[13]     Skyline also refers to an "ESB internal memorandum [Skyline EX. 146] describing a conversation with an ESB lawyer [that] strongly indicates that ESB knows its argument in this case is without merit." (*Skyline's*

31

Accordingly, I conclude that Skyline breached the October 1993 Lease Modification by selling souvenirs that were not readily identifiable with the Attraction, as evidenced by Exhibits RRRRRR through GGGGGGG, and this violation continues. ESB lacks an adequate remedy at law, and is entitled to a permanent injunction restraining Skyline from selling the items marked as Exhibits RRRRRR-GGGGGGG and similar items that do not include the word "Skyline" or "Skyride," the Skyline logo or some other characteristic or feature that easily connects the souvenir with the Attraction in the mind of the consumer.

The foregoing constitutes the Court's finding of facts and conclusions of law pursuant to FED. R. CIV. P. 52(a) made applicable to these adversary proceedings by FED. R. BANKR. P. 7052. The Court has considered the parties' remaining arguments, and concludes that they lack merit. The parties are directed to schedule a status conference to address the disposition of the issue relating to attorney's fees. Settle order on notice.

Dated: New York, New York
      August 20, 2013

                      /s/ *Stuart M. Bernstein*
                      STUART M. BERNSTEIN
                      United States Bankruptcy Judge

---

*Proposed Findings* at 17.) The email, dated November 12, 2007, supposedly refers to a conversation with an ESB lawyer (Bleckner) who implied that the Skyline gift shop could sell flattened pennies because they had New York City-related scenes on the opposite side. (*See* EX 146.) Zorn was copied on the email but did not recall receiving it. (Tr. at 227:19-20.)

    The email was not probative on the meaning of the gift shop limitation. Skyline failed to identify who Bleckner was, the email said that Bleckner needed to review the lease again, and the email does not indicate he was aware of the context in which the October 1993 Lease Modification arose.