UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
IN RE: NEW YORK SKYLINE, INC.,                 :   Chapter 11
                                               :   Case No. 09-10181 (SMB)
                Debtor.                        :
------------------------------------------------------------X
NEW YORK SKYLINE, INC.,                        :
                                               :
                Plaintiff,                     :
                                               :
        -against-                              :
                                               :   Adv. P. No. 09-01145 (SMB)
EMPIRE STATE BUILDING COMPANY L.L.C.,          :
EMPIRE STATE BUILDING, INC. and                :
EMPIRE STATE BUILDING ASSOCIATES               :
L.L.C.                                         :
                Defendants.                    :
------------------------------------------------------------X

## MEMORANDUM DECISION AND ORDER DENYING
## MOTION FOR STAY PENDING APPEAL

**A P P E A R A N C E S:**

STEWART OCCHIPINTI, LLP
65 West 36th Street, 7th Floor
New York, New York 10018

    Charles A. Stewart, III, Esq.
    Elin M. Frey, Esq.
        Of Counsel

*Attorneys for New York Skyline, Inc.*


STERN TANNENBAUM & BELL LLP
380 Lexington Avenue
New York, NY 10168

    Francine Nisim, Esq.
    Karen S. Frieman, Esq.
    David S. Tannenbaum, Esq.
        Of Counsel

*Attorneys for Empire State Building Company L.L.C.,*
*Empire State Realty Observatory TRS, LLC and Empire State Building, Inc.*

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

The debtor, New York Skyline ("Skyline") has moved for a stay pending appeal of the Court's permanent injunction restraining it from using commissioned sales representatives to sell tickets to its simulated helicopter ride (the "Attraction") near the footprint of the Empire State Building (the "Building"). The underlying dispute turns on a question of contract interpretation which was resolved following a two day trial. For the reasons that follow, the motion is denied.

## BACKGROUND

The background is set forth in the Court's Post-Trial Findings of Fact and Conclusions of Law, dated Aug. 20, 2013 (the "Decision") (ECF Doc. # 103). I assume familiarity with the Decision, which dealt with several issues, and limit the discussion to facts needed to understand this ruling. The abbreviations and definitions used in the Decision are also used in this decision.

Skyline operates the Attraction in the Building, and has long-running disputes with its landlord, ESB. In May 2005, and following the initiation of litigation by Skyline, Skyline and ESB entered into the May 2005 Agreement. (Ex. I.)[1] The latter, in relevant part, was intended to limit aggressive sales tactics by Skyline's ticket sellers in the vicinity of the Building. Toward that end, the May 2005 Agreement included the following provision:

> 7. The following protocol shall be strictly observed by NYSR and its employees and representatives at all times:
>
> . . . .
>
> (d) All NYSR employees and representatives who work in the NYSR Premises or *in any area of or near the Building* (including without limitation the Visitor Center) in the course of performing NYSR-related duties:
>
> . . . .

---

[1] "Ex." refers to the exhibits received in evidence during the trial, and "Tr." refers to the trial transcript.

    • Must be salaried employees and not working on commission or other sales incentive.

(Ex. I at 5-6) (emphasis added).

While the parties agreed that the protocol was designed to impose an area within which Skyline could not use commission-based ticket sellers, they disagreed on its scope, *viz.*, the meaning of the phrase "in any area of or near the Building."[2] The Court had earlier decided the phrase was ambiguous, and heard evidence as to its meaning at trial. That evidence showed that the parties did not discuss any precise definition during the negotiations that culminated in the execution of the May 2005 Agreement, and each had its own *unexpressed* view. (Tr. at 250:11-20; *id*. at 353:2-15.)

