UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
In re:  NEW YORK SKYLINE, INC.,      :      Chapter 11
                                              :      Case No. 09-10181 (SMB)
                 Debtor.          :
------------------------------------------------------------X
NEW YORK SKYLINE, INC.,             :
                                              :
                 Plaintiff,       :
                                              :
                 -against-      :
                                              :      Adv. P. No. 09-01145 (SMB)
EMPIRE STATE BUILDING COMPANY L.L.C.,  :
EMPIRE STATE BUILDING, INC. and      :
EMPIRE STATE BUILDING ASSOCIATES      :
L.L.C.                                      :
                Defendants.     :
------------------------------------------------------------X

## POST-REMAND OPINION REGARDING COURT'S AUTHORITY TO ISSUE PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

**A P P E A R A N C E S:**

STEWART OCCHIPINTI, LLP
65 West 36th Street, 7th Floor
New York, New York 10018

       Charles A. Stewart, III, Esq.
       Elin M. Frey, Esq.
          Of Counsel

*Attorneys for New York Skyline, Inc.*

STERN TANNENBAUM & BELL LLP
380 Lexington Avenue
New York, NY 10168

       Francine Nisim, Esq.
       Karen S. Frieman, Esq.
       David S. Tannenbaum, Esq.
          Of Counsel

*Attorneys for Empire State Building Company L.L.C.,*
*Empire State Realty Observatory TRS, LLC and Empire State Building, Inc.*

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

After this Court confirmed the debtor's plan, entered a final decree and closed the case, it rendered certain decisions and entered a final judgment in an adversary proceeding that had been removed from state court early in the case and prior to confirmation.  The District Court vacated the judgment and remanded to this Court to consider several questions.  *See New York Skyline, Inc. v. Empire State Bldg. Trust Co. L.L.C.* (*In re New York Skyline, Inc.*), 512 B.R. 159 (S.D.N.Y. 2014) ("*Remand Decision*"), *aff'd*, 601 F. App'x 52 (2d Cir. 2015).  The principal questions on remand are whether these removed claims continued to be "related to" the confirmed and closed bankruptcy case, and whether the Court had the authority to issue proposed findings of fact and conclusions of law under 28 U.S.C. § 157(c)(1) or other authority.

As discussed in detail below, the Court concludes that it did not lose its "related to" or non-core jurisdiction over pre-confirmation claims following confirmation and the closing of the bankruptcy case, and had the power to issue proposed findings of fact and conclusions of law pursuant to 28 U.S.C. § 157(c)(1).  Alternatively, the Court exercised supplemental jurisdiction over the removed proceeding, and had the power to enter proposed findings of fact and conclusions of law under either 28 U.S.C. § 157(c)(1) or its inherent power.  Finally, the Court concludes that it had core jurisdiction over the debtor's claim to rescind the parties' May 2005 Agreement (the "Rescission Claim") which the Court dismissed on a motion for partial summary judgment, and will enter a separate final judgment dismissing that claim.

## BACKGROUND

The background to this long running dispute between the parties is discussed in numerous opinions of this Court and more recently by the District Court in the *Remand Decision*.  I limit the discussion to what is necessary to address the questions posed by the District Court.[1]

The debtor, New York Skyline, Inc. ("Skyline"), operates a helicopter simulator ride (the "Attraction") on the second floor of the Empire State Building (the "Building").  Skyline and ESB[2] have been parties to a Lease, as modified (the "Lease"), and a License, as modified (the "License"), since 1993.  The parties have been litigating with each other for just as long regarding various aspects of their relationship.

Focusing on May 2005, they were at that time engaged in litigation brought by Skyline in state court.  The lawsuit was prompted by ESB's decision to reverse the Building escalators which had the effect of blocking or at least impeding access to and from the Attraction.  In May 2005, they entered into an agreement (the "May 2005 Agreement") to resolve the access issue as well as some, but not all, of the disputes between them.  Among other things, the May 2005 Agreement permitted Skyline to install video monitors and erect signage at the premises.  In addition, the May 2005 Agreement required Skyline employees or representatives working in areas "of or near the building" to wear uniforms approved by ESB and prohibited them from being paid commissions or sales incentives.  Finally, it required Skyline to pay an access fee in

---

[1]    Unless otherwise indicated in this opinion "ECF" refers to the electronic docket in this adversary proceeding and "ECF/Main Case" refers to the electronic docket in Skyline's bankruptcy case.

[2]    "ESB" refers collectively to the Empire State Building Company L.L.C., which manages the Building, the Empire State Building, Inc., which owns the leasehold for the observation decks located on the 86th and 102nd floors, and the Empire State Building Associates L.L.C., which is the master lessee.

3

the annual amount of $450,000 and a security fee in the annual amount of $335,000.[3]  As part of

the settlement embodied in the May 2005 Agreement, the parties stipulated to discontinue the

pending state court action with prejudice.

The peace was only temporary.  In July 2008, ESB served Skyline with a Notice to Cure

demanding $431,000 in Building security fees.  In response, Skyline commenced an action in

state court to obtain a "Yellowstone" injunction (the "Skyline Action").

On January 12, 2009, and while the Skyline Action was pending in state court, Skyline

filed a chapter 11 case in this Court.  ESB filed an adversary proceeding against Skyline on

March 4, 2009 (the "ESB Action"), and removed the Skyline Action to this Court on March 30,

2009.  The ESB Action asserted eleven claims.  The majority sought declaratory relief,

injunctive relief, and specific performance in connection with conduct by Skyline alleged to have

violated the Lease or License.  In addition, Count I sought a declaratory judgment that the May

2005 Agreement was part of the Lease and the License, and Count XI sought attorneys' fees and

expenses under the Lease incurred in connection with bringing the ESB Action.  Skyline's Third

Amended Complaint (the "Complaint"), filed on July 29, 2009, asserted a host of claims,

including rescission of the May 2005 Agreement, declaratory and injunctive relief, breach of

specific provisions of the Lease and License, unjust enrichment, *prima facie* tort, tortious

interference with contract, turnover and violations of the automatic stay in connection with

breaches of the Lease and License agreements.

In April 2009, Skyline filed two motions: (1) to remand the Skyline Action or abstain and

(2) to extend the time within which to assume or reject the Lease for ninety days pursuant to

---

[3]        Skyline paid a reduced rate if it provided its own security.

4

Bankruptcy Code § 365(d)(4).  The Court considered both motions on the same day.  It granted

the ninety-day extension and denied the motion to remand or abstain reasoning that "the issues

were intertwined with the issues raised by Skyline's anticipated motion to assume some or all of

its agreements with ESB."  Specifically, the claims were core insofar as they related to the Lease

assumption and "arguably" core to the extent they related to the allowability of ESB's proof of

claim.  The Court later entered a stipulation and order that fast-tracked claims in the adversary

proceedings believed to be relevant to Skyline's decision to assume or reject the Lease under

section 365.  On July 17, 2009, and in connection with that order, the parties cross-moved for

partial summary judgment.  Among other relief, ESB moved to dismiss Skyline's Third Claim

for Relief which sought to rescind the May 2005 Agreement.[4]

Shortly after the motions were filed, and before they were decided, Skyline moved to

assume the Lease.  The strategy was curious but understandable.  The resolution of the

Rescission Claim was critical to determining exactly what agreements Skyline was assuming and

the amount of the cure costs it would have to pay.  In particular, ESB was seeking substantial

access and security fees under the May 2005 Agreement.  Nevertheless, Skyline made the

decision that it needed to operate in the Building, even if it had to do so under the May 2005

Agreement, and believed it could bear whatever costs that involved.  (*Motion to Assume Lease*,

dated July 20, 2009 ("The Debtor has determined, in the exercise of its business judgment, that it

would be in the Debtor's best interest to assume the Lease.  The reason is simple: the Debtor's

business is contingent upon the Lease, and on an operating basis, the Debtor has historically been

profitable, and remains profitable.") (ECF/Main Case Doc. # 38).)

---

[4]      Skyline moved for a determination that Article 42 of the Lease, which dealt with electrical charges, was
ambiguous.

The Court granted Skyline's motion to assume the Lease and License on September 17, 2009, over ESB's objection and while ESB's motion for partial summary judgment was still pending. (*See Order Granting Motion to Assume Lease*, dated Sept. 17, 2009 ("*Assumption Order*") (ECF/Main Case Doc. # 57).) Pursuant to the *Assumption Order*, Skyline assumed both the Lease and License, paid $306,991.02 to ESB in undisputed cure amounts, and escrowed $768,120.76 to satisfy the disputed cure amounts should they be allowed. Among the disputed items were "security charges, access fees, electrical charges, late fees, and attorneys' fees." In addition, the status of the May 2005 Agreement, and specifically, whether it had been assumed, was still an open issue.