According to Thomas Keltner, general counsel to Malkin Holdings and the individual who spearheaded the negotiations for ESB leading to the May 2005 Agreement, the prohibited selling zone reached any area where Skyline salespersons started to encounter tenants and visitors to the Building in a concentrated number, and could include areas as far from the Building as Pennsylvania Station. (Tr. at 250:11-20.) Skyline witnesses testified that they viewed the limitation differently. At the time, ESB was seeking to upgrade the operations, look and feel of the Building, and they understood the phrase to refer to the Building itself and its footprint, *i.e.*, the sidewalk area adjacent to the Building. (Tr. at 353:2-15.)

After hearing the testimony and reviewing the relevant documents, the Court concluded that the phrase "in any area of or near the Building" referred to the two block, one avenue Zone bordered by 36th Street to the North, 31st Street to the South, Madison Avenue to the East and

---

[2] The Decision referred to the phrase "of or near the Building." This decision includes the three introductory words "in any area." This makes the clause clearer but does not change anything else.

Broadway to the West. In reaching this conclusion, the Court placed substantial weight on agreements that Skyline had entered into with certain independent contractors beginning in November 2009 and the testimony of Michael Leeb, Skyline's chief operating officer. The agreements provided that the independent contractors – who Skyline compensated on a commission basis – could not sell tickets to the Attraction within the Zone. (Decision at 22.) In November 2010, Skyline entered into another series of agreements with independent contractors that prohibited the independent contractors "from working on any part of any sidewalk which borders the Empire State Building." (*Id.* (quoting Ex. IIIIII, Addendum B, at ¶ 2.)) In other words, Skyline shrunk the prohibited zone to the Building's sidewalk or footprint.

In explaining the reason for the designation of the Zone and the change in November 2010, Leeb, the Skyline employee who prepared the independent contractor contracts, (Tr. at 156:6-7), testified that Skyline's view of what was "near" the Building was a developing one, and Skyline shrunk the Zone because it couldn't supervise its employees working that far from the Building:

> Q:   So your program developed from prohibiting independent contractors from selling anywhere what you considered to be near the building, which was 31st to 36th, Madison to Broadway, and then that idea developed over time to 2010 to all of a sudden take the position that now near the building is just the building footprint.
>
> A:   Correct.
>
> Q:   Is that your position?
>
> A:   Yes.
>
> Q:   Okay.
>
> A:   Because when we prohibited the independent contractors from working whatever -- north of 36th and south of 31st Street, we had to cover this area with employees, and it became impossible for us to supervise these employees working in these areas. So we shrunk the employees back to the footprint of the Empire State Building, and then allowed the IC's to work the void that was created now.

(Tr. at 161:18-162:9.)

4

Assessing this testimony and the language of the independent contractor agreements, the Court concluded:

> The most probative evidence of what the parties intended is evidenced by Skyline's understanding of the Zone as reflected in Leeb's testimony and the independent contractor agreements signed prior to November 2010. These agreements created a two block, one avenue frozen zone around the Building, bordered by 36th Street, 31st Street, Madison Avenue and Broadway, which was off limits to the independent contractors. Only salaried employees could sell tickets within that area. The limitation was a reasonable one and accomplished its purpose – preventing aggressive sales persons from accosting tenants and visitors "of or near the Building." In November 2010, Skyline narrowed the Zone to the Building's footprint, not because it had changed its view of the Zone but because it could not supervise employees selling tickets in the Zone.

(Decision at 25.) In short, the Zone reflected the "area of or near the Building" that the parties intended would be off-limits to commission-based salespersons.

The evidence showed that Skyline nevertheless used commission-based independent contractors to sell tickets to the Attraction just off the Building footprint – across the street from the Building and on the sidewalk between the end of the Building and Sixth Avenue. Accordingly, the Court declared that Skyline had breached the May 2005 Agreement by paying commissions or other sales incentives to its independent contractors working in the "area of or near the Building," *i.e.*, inside the Zone, (*Order and Final Judgment*, dated Sept. 11, 2013, at ¶ 20 (ECF Doc. # 108)), and issued a permanent injunction prohibiting Skyline "from compensating employees, independent contractors and/or other representatives, working in areas of or near the Building on a commission or other sales incentive basis." (*Id.* at ¶ 21.)