The Court's decision on the cross-motions for summary judgment resolved those questions. The Court dismissed the Rescission Claim for three reasons. First, the May 2005 Agreement was indivisible from and therefore part of the Lease and License. Hence, Skyline could not rescind just the May 2005 Agreement; it had to rescind the Lease and License which it was not prepared to do. *New York Skyline, Inc. v. Empire State Bldg. Co. L.L.C.* (*In re New York Skyline, Inc.*), 432 B.R. 66, 80 (Bankr. S.D.N.Y. 2010) ("*Rescission Decision*"). Second, by assuming the Lease and License, Skyline had also assumed the May 2005 Agreement. Skyline's assumption of the May 2005 Agreement barred the claim to rescind the same agreement. *Id.* at 82. Third, Skyline had discontinued its May 2005 state court action with prejudice following the execution of the May 2005 Agreement, and the *status quo* could not be restored if the May 2005 Agreement was rescinded. *Id.* at 84.[5]

---

[5]    The Court also denied Skyline's motion for partial summary judgment which argued that the method of computing the electrical charges under paragraph 42 was ambiguous. Skyline was essentially asking for summary judgment that it would be inappropriate to grant summary judgment on that contract claim, but neither Skyline nor ESB have made that motion. Hence, consideration of Skyline's motion would waste judicial resources. *Rescission Decision*, 432 B.R. at 84.

On October 12, 2010, the Court confirmed Skyline's *Fourth Amended Chapter 11 Plan of Reorganization* (the "*Plan*"), which, *inter alia*, retained jurisdiction over the pending adversary proceedings.  On February 28, 2011, the Court entered a final decree after determining that the Plan had been substantially consummated and closed Skyline's bankruptcy case.  (*Final Decree*, dated Feb. 28, 2011 (ECF/Main Case Doc. # 164).)  The *Final Decree* expressly provided that "the Bankruptcy Court shall retain jurisdiction over the pending adversary proceedings" between Skyline and ESB.

## A.       Subsequent Litigation

Except for the Rescission Claim, all of the relevant litigation occurred after the entry of the Confirmation Order and the *Final Decree*.  The parties worked to narrow the issues, and on June 17, 2011, they filed a stipulation that withdrew or limited many of their claims.  Skyline's five remaining claims included (1) the Fourth Claim, but only to the extent it sought a declaration that ESB had breached certain contractual duties under the May 2005 Agreement, (2) the Twelfth Claim, for damages and declaratory relief in connection with the electricity charges under Article 42 of the Lease, (3) the Fourteenth Claim, for damages for breach of the covenant of good faith and fair dealing, (4) the Fifteenth Claim, sounding in *prima facie* tort, and (5) the Eighteenth Claim, for tortious interference with contract.  Of the twenty claims and counterclaims asserted by ESB, eight were submitted for trial: the cause of action for attorneys' fees, and seven counterclaims requesting declaratory relief, specific performance, and injunctive relief relating to various disputes under the parties' agreements, including the protocol provisions in paragraph seven of the May 2005 Agreement.

7

1.       **The Authority Decision**

On July 15, 2011, ESB again moved for partial summary judgment on several issues.

The Supreme Court had decided *Stern v. Marshall*, 131 S. Ct. 2594 (2011) one month earlier,

and Skyline argued that the Court lacked the power to hear and determine ESB's motion or the

adversary proceedings or even the authority to make a report and recommendation to the District

Court.

On May 11, 2012, the Court issued its decision on ESB's motion.  *New York Skyline, Inc.*

*v. Empire State Bldg. Co. L.L.C.* (*In re New York Skyline, Inc.*), 471 B.R. 69 (Bankr. S.D.N.Y.

2012) ("*Authority Decision*").  The Court concluded that "with a few exceptions, the remaining

claims asserted by Skyline and ESB are non-core," and both parties had consented to the Court's

authority to enter a final judgment on the claims in the adversary proceedings.  *Id.* at 79-80.  The

Court granted ESB's motion seeking attorneys' fees and expenses that it had incurred in bringing

the ESB Action to enforce its rights, *id.* at 82-84, but denied recovery of the fees and expenses to

the extent they were incurred prosecuting its counterclaims or defending Skyline's affirmative

claims in the Skyline Action.  *Id.* at 85.  Next, the Court denied summary judgment relating to

the issue of incentive compensation under the May 2005 Agreement because the provision was

ambiguous.  *Id.* at 86-87.  Finally, the Court dismissed Skyline's Fourteenth Claim for Relief

(breach of the covenant of good faith and fair dealing), *id.* at 88-91, the Fifteenth Claim for

Relief (*prima facie* tort), *id.* at 91-93, and the Eighteenth Claim for Relief (tortious interference

with contract).  *Id.* at 93-95.  Following this disposition, three categories of claims remained to

be decided:  the liquidation of ESB's allowed claim for attorneys' fees and expenses, the method

of computing the electricity charges under Article 42 of the Lease, and several discrete claims

concerning the breach of the protocol provisions of the May 2005 Agreement and the Lease.

8

### 2.    The Electricity Trial

Skyline's claim relating to the computation of electricity charges under Article 42 of the Lease, and its related claim that it had been overcharged by ESB, was tried on September 24 and October 24, 2012.  In a decision dated February 22, 2013, the Court granted ESB's motion for judgment on partial findings and dismissed the Twelfth Claim for Relief.  *New York Skyline, Inc. v. Empire State Bldg. Co. L.L.C.* (*In re New York Skyline, Inc.*), Adv. P. Nos. 09-1107 (SMB), 09-1145 (SMB), 2013 WL 655991 (Bankr. S.D.N.Y. Feb. 22, 2013) ("*Electricity Decision*").

### 3.    The Protocol Trial

The Protocol Trial concerned four claims asserting breaches of the protocols, and in one instance, the Lease.  Skyline's Fourth Claim for Relief, as modified by the joint pre-trial order, sought a declaration that ESB had unreasonably refused to permit Skyline to install four video monitors in the Visitor Ticketing Area, and additional monitors on the 80th floor and an injunction against continuing breaches.  *See New York Skyline, Inc. v. Empire State Bldg. Co. L.L.C.* (*In re New York Skyline, Inc.*), 497 B.R. 700, 704 (Bankr. S.D.N.Y. 2013) ("*Protocol Decision*"), *vacated*, 512 B.R. 159 (S.D.N.Y. 2014), *aff'd*, 601 F. App'x 52 (2d Cir. 2015). Skyline's Fourth Claim for Relief, as modified by the joint-pretrial order, also sought a declaration that ESB had refused to install certain signage directing visitors to the Attraction and an injunction against continuing breaches.  *Id.* at 711.  The Court dismissed both claims after trial.  *Id.* at 711 (monitors), 712 (signage).

ESB asserted breaches of the protocol provisions and the Lease in its counterclaims and sought declaratory and injunctive relief.  ESB's Second Counterclaim alleged that Skyline had breached the May 2005 Agreement by compensating its employees and/or independent contractor representatives who worked "in any area of or near the Building. . . on a commission

9

or other sales incentive basis." *Id.* at 712-13.  The claim had two components.  *Id* at 713.  ESB

charged, and Skyline conceded, that Skyline was paying commission-based compensation to

representatives selling tickets to the Attraction across the street from the Building and on

sidewalks outside the footprint of the Building.  In addition, ESB contended that Skyline was

paying salaries to its employees working in or near the Building that included a sales-incentive

component.  Finally, ESB's Fourth and Fifth Counterclaims alleged that Skyline had breached

the Lease provision that permitted Skyline to "sell first class, tasteful souvenir gift items which

are readily identifiable with the Attraction."  *Id.* at 717.

Following trial, the Court ruled that Skyline had breached the protocol provision by

paying commissions and sales incentives to representatives who sold tickets in an "area of or

near the Building."   The Court enjoined Skyline from paying a commission or other sales

incentive to its employees and representatives that worked within an area bounded by 36th Street

on the north, 31st Street on the south, Madison Avenue on the east and Broadway on the west

(the "Zone").  *Id.* at 715-16.  Skyline did not, however, breach the same provision by considering

an employee's selling ability in fixing his or her salary.  *Id.* at 716-17.  Finally, Skyline also

breached the gift shop provision in the Lease, and was enjoined from selling certain specific

items and similar items that did not include the words "Skyline" or "Skyride." *Id.* at 717-20.

The Protocol Trial resolved the remaining open issues in the Skyline Action, and a final

judgment was entered on September 16, 2013 (the "Skyline Judgment").  (*Order and Judgment*,

dated Sept. 11, 2013 (ECF Doc. # 108).)  The Skyline Judgment expressly recounted the

disposition of every claim and counterclaim, including those resolved or dismissed in prior

decisions or by stipulation.  The claim for attorneys' fees and legal expenses was settled for

10

$20,000 and included in the final judgment entered in the ESB Action.  (*Order and Judgment*, dated Oct. 17, 2013 ("ESB Judgment") (ECF/Adv. P. No. 09-01107 Doc. # 65).)

**B.     The Appeals**

Skyline filed a timely Notice of Appeal from the Skyline Judgment.  (*Notice of Appeal*, dated Sept. 16, 2013 (ECF Doc. # 109).)  According to Skyline's statements of issues on appeal, and aside from the jurisdictional and *Stern* issues, Skyline challenged the findings and conclusions relating to (1) the injunction against paying commission-based employees and representatives selling tickets within the Zone and (2) the judgment on partial findings in connection with the electricity claim.  (*Appellant New York Skyline's Designation of Record and Statement of Issues on Appeal*, dated Sept. 27, 2013, at 8-9 (ECF Doc. # 115).)  ESB did not file a cross-appeal, and neither party appealed from the ESB Judgment.