Skyline immediately filed a Notice of Appeal, (ECF Doc. # 109), and made this motion to stay the injunction pending the appeal. The Court granted a temporary stay on September 16, 2013 that has continued in effect pending the determination of this motion. Skyline's motion primarily argues that the Court's finding regarding the meaning of "in any area of or near the

5

Building" was clearly erroneous, and when considered along with the other relevant factors requires that a stay be granted.

## DISCUSSION

Rule 8005 of the Federal Rules of Bankruptcy Procedure authorizes a bankruptcy judge to stay his judgment or order pending appeal.[3] The same standards that govern a stay pending an appeal from a District Court order to the Court of Appeals apply in the case of an appeal from the Bankruptcy Court to the District Court. *See In re Savage & Assocs., P.C.*, No. 05 Civ.2072(SAS), 2005 WL 488643, at *1 (S.D.N.Y. Feb 28, 2005).

The decision to grant or deny a stay pending appeal is committed to the discretion of the bankruptcy court. *See Nken v. Holder*, 556 U.S. 418, 433 (2009). "The four factors to be considered in issuing a stay pending appeal are well known: '(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.'" *In re World Trade Ctr. Disaster Site Litig.*, 503 F.3d 167, 170 (2d Cir. 2007) (quoting *Hilton v. Braunskill*,

---

[3] Rule 8005 provides:

> A motion for a stay of the judgment, order, or decree of a bankruptcy judge, for approval of a supersedeas bond, or for other relief pending appeal must ordinarily be presented to the bankruptcy judge in the first instance. Notwithstanding Rule 7062 but subject to the power of the district court and the bankruptcy appellate panel reserved hereinafter, the bankruptcy judge may suspend or order the continuation of other proceedings in the case under the Code or make any other appropriate order during the pendency of an appeal on such terms as will protect the rights of all parties in interest. A motion for such relief, or for modification or termination of relief granted by a bankruptcy judge, may be made to the district court or the bankruptcy appellate panel, but the motion shall show why the relief, modification, or termination was not obtained from the bankruptcy judge. The district court or the bankruptcy appellate panel may condition the relief it grants under this rule on the filing of a bond or other appropriate security with the bankruptcy court. When an appeal is taken by a trustee, a bond or other appropriate security may be required, but when an appeal is taken by the United States or an officer or agency thereof or by direction of any department of the Government of the United States a bond or other security shall not be required.

481 U.S. 770, 776 (1987)); *accord Nken*, 556 U.S. at 426; *Floyd v. City of New York*, No. 08 Civ. 1034 (SAS), 2013 U.S. Dist. LEXIS 132881, at *3 (S.D.N.Y. Sept. 17, 2013).

The first two factors are the most critical. *Nken*, 556 U.S. at 434. "It is not enough that the chance of success on the merits be 'better than negligible.'" *Id.* (quoting *Sofinet v. INS*, 188 F.3d 703, 707 (7th Cir. 1999) (internal quotation marks omitted)). "By the same token, simply showing some 'possibility of irreparable injury' fails to satisfy the second factor." *Nken*, 556 U.S. at 434-35 (citation omitted). "'The probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury plaintiff will suffer absent the stay. Simply stated, more of one excuses less of the other.'" *Mohammed v. Reno*, 309 F.3d 95, 101 (2d Cir. 2000) (quoting *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 153 (6th Cir. 1991)); *accord Thapa v. Gonzales*, 460 F.3d 323, 334 (2d Cir. 2006).