**1.     The Remand Decision**

The District Court rendered the *Remand Decision* on June 16, 2014.  After recounting the lengthy history of the Skyline and ESB Actions and discussing bankruptcy jurisdiction, *Stern* and other sources of jurisdiction (discussed below), the District Court reversed this Court's conclusion that Skyline had consented to this Court's authority to enter a final judgment on non-core claims, and vacated the Skyline Judgment.  *Remand Decision*, 512 B.R. at 178.  The District Court concluded that it could not necessarily treat the Court's decisions in the Electricity and Protocol Trials as proposed findings of fact and conclusions of law.  It posited that the claims decided in connection with the Skyline Action, particularly the claims identified in Skyline's statement of issues on appeal, were no longer "related to" the bankruptcy case for purposes of 28 U.S.C. § 157(c) when they were decided.  *Remand Decision*, 512 B.R. at 178.  If the claims were not "related to" the bankruptcy case, the District Court asked whether the Court nonetheless

retained jurisdiction under other principles such as inherent authority or supplemental jurisdiction to issue proposed findings of fact and conclusions of law, or alternatively, whether the issuance of proposed findings and conclusions absent "related to" jurisdiction exceeded the scope of the reference under 28 U.S.C. § 157(a). *Id.* at 178-79.

Accordingly, the District Court remanded the Skyline Action for two purposes. First, "to consider the basis for issuing proposed findings of fact and conclusions of law pursuant to section 157(c)(1) or other authority." *Id.* at 179. Second, to "determine which claims were core *when decided* and, if necessary, enter a separate judgment with respect to only those claims." *Id.* (emphasis added). After receiving the Court's determination of the remanded issues, the District Court would then decide whether to request proposed findings of fact and conclusions of law or withdraw the reference for further proceedings.[6] Following the *Remand Decision*, the Court received supplemental briefing from the parties on the questions posed by the District Court.

### 2.    The Decision of the Court of Appeals

ESB appealed to the Second Circuit. In a decision dated April 21, 2015, the Court of Appeals agreed with the District Court that Skyline had not consented to the entry of a final judgment, *Empire State Bldg. Co. L.L.C v. New York Skyline, Inc.* (*In re New York Skyline, Inc.*), 601 F. App'x 52, 55 (2d Cir. 2015), and affirmed its order vacating the Skyline Judgment. *Id.* at 56. It further concluded that it lacked appellate jurisdiction over the order remanding the case, but noted that ESB's arguments raised "serious concerns" about the proper construction of *Stern*, including "whether it [*Stern*] (1) held 28 U.S.C. § 157(b)(2)(C) was unconstitutional on its face or as applied in that case; (2) limits bankruptcy courts' ability to treat core claims implicating

---

[6]       The District Court subsequently denied ESB's motion for a stay pending appeal. *New York Skyline, Inc. v. Empire State Bldg. Co. L.L.C.* (*In re New York Skyline, Inc.*), 520 B.R. 1 (S.D.N.Y. 2014) ("*Stay Decision*").

Article III powers as non-core claims, *see Executive Benefits Ins. Agency v. Arkison,* —— U.S. —

—, 134 S.Ct. 2165, 2172–73, 189 L.Ed.2d 83 (2014); and (3) affected bankruptcy courts' power

over non-core claims." *Id.* It did not foreclose the District Court from giving further

consideration to its decision to remand. *Id.*

The Second Circuit's mandate issued on May 12, 2015 and was filed with this Court on

June 1, 2015. Neither party asked the District Court to give further consideration to its decision

to remand.

## DISCUSSION

### A.    Introduction

The bankruptcy court's subject matter jurisdiction originates with 28 U.S.C. § 1334.

Section 1334(a) grants the district court original jurisdiction over all bankruptcy cases, and §

1334(b) grants the district court original but non-exclusive jurisdiction over all civil proceedings

arising under title 11 or arising in or related to cases under title 11. Civil proceedings arising

under title 11 or arising in a case under title 11 invoke substantive rights under title 11 or rights

that could only arise in the context of a bankruptcy case. *Binder v. Price Waterhouse & Co.,*

*LLP* (*In re Resorts Int'l, Inc.*), 372 F.3d 154, 162–63 (3d Cir.2004). "Related proceedings are

those whose outcome might have a "conceivable effect" on the estate. *Publicker Indus., Inc. v.*

*United States* (*In re Cuyahoga Equip. Corp.*), 980 F.2d 110, 114 (2d Cir.1992); *Pacor, Inc. v.*

*Higgins* (*In re Pacor, Inc.*), 743 F.2d 984, 994 (3d Cir.1984); *overruled in part on other grounds*

*by Things Remembered, Inc. v. Petrarca,* 516 U.S. 124, 124–25 (1995). "An action is related to

bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action

(either positively or negatively) and which in any way impacts upon the handling and

administration of the bankrupt estate." *Pacor*, 743 F.2d at 994; *accord Celotex Corp. v. Edwards*, 514 U.S. 300, 308 n. 6 (1995).

The district court may refer all cases and proceedings within its bankruptcy jurisdiction to the bankruptcy court. 28 U.S.C. § 157(a). The United States District Court for the Southern District of New York first referred its bankruptcy jurisdiction to this Court pursuant to its *Order,* No. M10–450, (S.D.N.Y. July 10, 1984), and following the Supreme Court's decision in *Stern*, issued an amended order of reference. *See Amended Standing Order of Reference,* No. M10– 468, 12 Misc. 00032 (S.D.N.Y. Jan. 31, 2012). Consequently, the bankruptcy jurisdiction of the district court and the bankruptcy court after referral are the same even if the power to enter a final judgment is not.

Title 28 divides bankruptcy proceedings into core proceedings and non-core proceedings. Core proceedings correspond to proceedings that arise in the bankruptcy case or arise under title 11. *Stern*, 131 S. Ct. at 2605. Non-core proceedings are synonymous with "related to" proceedings. *Id.* (quoting COLLIER ON BANKRUPTCY ¶ 3.02[2], p. 3–26, n. 5 (16th ed. 2010)); *Remand Decision*, 512 B.R. at 173. Prior to *Stern*, the bankruptcy court could "hear and determine" all core proceedings, 28 U.S.C. § 157(b)(1), *i.e.*, enter final judgments. The bankruptcy court's authority was more limited in the case of non-core proceedings. Absent the parties' consent to enter a final judgment, the bankruptcy court could only issue proposed findings of fact and conclusions of law that were then subject to *de novo* review. 28 U.S.C. 157(c)(1).[7]

---

[7]    Title 28, § 157(c)(1) states:

A bankruptcy judge may hear a proceeding that is not a core proceeding but that is otherwise related to a case under title 11. In such proceeding, the bankruptcy judge shall submit proposed

In *Stern*, the Supreme Court identified a third category of claims: claims that were statutorily core but as to which the bankruptcy court, a non-Article III court, lacked the Constitutional authority to enter a final judgment. The adjudication of these so-called *Stern* claims left an apparent statutory gap that divided the courts. The bankruptcy court could not hear and determine a *Stern* claim, but since it could only enter proposed findings and conclusions on non-core claims, it could not render proposed findings and conclusions on *Stern* claims because they were statutorily core. *Compare Ortiz v. Aurora Health Care, Inc.* (*In re Ortiz*), 665 F.3d 906, 915 (7th Cir. 2011) (28 U.S.C. § 157(c)(1) does not apply to *Stern* claims) *with Exec. Benefits Ins. Agency v. Arkison* (*In re Bellingham Ins. Agency, Inc.*), 702 F.3d 553, 565-66 (9th Cir. 2012) (bankruptcy court can render proposed findings and conclusions on *Stern* claims), *aff'd*, 134 S. Ct. 2165 (2014).

The Supreme Court closed the gap in *Exec. Benefits Ins. Agency v. Arkison*, 134 S. Ct. 2165 (2014). Affirming the Ninth Circuit, the Supreme Court ruled that *Stern* claims could proceed as non-core claims within the meaning of 28 U.S.C. § 157(c). *Arkison*, 131 S. Ct. at 2173. The Supreme Court relied on the plain text of the severability provision in the Bankruptcy Amendments and Federal Judgeship Act of 1984 which provided that if any provision of the 1984 Act was invalid or its application was held to be invalid, the remainder of the provisions were not affected. *See id.* Citing the principle that gives effect to the valid portions of a partially invalidated statute, and absent evidence that Congress would have preferred no statute at all, the

---

findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected.

Supreme Court concluded that *Stern* claims could be adjudicated as non-core claims under 28

U.S.C. § 157(c)(1). *Id.*

## B.     The Nature of the Claims

Before addressing the question of authority posed by the *Remand Decision*, I first deal

with the appropriate classification of the claims when they were decided.  The District Court has

already determined that the claims tried in the Electricity and Protocol Trials were non-core or

"related to" the bankruptcy case at least at the time that they were removed to this Court.  *See*

*Stay Decision*, 520 B.R. at 5-6 & n. 16.  Furthermore, the three causes of action dismissed in the

*Authority Decision* were also non-core claims at the time they were removed.  They arose under

state contract and tort law, Skyline was a party, and the outcome could conceivably affect its

rights.

On the other hand, the Rescission Claim, decided pre-confirmation, was core.  It called

upon the Court to determine the scope of the property rights of the estate, to wit, whether the

May 2005 Agreement was part of the Lease and License.  The assumption motion crystallized

these issues, raising questions regarding the identity and scope of the agreement that was being

assumed and the amount of the default that Skyline had to promptly cure.  *See Authority*

*Decision*, 471 B.R. at 77-78.  Skyline contended that the May 2005 Agreement was a separate

agreement that was not being assumed, and accordingly, the unpaid security and access fees did

not have to be promptly cured.  *See* 11 U.S.C. § 365(b)(1)(A) (prohibiting a trustee from

assuming a lease or executory contract in default unless the trustee "cures, or provides adequate

assurance that the trustee will promptly cure, such default. . . .").  ESB maintained that the May

2005 Agreement was part of the Lease and License, and therefore, had to be assumed if the

16

Lease and License were assumed.  Furthermore, Skyline would have to "cure" the unpaid access and security fees (as well as other amounts) as a condition to assumption.