**A.    Likelihood of Success on the Merits**

In assessing the likelihood of successfully reversing a decision he has just rendered, the judge must remain detached and view the accuracy of his judgment based on objective factors, including "the extent to which the challenged decision is supported by precedent; the standard of review that will govern the appeal; and the extent to which the decision is supported or opposed by government agencies to whose judgment the appellate court would normally defer." *Hayes v. City of New York*, 503 F. Supp. 946, 963 (S.D.N.Y. 1980), *aff'd*, 648 F.2d 110 (2d Cir. 1981). This dispute does not concern or involve any government agencies. Furthermore, although Skyline contends that the Court applied the wrong rule for interpreting the ambiguous phrase, Skyline's principal argument is that the Court's interpretation of the phrase "in any area of or near the Building" was clearly erroneous. (*See New York Skyline's Memorandum of Law in Support of Motion Brought by Order to Show Cause for Stay Pending Appeal*, dated Sept. 11,

7

2013 ("*Skyline Memo*") at 1 (ECF Doc. # 111) ("Skyline respectfully submits that there is a 'substantial possibility' that the District Court will determine that this Court's holding respecting the ambiguous phrase 'near the Building' in the May 2005 agreement is 'clearly erroneous'. . . .").)  "To be clearly erroneous, a decision must strike [the reviewing court] as more than just maybe or probably wrong; it must ... strike [the reviewing court] as wrong with the force of a five-week-old, unrefrigerated dead fish." *Best Payphones, Inc. v. Manhattan Telecomm. Corp. (In re Best Payphones, Inc.)*, 432 B.R. 46, 53 (S.D.N.Y. 2010) (quoting *Parts & Elec. Motors, Inc. v. Sterling Elec., Inc.,* 866 F.2d 228, (7th Cir. 1988), *cert. denied*, 493 U.S. 847 (1989)), *aff'd*, 450 F. Appx. 8 (2d Cir. 2011).  The Court's findings were based on the record evidence and its assessment of the witnesses' credibility.  Skyline therefore faces a high hurdle in showing a strong likelihood of success.

Skyline's arguments boil down to two principal points.  First, the Court mistakenly concluded that Skyline did not use independent contractors just off the footprint of the Building and inside the Zone until November 2010.  Second, the Court should have adopted Skyline's interpretation – that "in any area of or near the Building" referred to the Building and its footprint – because that was Skyline's practice before ESB asserted its counterclaims, and is more probative of the parties' intent.  Skyline also contends that the evidence did not support the Court's inference that the creation of the independent contractor agreements was a reaction to the counterclaims asserted by ESB in this case.  Finally, the Court ignored the fact that salaried employees working "in any area of or near the Building" had to dress in an ESB-approved uniform.  The uniform requirement only made sense if "near the building" referred to the

8

Building footprint because ESB had no interest in imposing a dress code on employees who worked as far as two blocks away.[4]

As to Skyline's first main point, the Court never found that between 2005 and 2010, "only independent contractors could sell tickets within the Zone." (*See Skyline Memo* at 8.) The discussion to which Skyline refers concerned what Leeb described as the evolving program, and focused on the November 2009 independent contractor agreements and subsequent events. Thus, under the November 2009 agreements, as explained by Leeb, "[o]nly salaried Skyline employees could sell tickets inside the Zone." (Decision at 22.) In November 2010, Skyline shrunk the Zone to supervise its employees more effectively, and "[a]s a result, Skyline's independent contractors started selling tickets inside the Zone, including across the street and down the block from the Building–areas that were previously restricted to employees." (*Id.* at 22-23.) This finding described what the various agreements provided and not where the independent contractors actually worked. To the contrary, the Court found that shortly after the execution of the May 2005 Agreement, Skyline established its orange team of independent contractors "who sold tickets on all areas outside of the footprint of the Building." (*Id.* at 21.)[5]

As to Skyline's second chief argument, that Skyline's independent contractors always sold tickets on the Building footprint does not undercut the Court's interpretation of the ambiguous phrase "in any area of or near the Building." The parties obviously intended a geographical limit; Skyline could not use independent contractors wherever it chose. While ESB was mainly concerned with aggressive sales tactics in the front of the Building, (Tr. at 209:7-22),

---

[4] Skyline also argues that the Court re-wrote the May 2005 Agreement by adopting the Zone. The Court did not re-write the agreement; it interpreted what the parties intended when they agreed to an admittedly ambiguous provision.