The Court could not finally decide the rescission question in the context of a motion to assume the Lease and the License.  *See Orion Pictures Corp. v. Showtime Networks, Inc.* (*In re Orion Pictures Corp.*), 4 F.3d 1095, 1098 (2d Cir. 1993)(holding that the Bankruptcy Court erred in deciding a disputed contract issue in the context of a motion to assume an executory contract). The procedure the Court adopted was designed to try the Rescission Claim and assumption motion simultaneously on an expedited basis.  Although Skyline pressed the assumption motion before the Court decided the Rescission Claim, the assumption motion did not finally resolve the core questions of what Skyline was actually assuming and the amount of the cure.  In fact, the *Assumption Order* required Skyline to escrow $768,170.76 in disputed cure amounts pending further order of the Court.  The attached schedule indicated that $569,567.27 of the escrowed funds covered "[d]isputed security charges, access fees, electrical charges, late fees, and attorneys' fees."

It was not until the *Rescission Decision* that these questions were answered.  The Court concluded that the May 2005 Agreement was not a separate or divisible agreement, and Skyline assumed the May 2005 Agreement when it assumed the Lease and License.  As a result, Skyline could not rescind the May 2005 Agreement.  It was only then that the scope of the assumed agreements was determined, and as Skyline concedes, the disputed cure amounts (other than ESB's attorneys' fees and expenses) were fixed and paid.  (*See New York Skyline, Inc.'s Memorandum of Law Regarding Issues on Remand*, dated Aug. 29, 2014, at 9 ("*Skyline Memo*") ("As a result of the lease assumption and the Court's decision on the rescission motion, Skyline cured all monetary defaults and was current with its lease obligations.") (ECF Doc. # 154).)

17

Skyline contends that because the *Rescission Decision* issued post-assumption, it had no effect on Skyline's determination to assume the Lease and License, and therefore, the Rescission Claim was not a core claim. (*Skyline Memo* at 20 n. 26.)  The argument confuses motivation with jurisdiction.  The *Assumption Order* did not determine whether it covered the May 2005 Agreement or what Skyline had to pay as a cure; the *Rescission Decision* did.  That decision may not have affected Skyline's own decision making process to assume the Lease and License but it was critical to determining the scope of assumed agreements and obligations imposed by the *Assumption Order.*

The other core claim related to the remaining disputed cure amounts, and the only one that lingered into the post-confirmation period concerned ESB's attorneys' fees and expenses.  I mention it for the sake of completeness but do not believe it is germane to the remand.  Both the Lease and the License provided for the recovery of attorneys' fees and expenses in certain circumstances.  *See Authority Decision*, 471 B.R. at 81.  Hence, Skyline had to cure the unpaid amounts as part of the assumption motion, and the disputed amount was escrowed pursuant to the *Assumption Order*.  ESB did not assert a separate claim for legal fees and expenses in the Skyline Action, and the Court subsequently ruled that ESB was not entitled to recover attorneys' fees incurred in its defense of Skyline's claims or the prosecution of ESB's counterclaims in the Skyline Action.  The award of attorneys' fees upon which the parties agreed appeared in the ESB Judgment from which no appeal was ever taken.  Consequently, it is not relevant to the issues raised by the remand order.

Accordingly, and with the exception of the Rescission Claim which was core, the Court had "related to" jurisdiction over the claims and counterclaims asserted in the Skyline Action when that action was removed because Skyline was a party and the resolution of those claims

18

would have a "conceivable effect" on Skyline's estate. *Authority Decision*, 471 B.R. at 78.

Whether the Court still had "related to" jurisdiction when these claims were decided is addressed

immediately below.

**C.      The Court's Authority to Issue Proposed Findings of Fact and Conclusions of Law**

The Court's authority to issue proposed findings of fact and conclusions of law involves

three questions.  First, did the Court lose its bankruptcy, "related to" jurisdiction over the claims

in the Skyline Action following confirmation of the *Plan* or the entry of the *Final Decree*?

Second, if the claims were no longer "related to" the bankruptcy case and the Court lost its

bankruptcy jurisdiction, did it nevertheless retain jurisdiction over the remaining claims under

another jurisdictional principle such as inherent authority or supplemental jurisdiction?  Third, if

the Court lacked non-core jurisdiction and could only exercise jurisdiction under an alternative

jurisdictional theory, could it enter proposed findings of fact and conclusions of law under 28

U.S.C. § 157(c)(1) or other authority?

**1.      Did the Court Retain Its Bankruptcy Jurisdiction?**

It is well-settled that a court's subject matter jurisdiction is determined based on the state

of facts at the time an action is commenced, or in this case removed to the federal court, and

"does not require federal district courts constantly to revisit jurisdictional findings to determine

whether the effect of the litigation on the bankruptcy estate remains 'conceivable.'"  *In re*

*WorldCom, Inc. Sec. Litig.,* 294 B.R. 553, 556 (S.D.N.Y.2003), *aff'd sub nom. Cal. Pub.*

*Employees' Ret. Sys. v. WorldCom, Inc.,* 368 F.3d 86 (2d Cir.2004), *cert. denied*, 543 U.S. 1080

(2005); *accord Fried v. Lehman Bros. Real Estate Assocs. III, L.P.*, 496 B.R. 706, 710 (S.D.N.Y.

2013).  The Court considered this issue in the *Authority Decision* where it stated:

A court's subject matter jurisdiction is determined at the time that the action is commenced, and subsequent events do not affect it. *Freeport—McMoRan, Inc. v. K N Energy, Inc.,* 428 U.S. 426, 428, 111 S.Ct. 858, 112 L.Ed.2d 951 (1991) ("We have consistently held that if jurisdiction exists at the time an action is commenced, such jurisdiction may not be divested by subsequent events."); *Certain Underwriters at Lloyds, London v. ABB Lummus Global, Inc.,* 337 B.R. 22, 25 (S.D.N.Y.2005) (same). Subject matter jurisdiction over a removed claim is also determined by the facts existing at the time of removal. *In re WorldCom, Inc. Secs. Litig.,* 294 B.R. 553, 556 (S.D.N.Y.2003). Even the dismissal of the underlying bankruptcy case does not automatically deprive the bankruptcy court of jurisdiction to determine pending matters. *Porges v. Gruntal Co. (In re Porges),* 44 F.3d 159, 162 (2d Cir. 1995) ("[N]othing in the Bankruptcy Code requires a bankruptcy court to dismiss related proceedings automatically following the termination of the underlying case.").

*Authority Decision,* 471 B.R. at 78; *accord Grupo Dataflux v. Atlas Global Grp., L.P.,* 541 U.S. 567, 582 (2004) ("We decline to endorse a new exception to a time-of-filing rule that has a pedigree of almost two centuries. Uncertainty regarding the question of jurisdiction is particularly undesirable, and collateral litigation on the point particularly wasteful."); *Dole Food Co. v. Patrickson,* 538 U.S. 468, 478 (2003) ("[J]urisdiction of the Court depends upon the state of things at the time of the action brought." (quoting *Keene Corp. v. United States,* 508 U.S. 200, 207 (1993))).[8]

---

[8]    There are limited exceptions. Diversity jurisdiction can be destroyed by the joinder of a non-diverse party, *Merrill Lynch & Co. v. Alleghany Energy, Inc.,* 500 F.3d 171, 179 (2d Cir. 2007) ("[I]t is clear that a diversity-destroying party joined after the action is underway may catalyze loss of jurisdiction.") (citation omitted), and saved by the dismissal of a non-diverse, dispensable party. *Newman–Green, Inc. v. Alfonzo–Larrain,* 490 U.S. 826, 832 (1989) ("[I]t is well settled that Rule 21 invests district courts with authority to allow a dispensable nondiverse party to be dropped at any time, even after judgment has been rendered.") (footnote omitted). In addition, "[a]lthough the existence of federal subject matter jurisdiction over an action removed from state court to federal court is normally to be determined as of the time of removal, . . . if a case was erroneously removed to federal court and a judgment was subsequently entered on the merits, the jurisdictional flaw that existed at the time of removal 'is not fatal to the ensuing adjudication if federal jurisdictional requirements are met at the time judgment is entered.'" *Hallingby v. Hallingby,* 574 F.3d 51, 56 (2d Cir. 2009)(quoting *Caterpiller Inc. v. Lewis,* 519 U.S. 61, 64 (1996)); *accord Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.,* 373 F.3d 296, 301 (2d Cir.2004) ("Mindful that a district court's erroneous failure to remand does not, by itself, necessitate reversal, we view the critical issue to be whether the district court had subject matter jurisdiction at any time before it rendered judgment."), *cert. denied,* 544 U.S. 949 (2005).

The Court is not attempting here to catalog every exception to the time-of-filing rule. However, it has found no exception in the case of "related to" jurisdiction, and as the discussion in the later text explains, the Third Circuit Court of Appeals has ruled that the time-of-filing rule applies to "related to" jurisdiction.