[5] As discussed in the succeeding text, Skyline also used independent contractors to sell tickets on the Building footprint in violation of even its own interpretation of the May 2005 Agreement.

9

the parties dealt with that specific problem in another provision of the May 2005 Agreement. Article 7(d) of the May 2005 Agreement stated that Skyline employees and representatives

> [c]annot stand, solicit customers, or otherwise conduct any NYSR-related business or activity in the immediate area of the Building sidewalk (from Building line to curb) which is directly in front of any Building entrance (at Fifth Avenue, 33rd Street, or 34th Street).

This provision already prevented aggressive sales tactics in front of the Building entrances, and the geographic limitation on independent contractors plainly envisioned a broader area at a distance from the Building. Although Skyline used commission-based salespersons just off the footprint (as well as on the footprint) since "day one," the Court rejected Skyline's practice as probative of the parties' intentions. Instead, the Court concluded that the most probative evidence of what the parties intended and understood was the geographical limitation imposed in the November 2009 agreements as buttressed by Leeb's testimony, quoted above.[6]

Furthermore, Skyline did not supply any other, reasonable explanation. Leeb, the draftsman of the agreements, could not account for the limitation in November 2009 other than the developing view of what was "near" the Building. At one point, he testified that Skyline introduced independent contractor agreements in 2009 as a result of a complaint made by one of the independent contractors to the New York State Department of Labor. (Tr. at 334:25-335-20.) On cross-examination, he backed off from this testimony, and conceded that he did not recall why all of the contractor agreements executed between November 2009 and November 2010 included the Zone. (Tr. at 340:20-341:22.) As a result, the Court rejected Skyline's argument

---

[6] Skyline criticizes the Court's reliance on the independent contractor agreements because Leeb testified that there were different levels of independent contractors, and some worked inside the Zone. The Court received into evidence all of the independent contractor agreements that Skyline produced. While the agreement dated in April 2009 did not include any geographical limits, (*see* Ex. CCCCCC), the agreements signed in November 2009 (except for Ex. DDDDDD, at NYSR 23435-37 and NYSR 23506-508), December 2009 (*see* Ex. EEEEEE), June 2010 (*see* Ex. FFFFFF) and July 2010 (*see* Ex. GGGGGG) limited the independent contractors to the Zone.

10

that the creation of the Zone was the result of a dispute with the Department of Labor, and found that it was motivated by Skyline's understanding of the requirements of the May 2005 Agreement.

This conclusion was also influenced by the timing of the November 2009 independent contractor agreements. The earliest agreement that Skyline produced, dated in April 2009, did not include any geographical limit on where that independent contractor could operate. (*See* Ex. CCCCCC.) In May 2009, ESB alleged for the first time in formal pleadings that Skyline compensated its *employees* on a commission basis and in express violation of the May 2005 Agreement. (*Answer to Second Amended Complaint and Counterclaims*, dated May 22, 2009, at ¶¶ 298, 315(b) (ECF Doc. # 7).) In September 2009, ESB expanded these allegations to aver that Skyline also compensated its *independent contractor representatives* on a commission basis or other sales incentive basis. (*Answer to Third Amended Complaint and Counterclaims*, dated Sept. 15, 2009, at ¶¶ 303, 320(b) (ECF Doc. # 33).) The restrictions on using commission-based independent contractors in the Zone first appeared in the agreements signed in November 2009, two months later. Left with no other explanation, and based upon the fact that the creation of the Zone followed on the heels of ESB's counterclaim regarding the independent contractors, the Court inferred that ESB's counterclaim was a contributing factor to the designation of the Zone, and reflected what Skyline understood to be "in any area of or near the Building."