Relying on the time-of-filing/removal rule, the Court concluded in the *Authority Decision* that "[n]either the confirmation of Skyline's plan nor anything else that subsequently occurred deprived this Court of its subject matter jurisdiction over those claims and counterclaims. Skyline's reliance on cases that concerned the commencement of post-confirmation litigation is misplaced." *Authority Decision*, 471 B.R. at 79.  The District Court questioned the conclusion. *See Remand Decision*, 512 B.R. at 178 ("The nature of the claims that went to trial, the confirmation of the Plan, and the issuance of the Final Decree, strongly suggest that the claims were no longer related to Skyline's bankruptcy case.") (footnote omitted).  It did not, however, foreclose the issue and it is germane to the Court's authority under 28 U.S.C. § 157(c)(1).

Skyline suggests that even if the Court's "related to" jurisdiction is determined at the time of filing or removal, the bankruptcy court must nevertheless determine the core/non-core status under 28 U.S.C. 157(b)(3) based on the facts that exist at the time of that determination.  (*Skyline Memo* at 12-16.)[9]  There is no basis in the law for this argument and it would lead to absurd results.  Section 157 could conceivably require the core/non-core determination at three different times: when the proceeding is referred (§ 157(a)), at the time the bankruptcy court determines the core/non-core status, (§ 157(b)(3)), and when the merits are decided (§ 157(c)(1)).  Under Skyline's formulation, a proceeding could theoretically be core when filed, non-core when its status was determined and not even "related to" the case when it was decided.  Presumably, the order could be reversed (non-core or no jurisdiction at all when filed and when determined under

---

[9]    Section 157(b)(3) states:

The bankruptcy judge shall determine, on the judge's own motion or on timely motion of a party, whether a proceeding is a core proceeding under this subsection or is a proceeding that is otherwise related to a case under title 11. A determination that a proceeding is not a core proceeding shall not be made solely on the basis that its resolution may be affected by State law.

§ 157(b)(3) but core when decided). Since Skyline's argument raises three possibilities

(core/non-core/neither core nor non-core) considered at three different times, there are eighty-

one possible combinations.

The suggestion that a bankruptcy court must continually reexamine its non-core

jurisdiction is contrary to the law of this District. *See WorldCom*, 294 B.R. at 556. There is only

one set of facts that counts – those that exist at the time of filing or removal. As ESB succinctly

observed, "Skyline confuses the issues of *when* a determination must be made pursuant to

Section 157 and *what facts the Court examines* when it makes such determination." (*ESB's

Reply Brief on Remand*, dated Sept. 12, 2014, at 5 (emphasis in original) (ECF Doc. # 155).)

Skyline cites *LFD Operating, Inc. v. Gen. Elec. Capital Corp.* (*In re Ames Dep't Stores,

Inc.*), No. 06 cv 5394 (BSJ), 2008 WL 7542200, at *7 n. 9 (S.D.N.Y. June 4, 2008) ("*Ames II*"),

*aff'd*, 319 F. App'x 40 (2d Cir. 2009) ("*Ames III*") in support of its contention that "related to"

jurisdiction must be determined at the time the matter is decided. (*Skyline Memo* at 13.)[10]

While *Ames* considered post-removal facts in addressing jurisdictional issues, it is

distinguishable. In *Ames*, the debtor licensed LFD to sell LFD's shoes in the debtor's stores.

Under the parties' agreement, the debtor was supposed to take its licensing fee from the proceeds

of the shoe sales, and pay the balance to LFD. The debtor did not, however, maintain a separate

bank account and commingled the shoe proceeds with its other funds. *Ames II*, 2008 WL

7542200, at *1. The debtor's secured lender, GECC, regularly swept the debtor's account,

including the portion corresponding to the LFD sale proceeds. *Id.* at *1-2. Finally, under the

---

[10]     Skyline also cited and discussed *Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171 (2d Cir.
2007). (*See Skyline Memo* at 27-28.) The case, which was cited in an earlier footnote, addressed an exception based
on the "contamination theory" to the time-of-filing rule in diversity cases that does not apply to "related to"
jurisdiction.

loan agreements and the Bankruptcy Court's cash collateral order, the debtor was obligated to indemnify GECC.

LFD commenced an adversary proceeding against the debtor in bankruptcy court and an action against GECC in state court which GECC removed to the Bankruptcy Court. The main issue in both proceedings was whether the shoe proceeds were property of the estate or property belonging to LFD. LFD moved for remand and mandatory abstention contending that the removed proceeding was non-core. The Bankruptcy Court denied the motion concluding, *inter alia*, that the proceeding was core and mandatory abstention did not apply. *LFD Operating, Inc. v. Gen. Elec. Capital Corp.* (*In re Ames Dep't Stores, Inc.*), Adv. P. No. 01-8153 (AJG), 2006 WL 1288586, at *11 (Bankr. S.D.N.Y. Apr. 19, 2006) ("*Ames I*"). According to the Bankruptcy Court, the removed claim involved a determination of property of the estate, affected the debtor's indemnification obligation under various loan documents and Bankruptcy Court orders and implicated the automatic stay. *Id.* "In addition, the Court notes that although the indemnification issue at the time of the filing of the Abstention Motion did not have as significant an impact on the administration of the estate as it does today, the availability of the finds [*sic*] set aside for the LFD–GE Capital Action, if released today, would nearly double the amount of cash that would be immediately available to satisfy administrative claims." *Id.*

LFD appealed. Seizing on the language just quoted, LFD contended that it was inappropriate for the Bankruptcy Court to have considered the post-commencement state of facts because 28 U.S.C. § 157 required the Bankruptcy Court to make the core/non-core determination as of the time the proceeding was removed. *Ames II*, 2008 WL 7542200, at *7 n. 9. In response, the District Court observed: "section 157 does not address the time at which the Court must assess whether the proceeding is core or non-core. LFD fails to provide the Court with any

23

further authority in support of this assertion." *Id*. The District Court cannot be read as rejecting the time-of-filing/removal rule; its statement was based on inadequate briefing by the party invoking the rule.

Furthermore, the strength of the inference that Skyline tries to draw from *Ames II* is weakened by the decision on appeal to the Second Circuit. The Court of Appeals agreed that the removed proceeding was core because it would directly affect a core bankruptcy function. The same sale proceeds were at issue in the removed action and the adversary proceeding brought by LFD against the debtor, the issue was already before the Bankruptcy Court as part of the claims allowance process, directly implicated the debtor's obligations and directly affected the core bankruptcy function of distributing and administering the property of the estate. *Ames III*, 319 F. App'x at 41-42. The Second Circuit did not mention the changing circumstances or their relevance to the Bankruptcy Court's jurisdiction.

## 1.   The Effect of Confirmation

Although 28 U.S.C. § 1334 does not expressly limit the bankruptcy court's post-confirmation jurisdiction, it is settled law that the bankruptcy court's jurisdiction "shrinks" once a chapter 11 plan is confirmed. *Penthouse Media Grp. v. Guccione* (*In re Gen. Media, Inc.*), 335 B.R. 66, 73 (Bankr. S.D.N.Y. 2005). A party invoking the bankruptcy court's post-confirmation jurisdiction must meet two requirements. First, the plan must provide for the retention of jurisdiction over the dispute. *Hosp. and Univ. Prop. Damage Claimants v. Johns-Manville Corp.* (*In re Johns-Manville Corp.*), 7 F.3d 32, 34 (2d Cir. 1993). Second, the matter must have a "close nexus to the bankruptcy plan or proceeding, as when a matter affects the interpretation, implementation, consummation, execution, or administration of the confirmed plan or

incorporated litigation trust agreement." *Resorts Int'l*, 372 F.3d at 168-69; *accord Remand Decision*, 512 B.R. at 175; *Gen. Media*, 335 B.R. at 73.

These limitations only apply, however, to proceedings commenced post-confirmation; they do not affect proceedings, even "related to" proceedings, filed prior to confirmation. *Nuveen Mun. Trust v. Withumsmith Brown, P.C.*, 692 F.3d 283 (3d Cir. 2012), *denying certified question*, 213 N.J. 527 (N.J. 2013), is directly on point. There, the debtor's secured lender commenced a post-petition, pre-confirmation lawsuit in the District Court against the debtor's accountant and lawyer alleging common law claims sounding in fraud, aiding and abetting fraud and negligent misrepresentation. *Id.* at 289. The debtor subsequently confirmed a liquidating plan. *Id.* at 289 n. 1. After the District Court initially dismissed the action with prejudice on other grounds, the Court of Appeals remanded the case to allow the District Court to determine the basis of its jurisdiction to dismiss the action on the merits. *See id.* at 287. On remand, the District Court concluded that it had "related to" jurisdiction because the action would have a conceivable effect on the distributions in the case, and re-entered its order dismissing the action with prejudice. *Id.* at 287-88, 292.