Moreover, while Skyline contends that its conduct prior to the time that ESB asserted its counterclaim is most probative of what the parties intended, it ignores that it did not interpret the geographical limit consistently. The evidence showed that Skyline used independent contractors from at least May 2005 through November 2009 *on the Building footprint*. Leeb attended a Skyline Board of Directors meeting on June 10, 2010. This appeared to be an annual meeting

11

because the Board approved the minutes of the June 15, 2009 Board meeting. (Ex. HHHHHH.) During the June 2010 meeting, "Mr. Leeb presented a breakdown of sales and operational costs. Mr. Leeb stated that moving Independent Contractors *off the Empire State Building property* increased productivity." (Ex. HHHHHH (emphasis added).) Thus, Skyline used independent contractors *on the Building property* (*i.e.*, the footprint) from 2005 until after the June 2009 meeting but before the June 2010 meeting — a period that encompassed November 2009. Even Skyline concedes that it could not use independent contractors *on the Building property*. In addition, Leeb testified that Skyline's use of independent contractors reflected an evolving program that went from the footprint to just off the footprint while ostensibly designating a Zone that it honored in the breach. Skyline's own conduct under the May 2005 Agreement is not probative of what the parties intended; rather, its "understanding" was born of an expediency that changed over time.

Skyline's position comes down to the argument that because it admittedly used independent contractors just off the Building footprint since 2005, that must be what the parties intended, and hence, Skyline did not breach the May 2005 Agreement. This position confuses what Skyline did do with what it could do. The fact that Skyline created the appearance of a geographical limitation after ESB raised the issue, only to ignore it, hardly proves that the geographical limit the parties intended was not the one that Skyline documented.

Skyline correctly notes that the same geographical limitation applied to every restriction in paragraph 7(d), and reading "in any area of or near the Building" to include areas beyond the Building or its footprint leads to unintended results. For example, Skyline employees and representatives who "work in the NYSR Premises or in any area of or near the Building" must wear a tie plus a jacket or sweater vest. According to Skyline, the parties could not have

12

intended to place dress restrictions on Skyline employees selling tickets two blocks from the Building.

This argument ignores the fact that each of the *other* clauses in paragraph 7(d) includes a narrower restriction that supersedes the broader "area of or near the Building." Thus, the dress restriction Skyline cites appears to be limited to Skyline representatives who work alongside ESB employees in the Visitor Center.[7] Similarly, Skyline employees and representatives who "work in the NYSR Premises or in any area of or near the Building" "[c]annot be in Lobby at any time except when escorting NYSR customers from 33rd street entrance to West Escalators" and "[c]annot stand, solicit customers, or otherwise conduct any NYSR-related business or activity in the immediate area of the Building sidewalk (from Building line to curb) which is directly in front of any Building entrance (at Fifth Avenue, 33rd Street, or 34th Street)." (Ex. I at 6.) Finally, Skyline employees and representatives who "work in the NYSR Premises or in any area of or near the Building" are "limited in the Visitor Center to (i) not more than two (2) such employees or representatives in the Visitor Center pre-security waiting area plus (ii) not more than two (2) such employees or representatives in the Visitor Center box office area." (*Id.*) The only provision of paragraph 7(d) that does not include a more specific geographical description such as the Building entrances, the Lobby or the Visitor Center is the restriction that pertains to the payment of commissions or other sales incentives to Skyline employees and representatives.

---

[7] The full restriction states that Skyline representatives who work in any area of or near the Building [m]ust be in dress code of tie plus jacket or sweater-vest with SkyRide badge/logo, effective within 30 days of the date on which a dress code of tie plus jacket or sweater-vest is implemented by ESBC for Visitor Center employees (it being agreed that prior to such date such dress code for NYSR employees and representatives shall be dark slacks or skirts and collared shirts). NYSR shall maintain within its sole discretion the color of the uniform as well as the design and color of SkyRide badge/logo, so long as the SkyRide color and badge/logo are readily distinguishable from the ESBC color and badge/logo.

(Ex. I at 5-6.)

Hence, reading the May 2005 Agreement, and specifically paragraph 7(d), as a whole, the parties intended to impose a broader area of restriction on commission-based ticket selling than on the other activities covered by the agreement.