Writing for the Third Circuit, Judge Ambro affirmed the jurisdictional ruling. At the outset, he reiterated the well-settled rule that subject matter jurisdiction is determined at the time of filing, *id.* at 294 (citing *Grupo Dataflux,* 541 U.S. at 570–71 ("It has long been the case that 'the jurisdiction of the Court depends upon the state of things at the time of the action brought.'" (quoting *Mollan v. Torrance,* 22 U.S. (9 Wheat.) 537, 539, 6 L. Ed. 154 (1824)))), and noted its long pedigree and continuing vitality. *Id.* (citing *Grupo Dataflux,* 541 U.S. at 582). The time-of-filing rule is of such strength and longevity that "confirmation of a bankruptcy plan does not divest a district court of related-to jurisdiction over pre-confirmation claims." *Id.*; *accord Newby*

*v. Enron Corp. (In re Enron Corp. Sec.),* 535 F.3d 325, 336 (5th Cir.2008) ("Fleming cannot point to a single case in which we have held that plan confirmation divests a District Court of bankruptcy jurisdiction over pre-confirmation claims based on pre-confirmation activities that properly had been removed pursuant to "related to" jurisdiction. We likewise find none."); *ConocoPhillips Co. v. SemGroup, L.P.* (*In re SemCrude, L.P.*), 428 B.R. 82, 98 (Bankr.D.Del.2010) (same). Thus, the jurisdictional question of "conceivability" under *Celotex* and *Pacor* must be determined "at the time a lawsuit is filed." *Nuveen*, 692 F.3d at 294.[11]

Judge Ambro distinguished this principle from the rule that governed jurisdiction over litigation commenced post-confirmation:

> There is one twist to the otherwise straightforward application of *Pacor*'s conceivability standard. If an action is brought after the confirmation of a plan in a related bankruptcy proceeding, the post-confirmation context of the dispute alters the "related to" inquiry. Because a bankruptcy court's jurisdiction wanes after the confirmation of a case, "retention of bankruptcy jurisdiction may be problematic.... At the most literal level, it is impossible for the bankrupt debtor's estate to be affected by a post-confirmation dispute because the debtor's estate ceases to exist once confirmation has occurred."

*Id.* (quoting *Resorts Int'l*, 372 F.3d at 164–65); *accord SemCrude*, 428 B.R. at 97-98. Skyline elides the jurisdictional distinction that Judge Ambro drew between pre-confirmation and post-confirmation litigation, and relies on two cases – *In re Kassover*, 448 B.R. 625 (S.D.N.Y. 2011) and *In re Gen. Media, Inc.*, 335 B.R. 66 (Bankr. S.D.N.Y. 2005) – that addressed the question of jurisdiction commenced post-confirmation. (*Skyline Memo* at 25-26.) For the reasons stated by Judge Ambro, they are not apposite.

---

[11]   Skyline argues that *Nuveen* is distinguishable because it concerned the district court's original bankruptcy jurisdiction. (*Skyline Memo* at 15 n. 21.) The district court's original bankruptcy jurisdiction and the bankruptcy court's referred jurisdiction both emanate from 28 U.S.C. § 1334. Unless the referral of bankruptcy jurisdiction is limited, the jurisdiction of the district court and the bankruptcy court are the same. In this district, the District Court has referred its entire bankruptcy jurisdiction to the Bankruptcy Court.

I recognize that the time-of-filing rule may seem counter-intuitive when discussing "related to" jurisdiction. Unless the bankruptcy court orders otherwise, the confirmation of the plan vests the property of the estate in the debtor. 11 U.S.C. § 1141(b).[12] When this occurs, the estate ceases to exist, and the outcome cannot have a "conceivable effect" on a non-existent estate. *See Gen. Media*, 335 B.R. at 75 ("Once confirmation occurs, there is no longer . . . an estate that can benefit."). In this literal sense, the outcome of the pre-confirmation proceeding can no longer affect the bankruptcy estate. *Nuveen Mun. Trust*, 692 F.3d at 294. Nevertheless, the subsequent event of plan confirmation does not create an exception to the longstanding time-of-filing rule for determining the subject matter jurisdiction or divest the court of "related to" jurisdiction over pre-confirmation claims. *Id.*; *Beitel v. OCA, Inc.* (*In re OCA, Inc.*), 551 F.3d 359, 367 n. 10 (5th Cir. 2008); *Enron*, 535 F.3d at 336.

Accordingly, the Court concludes that the confirmation of Skyline's *Plan* did not affect the Court's "related to" jurisdiction over the remaining claims in the Skyline Action, and the Court continued to enjoy the power to issue proposed findings of fact and conclusions of law pursuant to 28 U.S.C. § 157(c)(1).

### 2.    The Effect of the Final Decree

Having concluded that the confirmation of the *Plan* did not affect the Court's non-core jurisdiction, I must consider whether the entry of the *Final Decree* did.[13] As noted, the *Final*

---

[12]    Skyline's *Plan*, § 1.01 tracked the statute, and provided in pertinent part: "[o]n the Effective Date, the assets of the Estate shall vest in the Debtor free and clear of all Liens, Claims and encumbrances, except as set forth in the Plan."

[13]    The *Final Decree* closed the case, but the Clerk failed to note on the docket that the case was closed. This was an administrative oversight, and I deem the bankruptcy case to have been closed when the *Final Decree* was entered.

*Decree* provided that the "Bankruptcy Court shall retain jurisdiction over the pending adversary proceedings in this Chapter 11 case."

We begin with the related though different question of post-dismissal jurisdiction decided by the Second Circuit in *Porges v. Gruntal & Co., Inc.* (*In re Porges*), 44 F.3d 159 (2d Cir. 1995). There, the debtor was a stockbroker formerly employed by Gruntal & Co., Inc. ("Gruntal") and Dean Witter Reynolds, Inc. ("Dean Witter"). A former client (Breen) commenced an arbitration proceeding against the debtor, Gruntal and Dean Witter based on the debtor's churning, and Gruntal commenced a separate arbitration against the debtor to recover on two promissory notes executed by the debtor. The debtor filed a chapter 13 case staying the arbitrations against him. Breen proceeded against Dean Witter and Gruntal, settled with Dean Witter and recovered an award of $205,345 against Gruntal. *Id.* at 161.

Gruntal paid Breen, and filed proofs of claim for (1) contribution and indemnity and (2) the amount owed on the two promissory notes. The debtor objected to Gruntal's proofs of claim and commenced an adversary proceeding in the bankruptcy court alleging that Gruntal was not entitled to contribution or indemnity based on its own misconduct and was not entitled to recover on the promissory notes because it had wrongfully terminated his employment. The debtor also filed a counterclaim against Gruntal alleging breach of his employment agreement. *Id.*

The bankruptcy court tried the adversary proceeding, orally ruled in Gruntal's favor and directed Gruntal's attorney to submit proposed findings of fact and conclusions of law. One day before the submissions were due, the debtor moved to dismiss his chapter 13 case.[14] The

---

[14] With certain exceptions that did not apply, Porges, a chapter 13 debtor, had the absolute right to dismiss his case. 11 U.S.C. § 1307(b).

28

bankruptcy court signed the dismissal order but specifically retained jurisdiction under 11 U.S.C. § 349 to enter findings of fact and conclusions of law on the issues previously adjudicated, *id.* at 162, and subsequently entered a money judgment in Gruntal's favor over the debtor's objection. *Id.* at 161-62.

The threshold question before the Second Circuit was whether the bankruptcy court had jurisdiction to enter the judgment following the dismissal of the bankruptcy case. *Id.* at 162. The Court first adopted "the general rule that related proceedings ordinarily should be dismissed following the termination of the underlying bankruptcy case." *Id.* Notwithstanding the general rule,

> [T]he dismissal of an underlying bankruptcy case does not automatically strip a federal court of jurisdiction over an adversary proceeding which was related to the bankruptcy case *at the time of its commencement*. The decision whether to retain jurisdiction should be left to the sound discretion of the bankruptcy court or the district court, depending on where the adversary proceeding is pending.

*Id.* (emphasis added).

The Court "analogized" the bankruptcy court's exercise of post-dismissal jurisdiction to the district court's exercise of pendant jurisdiction over state claims after dismissing the federal claims. *Id.* at 162; *accord Jamaica Shipping Co. v. Orient Shipping Rotterdam, B.V.* (*In re Millenium Seacarriers, Inc.*), 458 F.3d 92, 96 (2d Cir. 2006) (in *Porges*, "we analogized to the supplemental jurisdiction context."). In such circumstances, the district court must consider four factors in determining whether to continue to exercise jurisdiction: judicial economy, convenience of the parties, fairness and comity. *Porges*, 44 F.3d at 162-63.

The Court contrasted pendant jurisdiction with post-dismissal bankruptcy jurisdiction, observing that the exercise of post-bankruptcy jurisdiction rested on a "more solid basis." District courts have the discretion to decline to hear pendent state claims, "whereas bankruptcy courts do not possess such discretion over adversary proceedings arising under the Bankruptcy Code or arising in a case under the Code." *Id.* at 162-63 n. 2; *accord Millenium Seacarriers*, 458 F.3d at 96. The Court also identified an important jurisdictional distinction:

> Further, unlike a lawsuit in which a claim that gives rise to federal subject matter jurisdiction coexists with pendent or ancillary state claims, an adversary proceeding and the companion bankruptcy case constitute two distinct proceedings. These distinctions serve to support a bankruptcy court's exercise of jurisdiction over an adversary proceeding following dismissal of the underlying bankruptcy case.