In the end, Skyline's argument is based on a misreading of the Court's discussion of the independent contractor agreements, its failure to offer probative evidence to explain why it suddenly designated the Zone when it did, and the Court's rejection of the probative value of its earlier conduct under the May 2005 Agreement. In short, Skyline has not made a strong showing that it is likely to succeed on the merits.

**B.     Irreparable Harm**

Skyline maintains that the permanent injunction will cause it irreparable harm if it is not stayed. The requirement of irreparable harm is "applied more stringently after trial, on motions for stays pending appeal . . . After judgment is entered, the propriety of the injury . . . has been judicially determined, and its imposition without further delay is surely more acceptable than prior to judgment." *Hayes*, 503 F. Supp. at 964. To establish irreparable harm, the movant "must demonstrate 'an injury that is neither remote nor speculative, but actual and imminent.'" *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir. 1989) (quoting *Consolidated Brands, Inc. v. Mondi*, 638 F. Supp. 152, 155 (E.D.N.Y. 1986)); *accord Ass'n of Legal Aid Attorneys v. City of New York*, No. 96 Civ. 8137(SHS), 1997 WL 620831, at *3 (S.D.N.Y. Oct. 8, 1997). A stay pending appeal "should issue not upon a plaintiff's imaginative, worst case scenario of the consequences flowing from the defendant's alleged wrong but upon a concrete showing of imminent irreparable injury." *USA Network v. Jones Intercable, Inc.*, 704 F. Supp. 488, 491 (S.D.N.Y. 1989); *see Borey v. Nat'l Union Fire Ins. Co.*, 934 F.2d 30, 34 (2d Cir.

1991) ("[A] mere possibility of irreparable harm is insufficient to justify the drastic remedy of a preliminary injunction."); *Ass'n of Legal Aid Attorneys*, 1997 WL 620831, at *6 (same).

Skyline's claim of irreparable harm ultimately centers on its fear of a disruption to its business. Leeb estimated that the independent contractors account for 33% of its ticket sales. (*Declaration of Michael Leeb in Support of Skyline's Motion for Stay Pending Appeal*, dated Sept. 11, 2013, at ¶ 4 (ECF Doc. # 112).) He predicted that without a stay Skyline will be forced to terminate its relationship with approximately 60 independent contractors. (*Id.* at ¶ 2.) He opined that they are not likely to accept Skyline's offer of employment, (*id.* at ¶ 5), or return if the injunction is reversed. (*Id.* at ¶ 6). In addition, it will take up to six months to replace the independent contractors with a competent sales force made up of Skyline employees. (*Id.* at ¶ 7.) This will increase Skyline's expenses and place a heavy burden on its management and administrative personnel. (*Id.* at ¶ 8.)

Skyline's alleged harm is speculative. Its entire argument is based on Leeb's conjecture that none of the independent contractors will stay on as Skyline employees, it will take six months to train a competent group of Skyline employees to fill the void, the independent contractors will not return if the injunction is reversed and the transition will place a toll on Skyline's management. His worst case scenario does not prove irreparable harm.

Moreover, even if one credited Leeb's speculation, it does not establish irreparable harm as a matter of law. Skyline does not contend that compliance with the permanent injunction will destroy its business. In fact, two-thirds of its sales are generated by sources other than the independent contractors. Rather, Skyline maintains that it will disrupt its business for a period of

15

up to six months, although it had previously estimated a four month disruption when it submitted a proposed counter-judgment, and over a month has now passed since the Decision.