*Porges*, 44 F.3d at 162-63 n. 2; *accord Millenium Seacarriers*, 458 F.3d at 96. The Court held that the bankruptcy court had conducted the appropriate analysis and properly concluded that it could exercise post-dismissal jurisdiction over the adversary proceeding.[15]

In *Millenium Seacarriers*, 458 F.3d at 96, the Second Circuit held that the failure to make explicit findings under the *Porges* factors was not a jurisdictional prerequisite to the retention of jurisdiction, and the failure to object in the forum court was waivable "provided that the existing record shows that the retention of jurisdiction did not amount to an abuse of discretion." Consequently, an appellate court is not required to remand to enable the lower court to make

---

[15]    The Court also concluded that the bankruptcy court had the authority to enter a money judgment against the debtor. First, Bankruptcy Code § 502 required the court to determine the validity and amount of the claim, and it was "but a short and logical step" to enter the money judgment on the basis of its determination under § 502. *Porges*, 44 F.3d at 164. Second, the bankruptcy court had authority to enter the money judgment under its inherent equitable powers. *Id.* The debtor had sought bankruptcy protection and initiated the adversary proceeding, and could not avoid an adverse judgment by subsequently repudiating the bankruptcy protection he sought. *Id.* at 165. Furthermore, "the exercise of a court's equitable powers to enter judgment is particularly appropriate where the court's decision would have preclusive effect in any subsequent proceedings." *Id.*

specific findings when the appellate court is satisfied "that the forum court did not improperly exercise subject matter jurisdiction by abusing its discretion in retaining jurisdiction." *Id.*

*Porges* did not alter the rule that subject matter jurisdiction is determined based on the state of the facts at the time the proceeding is commenced. In fact, it confirmed it. Instead, *Porges* essentially adopted a rule of permissive abstention that requires the bankruptcy court to consider four factors when deciding whether to retain post-dismissal jurisdiction over pending proceedings. Furthermore, *Porges* did not conclude that the bankruptcy court could exercise post-dismissal jurisdiction only under principles of supplemental jurisdiction, and ESB has stated that it is not relying on supplemental jurisdiction. (*ESB's Reply Brief on Remand*, dated Sept. 12, 2014, at 20-21 (ECF Doc. # 155).)

 Most important, *Porges* addressed the retention of jurisdiction following the *dismissal* of the case. Here, the Court did not dismiss Skyline's case; it granted Skyline's motion to enter the *Final Decree* and closed the case. The distinction is important. Generally, an order dismissing a case returns the parties to the *status quo ante* as if the bankruptcy case was never filed. *See Ramirez v. NYCTL 1996-1 Trust* (*In re Ramirez*), 283 B.R. 156, 160 (Bankr. S.D.N.Y. 2002). Unless the Court orders otherwise, the dismissal of a chapter 11 case reinstates any pre-petition custodianship, avoided transfer or lien voided under Bankruptcy Code § 506(d), 11 U.S.C. § 349(b)(1), vacates any order, judgment or transfer ordered under Bankruptcy Code §§ 522(i)(1), 542, 550 or 553, 11 U.S.C. § 349(c)(2), and revests the property of the estate in the entity in which the property was vested immediately prior to the petition date. 11 U.S.C. § 349(c)(3).

A final decree, on the other hand, is an administrative order that does not affect the Court's jurisdiction over pending matters. *Sterling Vision, Inc. v. Sterling Optical Corp.* (*In re*

31

*Sterling Optical Corp.*), 302 B.R. 792, 808 (Bankr. S.D.N.Y. 2003). Federal Bankruptcy Rule

3022 states that "[a]fter an estate is fully administered in a chapter 11 reorganization case, the

court, on its own motion or on motion of a party interest, shall enter a final decree closing the

case." The rule is flexible, and the 1991 advisory committee notes provide guidelines as to when

a final decree is appropriate:

> Factors that the court should consider in determining whether the estate has been
> fully administered include (1) whether the order confirming the plan has become
> final, (2) whether deposits required by the plan have been distributed, (3) whether
> the property proposed by the plan to be transferred has been transferred, (4)
> whether the debtor or the successor of the debtor under the plan has assumed the
> business or the management of the property dealt with by the plan, (5) whether
> payments under the plan have commenced, and (6) *whether all motions, contested
> matters, and adversary proceedings have been finally resolved.*

Emphasis added.

Although the pendency of unresolved adversary proceedings weighs against the entry of a

final decree, a bankruptcy court will often enter a final decree and close the case while adversary

proceedings are still pending to save the debtor money. Under 28 U.S.C. § 1930(a)(6), a chapter

11 debtor must continue to pay the United States Trustee fees each quarter until its case is

dismissed, converted or closed. *See Schwartz v. Aquatic Dev. Grp., Inc.* (*In re Aquatic Dev.

Grp., Inc.*), 352 F.3d 671, 680 (2d Cir. 2003)(Straub J., concurring); *Walton v. Jamko, Inc.* (*In re

Jamko, Inc.*), 240 F.3d 1312, 1313 (11th Cir. 2001); *Vergos v. Gregg's Enters., Inc.*, 159 F.3d

989, 993 (6th Cir. 1998); *United States Tr. v. CF&I Fabricators of Utah, Inc.* (*In re CF&I

Fabricators of Utah, Inc.*), 150 F.3d 1233, 1237 (10th Cir. 1998).[16] The fees are based on the

amount of quarterly disbursements made by the debtor. During the fourth quarter of 2010,

---

[16]     Section 1930(a)(6) states that the quarterly fee must be paid until the case has been "converted and
dismissed." Many chapter 11 cases, including Skyline's, are never "converted or dismissed." Instead, they are
closed when the bankruptcy court's administration of the case is complete. Thus, although the statute speaks of the
obligation to pay fees until the case is "converted or dismissed," it has been interpreted by the cited authorities to
mean that the debtor's obligation to pay United States Trustee fees also terminates when the case is closed.

Skyline's last full quarter in chapter 11, it disbursed $5,634,723.00.  (*Post Confirmation Disbursement Report*, dated Jan. 19, 2010 [*sic*] (ECF/Main Case Doc # 159).)  This level of disbursements obligated Skyline to pay a United States Trustee quarterly fee in the amount of $13,000.00.  *See* 28 U.S.C. § 1930(a)(6).

Seeking to avoid continuing liability for United States Trustee fees, Skyline filed an application for a final decree while the adversary proceedings were still pending.  (*See Application for Final Decree*, filed Jan. 19, 2011 (ECF/Main Case Doc. # 160).)  Its motion attached a proposed final decree to its application that included a decretal paragraph stating "that post-closing, the Bankruptcy Court shall retain jurisdiction over the pending adversary proceedings in this Chapter 11 case."  (*Id.* (ECF Doc. # 160-2).)  The Court signed Skyline's form of order, only adding the index numbers assigned to the two adversary proceedings.  (*See Final Decree*.)  Had Skyline suggested much less argued that the entry of the *Final Decree* stripped the Court of jurisdiction over the adversary proceedings, the Court would have refused to enter it based on the sixth factor identified in the 1991 advisory committee note.  By closing the case, Skyline was relieved of the obligation going forward to pay United States Trustee fees; assuming the same level of disbursements as the fourth quarter of 2010, Skyline has saved $52,000 every year since 2011.[17]

While the Court concludes that the *Porges* factors are not applicable because the Court closed the case and did not dismiss it, the Court will nonetheless discuss the *Porges* factors to

---

[17]     According to its final *Post Confirmation Disbursement Report* (ECF/Main Case Doc. # 159), Skyline projected disbursements of $867,042, and would have had to pay an additional $4,875 for 2011.  *See* 28 U.S.C. § 1930(a)(6).

ensure a complete record for the District Court.[18]  Skyline commenced this chapter 11 case,

invoking the jurisdiction of this Court.  Although the Skyline Action was then pending in state

court, it raised issues relating to the scope of the Lease and License, and the obligations under

the May 2005 Agreement, which were core disputes directly related to the extent of the property

of the estate and Skyline's forthcoming motion to assume the Lease and License.  For this

reason, the Court denied Skyline's initial motion to remand following ESB's removal of the

Skyline Action.  By the time that the Court entered the *Final Decree* in February 2011, it had

been presiding over the Skyline Action and the ESB Action for nearly two years.

Prior to the entry of the confirmation order and the *Final Decree*, the Court had become

familiar with the operative contractual documents, including the May 2005 Agreement, and the

issues that divided the two sides.  It had conducted two evidentiary hearings; the first relating to

the assumption of the Lease and License and the second concerning the confirmation of the plan.

Both were opposed by ESB and the Court had denied the initial application to confirm.  The

Court had also rendered a thirty-four page opinion in which it dismissed the Rescission Claim

and concluded that the May 2005 Agreement had been assumed by Skyline and governed the

parties rights and obligations along with the other portions of the Lease and License.

Furthermore, although the Court had denied Skyline's motion for partial summary judgment, it

had familiarized itself with the difficult issues relating to Article 42 of the Lease and had rejected

Skyline's anti-profiteering and public policy arguments directed at ESB's computation of

electrical charges.

---

[18]    The Court did not set forth its reasons for retaining jurisdiction in the *Final Decree*, but the omission was waived by Skyline because it actually proposed the form of the final decree that the Court signed, and did not object to the lack of express findings.

34

The state court, on the other hand, had not presided over the Skyline Action since its removal, and even if the litigation came before the same judge, he would have to get up to speed on the litigation.  Furthermore, the ESB Action was never pending in state court, and the parties would have had to start all over if this Court abstained from deciding the remaining issues in the ESB Action.  Neither the interest of judicial economy nor fairness to the parties and the state court would have been served by declining to retain jurisdiction.  *See Townsquare Media, Inc. v. Brill*, 652 F.3d 767, 774 (7th Cir. 2011) (noting that a bankruptcy judge's familiarity with the agreements at issue "argued for the bankruptcy judge's deciding their merits himself rather than letting the state court decide.").  Furthermore, the parties' disputes presented straightforward contract and tort issues that did not require the interpretation of any unsettled issues of state law or require deference to the state court as a matter of comity.