A partial or temporary disruption of business is not irreparable harm; the loss of a business, and not simply "loss of business," constitutes irreparable harm. *Ass'n of Legal Aid Attorneys*, 1997 WL 620831, at *6 ("[A] claim for business disruption . . . is insufficient by itself to establish irreparable harm."); *Arbitron Co. v. Phoenix Broad. Corp.*, No. 97 Civ. 4355 MBM HBP, 1997 WL 452020, at *4 (S.D.N.Y. Aug. 6, 1997) ("[I]rreparable harm has not been found when the evidence indicates that the loss of goodwill is limited to a partial or temporary disruption of business."); *Soap Opera Now, Inc. v. News Am. Publ'g, Inc.*, No. 90 Civ. 2631 (RJW), 1990 WL 124335, at *4 (S.D.N.Y. Aug. 17, 1990) ("[T]he loss of a business, and not simply 'loss of business,' constitutes irreparable harm.").

Accordingly, Skyline has failed to show that it will suffer irreparable harm absent a stay pending appeal.

**C.  Substantial Injury to ESB**

Skyline bears the burden of proving that a stay pending appeal will not cause substantial injury to ESB. *Barclays Capital Inc. v. Theflyonthewall.com*, 700 F. Supp. 2d 310, 355 (S.D.N.Y. 2010), *rev'd on other grounds*, 650 F.3d 876 (2d Cir. 2011). It maintains that ESB will not suffer any prejudice if a stay pending appeal is granted because (1) Skyline's current system has been in place since 2005, (2) ESB was not concerned about sales off the footprint in 2005 and (3) ESB can raise any issues with Leeb immediately. (*Skyline Memo* at 16.)

Skyline has failed to sustain its burden of proof. First, Skyline is factually wrong in arguing that ESB was not concerned with sales just off the footprint in 2005. The Court has

already determined after trial that the contrary was true.  Second, the opportunity to raise issues with Leeb provides small comfort.  The only issue that concerns ESB is Skyline's use of independent contractors just off the footprint.  The parties fundamentally disagree on this question, and the issuance of a stay pending appeal will take the issue off the table.

Thus, Skyline's "proof" comes down to the argument that ESB will not be injured by the maintenance of the *status quo* because it has gone on since 2005.  This proves nothing, and is belied by the evidence at trial.  While ESB did not and could not monetize its injuries (and hence, lacked an adequate remedy at law), the ESB witnesses testified that aggressive sales tactics created a negative experience for the Building's patrons and reflected negatively on the Building.  (Tr. at 207:23-208:15, 208:20-209:22, 237:25-238:24; 283:21-284:13.)  Skyline understood that this was the reason for the restriction on commission-based selling and agreed to it.

Moreover, ESB has fought long and hard to vindicate its contractual bargain.  Skyline's breach has persisted for years, the Lease expires at the end of June 2016, and a stay may allow ESB to continue its wrongful conduct for a substantial part of the remaining balance of the term.  Any further delay in allowing ESB to realize the right to which the Court concluded it was entitled is manifestly unfair and may constitute a substantial injury.  *Malarkey v. Texaco, Inc.*, 794 F. Supp. 1248, 1251 (S.D.N.Y. 1992).  On balance, this factor tips in favor of ESB.

### D.    The Public Interest

Lastly, Skyline argues that the public interest, to the extent there is any, favors a stay pending appeal because less experienced replacements "are more likely to make mistakes in representing the Observatory and Skyride experience" and "are more likely to be a source of

friction between ESB and Skyline, with the visitor caught in between." (*Skyline Memo* at 16.) ESB contends that no public interest is implicated in this matter beyond the interest in not allowing parties to breach their contracts.

I agree that no public interest is implicated; this is purely a private commercial dispute. If, as Skyline speculates, its replacements may make mistakes or create friction between ESB and Skyline, it can mitigate if not eliminate those possibilities with better training.

Accordingly, the motion for a stay pending appeal is denied. The Court will, however, maintain the temporary stay presently in place for a period of fourteen days from the date of this order to allow Skyline the opportunity to seek a stay pending appeal in the District Court.

So ordered.

Dated:   New York, New York
         October 2, 2013

                                                /s/ *Stuart M. Bernstein*
                                                STUART M. BERNSTEIN
                                                United States Bankruptcy Judge

18