The last *Porges* factor was not important one way or the other.  The state court is only one mile from this Court and is no more or less convenient than this Court to the parties, the witnesses and the proof.

Accordingly, the record supported the Court's exercise of discretion to retain jurisdiction over the adversary proceedings.

### 3.    Other Sources of Authority

Having concluded that the Court had "related to" jurisdiction at the times it decided the issues remaining after confirmation of the *Plan* and the entry of the *Final Decree*, and hence, the power to issue proposed findings of fact and conclusions of law under 28 U.S.C. § 157(c)(1), it is unnecessary to consider whether the Court had jurisdiction and authority under other principles of law.  In addition, ESB stated that it was not relying on supplemental jurisdiction.

Nevertheless, because the District Court may disagree with this Court's conclusion, I address the two other possible sources of authority to render proposed findings of fact and conclusions of law discussed by the District Court – inherent or ancillary jurisdiction and supplemental jurisdiction. *See Remand Decision*, 512 B.R. at 173-74.

There are at least two types of inherent authority that merit discussion, the narrow kind employed specifically in bankruptcy cases and the broader and more general inherent authority of a federal court. As to the former, some courts have stated that post-confirmation, post-closing or post-dismissal, a bankruptcy court has inherent authority, independent of the jurisdiction granted under 28 U.S.C. § 1334, to interpret its own orders. *E.g., Gulf Ins. Co. v. Glasbrenner*, 343 B.R. 47, 56 (S.D.N.Y. 2006) (collecting cases), *aff'd*, 273 F. App'x 90 (2d Cir. 2008); *LTV Corp. v. Back* (*In re Chateaugay Corp.*), 201 B.R. 48, 62 (Bankr. S.D.N.Y. 1996) ("Bankruptcy courts have inherent or ancillary jurisdiction to interpret and enforce their own orders wholly independent of the statutory grant of jurisdiction under 28 U.S.C. § 1334."), *aff'd*, 213 B.R. 633 (S.D.N.Y. 1997); *see Local Loan Co. v. Hunt*, 292 U.S. 234, 239 (1934) ("That a federal court of equity has jurisdiction of a bill ancillary to an original case or proceeding in the same court, whether at law or in equity, to secure or preserve the fruits and advantages of a judgment or decree rendered therein, is well settled.") (citations omitted). The instant proceedings do not implicate this type of inherent or ancillary authority because the Skyline Action did not require the Court to interpret or enforce an order entered in the bankruptcy case.

More broadly, a federal court also has "an 'inherent power,' governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Link v. Wabash R.R. Co.*, 370 U.S. 626, 630-31 (1962). Among these inherent powers is the power to decide cases within the court's

36

jurisdiction.  *See Song v. Ives Labs., Inc.*, 735 F. Supp. 550, 554 (S.D.N.Y. 1990); *cf. Porges*, 44

F.3d at 164 (discussing the bankruptcy court's "inherent equitable power" to enter a money

judgment in connection with the resolution of a claim objection).  The exercise of the inherent

power to decide a case presupposes jurisdiction; it does not empower a federal court to decide a

case in the absence of jurisdiction.

Supplemental jurisdiction supplies the missing jurisdictional link.  In *Klein v. Civale &*

*Trovato, Inc.* (*In re Lionel Corp.*), 29 F.3d 88 (2d Cir. 1994), the Second Circuit held that

bankruptcy courts may exercise supplemental jurisdiction under 28 U.S.C. § 1367.  *Lionel*, 29

F.3d at 92.  As the *Remand Decision* observed, the conclusion has been questioned by other

courts because the District Court can only refer its bankruptcy jurisdiction granted under 28

U.S.C. § 1334.  *See Remand Decision*, 512 B.R. at 174.  Nevertheless, it is the law of this

Circuit.

Reliance solely on supplemental jurisdiction, however, underscores the question

identified in the *Remand Decision*.  If the bankruptcy court is only exercising supplemental

jurisdiction, there may be no statutory basis to submit proposed findings of fact and conclusions

of law, a power that is limited to non-core and *Stern* claims under 28 U.S.C. § 157(c)(2).  *See*

*Walker v. Cadle Co.* (*In re Walker*), 51 F.3d 562, 573 (5th Cir. 1995) ("[Section] 157(c)(1)

speaks only of 'a proceeding that is not a core proceeding but that is otherwise related to a case

under title 11.'  It is silent with regard to the power of a bankruptcy court to 'hear' or 'determine'

a supplemental claim—a proceeding that is neither core nor related to the title 11 case.")

(quoting Susan Block–Lieb, *The Case Against Supplemental Jurisdiction: A Constitutional,*

*Statutory, and Policy Analysis,* 62 FORDHAM L. REV. 721, 810 (1994)).  Furthermore, the "gap"

cannot be closed through the same analysis that the Supreme Court applied in *Arkison* where it

relied on the severability clause in the Bankruptcy Amendments and Federal Judgeship Act of 1984 and concluded that the bankruptcy court could issue proposed findings of fact and conclusions of law under 28 U.S.C. § 157(c)(1). Here, the Court has not invalidated any part of the 1984 Act, and cannot rely on the severability clause.

This does not, however, end the inquiry. In *Sasson v. Sokoloff* (*In re Sasson*), 424 F.3d 864 (9th Cir. 2005), *cert. denied*, 547 U.S. 1206 (2006), the Ninth Circuit ruled that the bankruptcy court's "related to" jurisdiction included the district court's jurisdiction pursuant to 28 U.S.C. § 1367. *Id.* at 869; *see Townsquare Media*, 652 F.3d at 771 ("[O]nce a district court acquires jurisdiction over a claim, it acquires jurisdiction ('supplemental jurisdiction') over closely related claims even if they are based on state law. 28 U.S.C. § 1367(a). One might think that the bankruptcy court, being a "unit of the district court," 28 U.S.C. § 151, would have the same supplemental jurisdiction as the district court rather than that closely related claims would have to be split between the two courts, especially since Congress has given the district courts (including therefore bankruptcy courts) jurisdiction over proceedings "related to" bankruptcy. 28 U.S.C. § 1334(b)"). If supplemental jurisdiction travels with and is subsumed within the bankruptcy court's "related to" jurisdiction, the bankruptcy court can render proposed findings of fact and conclusions of law pursuant to 28 U.S.C. § 157(c)(1).

Furthermore, given the Second Circuit's determination that a bankruptcy court can exercise supplemental jurisdiction, it follows that even if 28 U.S.C. § 157(c)(1) does not apply, the bankruptcy court can nonetheless render proposed findings of fact and conclusions of law under its "inherent power" to decide a case over which it has jurisdiction. *Cf. Townsquare Media,* 652 F.3d at 771 ("But 28 U.S.C. § 157(c)(1) withholds authority from the bankruptcy judge to make the decision in a "related to" case; he can only recommend a decision to the

district court. It would be odd to think a bankruptcy judge could do more in the case of a supplemental state-law claim.").  Otherwise, a bankruptcy court would be left with subject matter jurisdiction over a proceeding that it lacked the power to decide even through a report and recommendation.

## CONCLUSION

In summary, the Court concludes that with the exception of the Rescission Claim, which was core when it was decided, the Court had non-core jurisdiction over the claims alleged in the Skyline Action at the time it was removed to this Court, did not lose that jurisdiction following confirmation of the *Plan* or the entry of the *Final Decree* and the closing of the case, and accordingly, had the authority to issue proposed findings of fact and conclusions of law pursuant to 28 U.S.C. § 157(c)(1).  Alternatively, the Court had supplemental jurisdiction, and had authority to enter proposed findings of fact and conclusions of law either under 28 U.S.C. § 157(c)(1) or its inherent power.  Finally, having determined that the Court had core jurisdiction over the Rescission Claim asserted in the Skyline's Third Claim for Relief, the Court will enter a separate judgment on that claim, and directs ESB to submit a final judgment dismissing that claim.

Although the District Court did not pose the question, this Court has one further recommendation.  The *Remand Decision* raised the possibility that it might request findings and conclusions from this Court.  *See Remand Decision*, 512 B.R. at 179.  If the District Court agrees that this Court had the authority to issue proposed findings and conclusions, it is respectfully recommended that the District Court treat the decisions rendered in connection with the Electricity and Protocol Trials (and if necessary, the *Authority Decision*) as this Court's proposed findings of fact and conclusions of law in accordance with the *Amended Standing Order of*

39

*Reference*, ("The district court may treat any order of the bankruptcy court as proposed findings of fact and conclusions of law in the event the district court concludes that the bankruptcy judge could not have entered a final order or judgment consistent with Article III of the United States Constitution."), and afford the parties the opportunity to file objections in accordance with FED. R. BANKR. P. 9033.

The clerk is directed to file a copy of this opinion with the District Court in Case No. 13 Civ. 7686 (SAS).

Dated: New York, New York
       August 26, 2015

                                        /s/ *Stuart M. Bernstein*
                                        STUART M. BERNSTEIN
                                        United States Bankruptcy Judge